Carlene McPhillip
3501 Blackhorse Pk #530-1026
Turnersville, NJ 08012
Email: kfordays@yahoo.com
*Pro Se Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| CARLENE MCPHILLIP, | **SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |
|---|---|
| Plaintiff | |
| vs. | |
| KATHLEEN M. MAGOON; NATIONSTAR MORTGAGE, LLC d/b/a MR COOPER; and ALLIED FIRST BANK, SB d/b/a SERVBANK, | Civil Action No.: |
| | 1:23-cv-02663-RMB-EAP |
| Defendants. | |

**COMES NOW** the Plaintiff, CARLENE MCPHILLIP, (hereinafter referred to as "Plaintiff"), who, via *Pro* Se submission, hereby files her Second Amended Complaint for Damages and Demand for Jury Trial against Defendants KATHLEEN M. MAGOON ("Magoon"); NATIONSTAR MORTGAGE, LLC d/b/a MR COOPER ("Mr. Cooper"); and ALLIED FIRST BANK, SB d/b/a SERVBANK ("Servbank") (hereinafter collectively referred to as "Defendants"), and in support of Plaintiff's claims avers the following:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 because the claims brought forth herein arise under the Constitution, laws or treaties of the United States.

1

2. Venue is proper in the United States District Court for the District of New Jersey under 28 U.S.C. §1391(b)(2), which states that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

3. Jurisdiction and venue are thus established.

## PARTIES TO THE ACTION

4. Plaintiff is *sui juris* before this Court.  At all times relevant to this action, Plaintiff owned and had superior claim to the property located at 1513 Patricia Court, Williamstown, New Jersey 08094 (hereinafter referred to as the "subject property").

5. Defendant Magoon is *sui juris* before this Court, and upon information and belief, is a resident of the State of New Jersey.  At all times material, Magoon represents herself as an attorney who is licensed to practice law in the State of New Jersey.

6. Magoon is the individual who prepared and had filed a foreclosure action against the subject property on or about August 25, 2022 in the Superior Court of New Jersey, Chancery Division, Gloucester County, under Case No.: F-008917-22 (the "foreclosure action").

7. Defendant Mr. Cooper is a national for-profit lending and servicing institution, serving mainly those in the mortgage-related industry.  At all times relevant to this action, Mr. Cooper asserts servicing and foreclosure rights to the subject property, which are disputed by Plaintiff.

8. Defendant Servbank is national for-profit lending and servicing institution, serving mainly those in the mortgage-related industry.  At all times relevant to this action, Mr. Cooper asserts servicing rights to the subject property, which are disputed by Plaintiff.

2

## **GENERAL ALLEGATIONS RELEVANT TO ALL CLAIMS**

9. This is an action brought by Plaintiff for compensatory, special, general, and punitive damages.

10. It has been alleged by Defendants that on November 29, 2017, Plaintiff executed a Note, in favor of Unifirst Mortgage Corporation in the sum of $238,598.00.  Further, Defendants contend that to secure the payment of said Note, Plaintiff executed to Mortgage Electronic Registration Systems, Inc., acting solely as a nominee for Unifirst Mortgage Corporation, its successors and assigns, a mortgage with the Note thereby conveying to it, in fee, the land hereinafter described on the express condition that such conveyance should be void if payment should be made according to the terms of the Note (the "Mortgage").

11. The Mortgage was allegedly duly recorded on November 30, 2017 in Gloucester County in Book 15286, Page 92.

12. The Mortgage was a purchase money mortgage and was given to secure a portion of the purchase price.

13. An Assignment of Mortgage, dated March 29, 2018, purports to transfer/assign the Mortgage from Mortgage Electronic Registration Systems, Inc., as nominee for Unifirst Mortgage Corporation, its successors and assigns, to Nationstar Mortgage LLC d/b/a Mr. Cooper, a Delaware Limited Liability Company, its successors and assigns.

14. Said alleged assignment was recorded in the Clerk's/Register's Office of Gloucester County, on April 2, 2018 in Book 351, Page 306.

15. Mr. Cooper is a known fraudulent mortgage-related foreclosure mill.

3

16. Mr. Cooper has a demonstrated history of violating Federal consumer financial laws and causing serious harm to consumers nationwide. See https://www.consumerfinance.gov/enforcement/actions/nationstar-mortgage-llc-dba-mr-cooper/.

17. As the Consumer Financial Protection Bureau stated in late 2020:

"On December 7, 2020, the Consumer Financial Protection Bureau (Bureau) filed a complaint and proposed stipulated judgment and order against Nationstar Mortgage, LLC, which does business as Mr. Cooper (Nationstar). The Bureau alleges that Nationstar violated multiple Federal consumer financial laws, causing substantial harm to the borrowers whose mortgage loans it serviced, including distressed homeowners. Nationstar is one of the nation's largest mortgage servicers and the largest non-bank mortgage servicer in the United States. The proposed judgment and order, which the court entered on December 8, 2020, requires Nationstar to pay approximately $73 million in redress to more than 40,000 harmed borrowers. It also requires Nationstar to pay a $1.5 million civil penalty to the Bureau. Attorneys general from all 50 states and the District of Columbia and bank regulators from 53 jurisdictions covering 48 states and Puerto Rico, the Virgin Islands, and the District of Columbia settled with Nationstar the same day and their settlements are reflected in separate actions, concurrently filed in the United States District Court for the District of Columbia. The orders in the Bureau's and the States' actions have yielded nearly $85 million in recoveries for consumers to date and over $6 million more in fees and penalties. They are also part of a larger government effort, which also includes assistance from the Special Inspector General for the Troubled Asset Relief Program

(SIGTARP) and the United States Trustee Program, to address Nationstar's alleged unlawful mortgage loan servicing practices."

18. Clearly Mr. Cooper has learned nothing, as they continue in their predatory and unlawful practices.

19. Upon information and belief, "mortgage" contracts are facilitated through a "time deposit" at an International Banking Facility ("IBF") that only 'foreigners' are permitted to establish for settlement of any type of "mortgage obligation" through an Automated Clearing House ("ACH") at an IBF.  See 12 C.F.R. 201.

20. Pursuant to 12 CFR § 204.1 (1)(ii), a mutual savings bank as defined in section 3 of the Federal Deposit Insurance Act (FDI Act) (12 U.S.C. 1813 (1)(5)(D) … "time deposit" as such term is defined by the board of Governors in Regulation D (12 CFR part 204).  For example, "mortgage loans" insured by the Federal Housing Administration ("FHA").

21. Funding through an IBF cannot be used in the United States, therefore by default, there are no mortgage loans enforceable in the United States, or outside a federal area.

22. Plaintiff did not qualify to apply for or receive a mortgage loan.

23. On or about January 23, 2023, Plaintiff secured a Mortgage Audit Report and a Forensic Loan Analysis from Bertrand Falls, an expert certified examiner.  **See attached.**

24. Said Audit Report confirms many of the factual allegations in this Complaint in support of Plaintiff's claims for relief.  Specifically:

- The Fixed Rate Note has been endorsed twice.

- The second endorsement is in blank.

- The Mortgage has not been assigned.

- An assignment of the Mortgage should have been executed simultaneously with an endorsement of the note in order to avoid separating the security instrument from the debt instrument.  While an endorsement may be in blank, an assignment is a recorded instrument.

- The burden of proof lies with the unknown second endorsee to prove that it has in its actual physical possession both the Fixed Note and the Mortgage together with the documents evidencing the chains of valid endorsements and assignments in its favor.

25. Pursuant 12 U.S.C. §1710(1)(3)(A), the term "contract mortgagee" means a person or entity under a contract with the Secretary that provides for the assignment of a single-family mortgage from the Secretary to the person or entity for the purpose of pursuing foreclosure.

26. However, 12 U.S.C. §1867 requires a filing of a "Report of condition listed as FFIEC 031, FFIEC 041, or FFIEC 51" version of the Consolidated Report of Condition and Income ("Call Report:), any financial activity outside of the United States.

27. FFIEC 031 permits a "foreclosure" provided it's a "lease" of a bank building.

28. FFIEC 041 permits Securitization of any "mortgage backed security."

29. MERSCORP, as an agent for Ginnie Mae, Fannie Mae, and Freddie Mac, are listed as GSE, owned by a foreign banking organization required to file a Consolidated Report of Condition and Income (Call Report).

30. MERSCORP has no legal authority to register, demand payment, or assign a trustee or hire anyone to initiate "foreclosure" in regards to private residential real property in the United States.

31. Here, MERSCORP purports to assign the underlying Mortgage.

32. MERSCORP had no legal or equitable authority to assign any interest in real property, including the subject property at the heart of this action.

33. Defendants knew, and should have known, that any assignment by MERSCORP was void as a matter of law.

34. The definition of the term "mortgage" defined in the 12 U.S.C. §1736 is lifted straight from the Home Owners' Loan Act of 1933 ("HOLA") as meaning "secure advances" to a "member bank."

35. The Federal Reserve Board's published regulations codified as 12 C.F.R. 206, lists the "eligible securities" being restricted to the Bank for International Settlement, and the debtor being a member bank.

36. 12 U.S.C. §632 defines the term "property" as including gold, silver, currency, credits, deposits, securities, choses in action, and any other form of property, the proceeds thereof, and any right, title, or interest therein.

37. 12 U.S.C. §632 defines, the term "person" as including any individual, or any corporation, partnership, association, or other similar organization.

38. All legitimate mortgage transactions regulated by the banking laws of the state and the United States are between member banks affiliates, directors, executives, and shareholders organized under title 12 of the United States Code.

39. A permissible "foreclosure" is restricted to collateral stock" posted by "any corporation involved in foreign banking."

40. Defendants knew, or should have known, that their attack on the constitutional rights and property interests of Plaintiff were unlawful.

7

41. As a result of Defendants' wrongful conduct as described herein, Plaintiff has been emotionally and financially damaged.

## COUNT I:
## VIOLATION OF CIVIL RIGHTS
## 42 U.S.C. §1983

## (All Defendants)

42. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

43. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law…"

44. Standing is a fundamental element in a foreclosure action.

45. To conduct a foreclosure action and seek possession of real property, a person or entity must have the legal authority to assert said interest.

46. The Tangible Note identifies the entity to whom it accommodated, the Originator.

47. Therefore, the Tangible Note herein could not have been transferred **in the ordinary course of business**; Mr. Cooper and Servbank have failed to establish that indorsements were made, nor are there any other notices which establish that Tangible Note negotiation was executed properly, nor are there any other notices which establish that the Originator sold the Tangible Note to another party for full value and consideration.

48. It is well established that an assignment of a Deed of Trust or Mortgage does not automatically assign the Tangible Note.

8

49. Assignment of a mortgage without assignment of a Note is a nullity and creates no legal interest in real property.

50. A party asserting an interest in real property must be able to prove their capacity of holder of the Tangible Note as one with rights acquired to perfect the transfer of enforcement contract rights to the Mortgage instrument as collateral for a Tangible Note debt obligation.

51. Without proper negotiation and physical transfer, the "true sale" of the Tangible Note is invalid as a fraudulent conveyance.

52. Any attempt to transfer the beneficial interest of a trust deed without actual ownership of the underlying Tangible Note attached together in one with the underlying Payment Intangible Transferable Record, is void and not voidable under state and federal law.

53. Therefore, Mr. Cooper and Servbank cannot establish that it is/was entitled to assert a claim on the subject property.

54. Defendants, through the actions alleged above, claim the right to have illegally commenced and completed foreclosure sale of the subject property under the Mortgage via an *in rem* action supported by false or fraudulent documents.

55. Said unlawful foreclosure action has caused and continues to cause Plaintiff great and irreparable injury in that the subject property is unique and was the homestead for Plaintiff.

56. Defendants knew, or should have known, that their asserted claims and interests in the subject property were fraudulent.

57. Defendants knew, or should have known, that any Assignment of Mortgage or Deed of Trust was void as a matter of law.

58. Defendants knew, or should have known, that Mr. Cooper and Servbank lacks the requisite standing to foreclose on the subject property.

59. The concept of a property interest was explored in *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), which stated:

"Certain attributes of "property" interests protected by procedural due process emerge from [our] decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims."

60. "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

61. As a result of Defendants' willful conduct, Plaintiffs have been emotionally and financially damaged.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.

## COUNT III:

## <u>INFLICTION OF EMOTIONAL DISTRESS</u>

62. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

63. Defendants' willful conduct, as more particularly described in this Complaint, has caused Plaintiff emotional harm.

64. Defendants' conduct was willful and intentional.

65. "To state a claim for intentional infliction of emotional distress, a plaintiff must show that (1) the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was `extreme and outrageous,' (3) that the actions of the defendant were the cause of the plaintiff's distress, and (4) that the emotional distress sustained by the plaintiff was severe. *Fahnbulleh v Steneck*, Civ. No. 15-5075, 2018 WL 1610692 (D.N.J. Apr. 3, 2018) (Salas, J.) (citing *Cole v. Laughrey Funeral Home*, 869 A.2d 457, 464 (N.J. Super. Ct. App. Div. 2005)).

66. Plaintiff has suffered severe emotional distress due to the conduct of Defendants.

67. Plaintiff is at risk of having her home unlawfully foreclosed on, which has only exasperated her emotional distress.

68. Defendants knew, or should have known, that its conduct would cause Plaintiff emotional distress.

69. Defendants knew, or should have known, that its conduct was so outrageous that it goes beyond all bounds of decency.

70. Defendants' conduct was done solely for the purpose of material and monetary benefit and to the detriment of Plaintiff.

71. It is intolerable in a civilized society for a non-party to assert a claim in interest in real property.

72. Defendant Mr. Cooper and Servbank have done so anyway.

73. It is intolerable for a party who has no claim or right to claim an interest in real property to foreclose and seek possession of real property.

74. Defendant Mr. Cooper and Servbank have done so anyway.

75. As a direct result of Defendants' outrageous conduct, Plaintiff has been emotionally and financially damaged.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.

<u>**COUNT IV:**</u>
<u>**DECLARATORY RELIEF**</u>
<u>**UNDER THE DECLARATORY JUDGMENT ACT**</u>
<u>**(28 U.S.C.A. § 2201)**</u>
<u>**(Specifically as to Defendant Mr. Cooper)**</u>

76.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

77. The Declaratory Judgment Act is remedial in nature, and "It was the congressional intent to avoid accrual of avoidable damages to one **not certain of his rights**..." *E. Edelmann & Co. v. Triple-A Specialty Co.*, 88 F.2d 852, 854, cert. denied, 300 U.S. 680, 57 S.Ct. 673, 81 L.Ed. 884 (7th Cir. 1937). (emphasis added).

12

78. Additionally, The Declaratory Judgment Act is intended to provide a convenient method for affording relief from uncertainty and insecurity when the rights and liabilities of parties stand contingent or in abeyance, as is the case here.

79. An actual controversy has arisen and now exists between Plaintiff and Defendant Mr. Cooper and Servbank, specified hereinabove regarding the respective rights as they relate to interest in the subject property.

80. As such, Plaintiff requests a judicial determination of the rights, obligations, and interest of the parties regarding the subject property, and such determination is necessary and appropriate under the circumstances so that all parties may ascertain and know their rights, obligations and interests regarding the subject property.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter a declaratory judgment declaring that Defendant Mr. Cooper and Servbank have no interest estate, right, title or interest in the subject property and award Plaintiff any other relief deemed just and proper.

## COUNT V: VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA")(12 U.S.C. §§ 2601–2617)

### (Specifically as to Defendants Mr. Cooper, Servbank and Magoon)

81. Plaintiff hereby incorporates all previous paragraphs as if fully set forth herein.

82. Plaintiff has consistently fought Defendants and its servicers in the prosecution of the state foreclosure action.

83. Plaintiff communicated her disagreement to Defendants with the alleged default on the subject property.

84. Defendants failed to respond to any of these communications and contentions to their alternate narrative surrounding their interest in the subject property.

85. It can reasonably be construed that Plaintiff's contest of the foreclosure and alleged default on the loan were qualified "QWRs" under the provisions of the Real Estate Settlement Procedures Act ("RESPA"), codified at 12 U.S.C. §§ 2601–2617.

86. Under RESPA, 12 U.S.C. § 2605(e), a loan servicer is required to respond to a qualified written request ("QWR") "relating to the servicing" of a loan. A QWR must "[s]tate[] the reasons the borrower believes the account is in error; or . . . [p]rovide[] sufficient detail to the servicer regarding information relating to the servicing of the mortgage loan sought by the borrower." 12 C.F.R. § 1024.31 (2014). Servicing is defined narrowly: "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3); see also 12 C.F.R. § 1024.2.

87. The law requires that a QWR be responded to by the recipient within a reasonable amount of time, generally within 30 days.

88. Plaintiff has never received any response to their QWRs from Defendants.

89. Defendants' actions and violations of the provisions promulgated under RESPA have caused Plaintiffs damages and harm.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.

14

**RESERVATION OF RIGHT TO AMEND**

Pursuant to Federal Rules of Civil Procedure 15(a), Plaintiff hereby reserves her right to amend, either once as a matter of right or by seeking leave of court to amend as provided under the federal rules.

**DEMAND FOR TRIAL OF JURY**

Plaintiff further demands a trial by jury on all triable issues herein.

Dated: September 5, 2023.                         Respectfully submitted,

 By: /s/ Carlene McPhillip
Carlene McPhillip
3501 Blackhorse Pk #530-1026
Turnersville, NJ 08012
*Pro Se Plaintiff*

15

# Mortgage Audit Report Deluxe Extended

for

## Carlene McPhillip

1513 Patricia Court, Williamstown NJ 08094

# Table of Contents

| | |
|---|---|
| Introduction | 3 |
| Purposes of the Examination | 5 |
| The Documents Presented for Examination | 7 |
| The Debt and the Security Instruments | 9 |
| The Promissory Note, 9; The Mortgage, 11; Information on the Debt and the Security Instruments, 13; The Parties to the Debt and the Security Instruments, 14; About the Servicer, 15; Examiners' Comments, 16 | |
| Robo-Signing | 17 |
| History, 17; Findings, 20 | |
| MERS as Nominee & Mortgagee | 21 |
| About MERS, 21; MERS and the Debt Instrument, 21; MERS and the Mortgage, 21 | |
| Securitization | 24 |
| Securitization in General, 24; The Search for the Securitization Trust, 27 | |
| The Chain of Title | 28 |
| Chain of Title in General, 28; The Sequence of Transactions, 29; Explanation of the Sequence, 30; Examiner's Comments, 31 | |
| Foreclosure | 32 |
| Foreclosure in General, 32; Foreclosure Transactions, 32 | |
| Affirmative Defenses/Arguments Against Foreclosure/Debt Argument/Fair Debt Collections Act USC 1692/Right of Recession/Foreclosure Offense & Defense/UCC Section/Standing and Capacity/Certificates Relating to a Securitization Trust/Foreclosure Procedure General Analysis/Note Analysis Arguments | 33 - 82 |

## Introduction

A securitization audit is an examination of the documents presented for a particular loan and security transaction and comparing and analyzing them with other available information for the purpose of determining if it has been securitized, and if it was, of identifying the securitizing entity.

The examination also involves a review of the documents presented as they relate to the various other transactions, topics and issues affecting securitizations in general and the audited loan in particular. These include the servicer's response or failure to respond to the borrower's request for information or Qualified Written Request (QWR) under 12 USC § 2605 or similar laws, the lender's compliance of the disclosures required before and during the granting of the loan under the Truth in Lending Act (TILA) and the Real Estate Settlement Procedures Act (RESPA), the standards employed in qualifying the borrower (more specifically, the Debt-to-Income Ratio and the Loan-to-Value Ratio), the role of MERS, robo-signing, the chain of title and foreclosure. Where applicable, each of these issues is discussed in their respective sections in this report.

Generally, the basic documents to be presented for this type of examination are the promissory note and the security instrument, *i.e.,* the mortgage, or deed of trust or security deed. Other relevant documents include alloges, assignments, documents pertaining to foreclosure and the MERS servicer inquiry screenshot. Collateral documents include the pre-closing documents such as the loan application, the Federal TIL Disclosure Statement, appraisal report and similar documents, liens search report or title report, mortgage loan statements and letters from the servicer and other correspondence.

Where applicable the examiner utilizes the facilities of ABSNet® for locating a loan in a particular trust and for obtaining information pertaining to the securitization, the Securities and Exchange Commission database at www.secinfo.com for the various documents that were filed by the trust and various other on-line sites that host resources on law and jurisprudence, legal definitions and procedures, robo-signing and various other information relevant to the issues at hand.

A loan is securitized by its holder. Although a loan may have been granted by a private lending institution, it may qualify for funding by a Government-Sponsored Enterprise (GSE) such as the Federal National Mortgage Association (FNMA or Fannie Mae) or Federal Home Loan Mortgage Corp. (FHLMC or Freddie Mac) whereupon it is sold or transferred by the

3

originating private lender to any of these institutions. If this has been the case for the loan under examination, the examiners will then conclude that it is now owned by a GSE.

On the other hand, a majority of home mortgage loans do not qualify for funding by these GSEs and their ownership remain with the originating lender. These private lenders also securitized their loans and they are referred as "private label" securitizations. The loan that is the subject of this examination should fall under this category or the examiner will conclude that it has not been securitized into a private label trust. For various reasons not all loans that failed to qualify for funding by GSEs were securitized into private label trusts. In other words, this examination puts great emphasis on the evidence that the loan has been securitized otherwise the examiner will not make that conclusion.

Whether or not the examined loan was found to have been owned by a GSE or was not securitized into a private label trust, the examination will still cover the various other issues affecting the loan and security such as the loan qualifying standards, disclosures, the role of MERS, robo-signing, the chain of title and foreclosure, where applicable. In short, the findings will generally bear down upon the chain of title which includes identifying the current holder or holders of the debt and the security instruments and the standing of the foreclosing entity to foreclose.

If the loan has been securitized and there are documents to support an analysis, the examiner will also present a computation in approximate terms the gross profit that the trust would have made from securitizing the subject loan and the time it took for the originating lender to recover from the trust the amount it lent to the borrower thereby replenishing its funds for fresh lending.

The examiner has no interest in the outcome of this examination and will perform his task in the highest degree of professional integrity.  All his decisions are exercised with due care and diligence and his conclusions are based on the documents presented coupled with information gathered from the most reliable sources that are available. Where necessary, the sources of these information are cited in this report.

On January 23, 2023, at the request of Carlene McPhillip, the examiner conducted an examination of the documents that she presented in connection with the loan that she obtained from UniFirst Mortgage Corp. on November 29, 2017. The loan is secured by a mortgage on a property located at 1513 Patricia Court, Williamstown NJ 08094.

4

## Purposes of the Examination

The purposes of this examination are as follows:

- The QWR and QWR Response. To establish the facts that a Qualified Written Request has been sent to the loan servicer on a certain date prior to this examination and that the servicer has responded to it on a certain date and to determine the disputations and requests for information that were manifested by the borrower in the request and the manner and extent to which they were handled and covered by the servicer in its response.

- The Loan and the Security. To establish the existence of the loan and the underlying security as agreed upon and acknowledged by the parties based on the documents presented, to identify the mortgaged property and to determine their terms and conditions. The documents are reviewed in order to determine if the lender complied with the disclosures required under the TILA and the RESPA. The debt-to-income ratio of the borrower and the loan-to-value ratio of the property are also computed in order to determine if these are within prescribed limits or if there are indications of predatory lending practices. This section also touches on the status and issues regarding loan servicing.

- Robo-Signing. To establish prima facie evidence that the persons who signed on behalf of the entities who have executed acts involving this loan and security, the witnesses to their signing, as well as the notaries public, have been involved in robo-signing or surrogate signing. This includes a comparison of their signatures with available specimens that could be obtained from various reliable sources including the examiner's own compilation.

- The Role of MERS. If Mortgage Electronic Registration Systems, Inc. (MERS) is a party in the debt and/or the security instruments, to determine what authority or capacity has been granted to MERS and by whom, and if MERS did perform any act under that capacity, to determine if this act was performed in accordance with law and/or the terms and conditions under which they were bestowed.

- The Securitization. To determine if the subject loan has been securitized and if it was, to establish that the securitizing entity exists or once existed, to identify the parties thereto, to verify if the required chains of endorsements of the promissory note and assignments

of the security instrument have been fully complied with, to review and assess the effect of securitization on the loan, to determine its present status as a securitized loan and to identify the entity who has possession of the loan and security instruments.

- Profit on the Securitized Loan. To determine, albeit in theoretical terms, the potential or actual income that the securitizing entity will derive or has derived from the securitization of the loan as well as the period of time it took for the originating lender to recover from the securitization trust the amount it loaned to the borrower.

- The Chain of Title. To identify any breaks in the chain of title or instances wherein the security instrument has been separated from the debt instrument in relation to the securitization of the loan, the capacity or lack thereof, of MERS to perform certain acts and the nullity of the documents that have been signed by forgers or robo-signers or surrogate signers based on the prima facie evidence that have been gathered.

- Foreclosure. To identify any flaws in the transactions leading to and relating to foreclosure in order to determine if the foreclosing entity has the standing to foreclose and can show evidence, upon demand, that it has physical possession of the note and the security instrument as well as the documents evidencing the chains of valid endorsements and assignments ending it its favor at the time of the filing of the complaint.

## The Documents Presented for Examination

The documents that were presented and which were considered in this examination are enumerated and described below. Sufficient effort has been exerted in obtaining these documents in order to ensure that they are complete and reflect the true state of the loan and the underlying security as of the date of examination. The examiner has added additional documents to support his findings and these are accordingly described as such.

Where, in spite of these efforts some documents could not be obtained, the examiner may not be able to attain the purpose or purposes of the examination for which these documents could have been made the bases, and thus, the examination will not cover these phases and no conclusion could be arrived at for them.

The examiner warrants that these documents were in the same state when they were examined as when they first came into his possession. In spite of the deficiencies as may be noted herein, the documents are treated as true and correct copies of their originals.

- Fixed Rate Note dated November 29, 2017

  This document consists of four pages.  This copy bears the signature of the borrower. It has been endorsed twice. The second endorsement is in blank (Exhibit A).

- Mortgage executed on November 29, 2017

  This document consists of 17 pages including the Legal Description. This copy bears the signatures of the borrower and the notarizing official. It does not bear markings or indications that it has been recorded (Exhibit B).

- MERS Servicer Inquiry Screenshot

  This document was obtained by the examiner from the official website of Mortgage Electronic Registration Systems, Inc. (MERS) on January 23, 2023 (Exhibit C).

- Mortgage Loan Statement dated November 18, 2022

  This is a one-page, computer-generated document that bears the name of the loan servicer (Exhibit D).

7

- Voluntary Liens Report dated January 20, 2023

  This document consists of five pages and pertains to the mortgaged property.  It was obtained from homeinfomax.com. It shows that the subject Mortgage was recorded in Gloucester County NJ on July 27, 2010 (Exhibit D).

## The Debt and the Security Instruments

### The Promissory Note

The loan that is the subject of this examination was granted on November 29, 2017. The parties in the promissory note are Carlene McPhillip, the borrower and UniFirst Mortgage Corp., the originating lender. It is a Fixed Rate Note with a term of 30 years to mature on December 1, 2047. It has been endorsed twice. The second endorsement is in blank (Exhibit A).

Promissory Note

A promissory note is a written promise to pay a debt. It is an unconditional promise to pay on demand or at a fixed or determined future time a particular sum of money to or to the order of a specified person or to the bearer. Promissory Notes, Law and Legal Definition, Retrieved August 25, 2014, from http://definitions.uslegal.com/p/promissory-notes/

Parties in a Promissory Note

The parties in a promissory note are basically the maker and the payee. The maker is person who makes the note and undertakes to pay the amount stated in the promissory note. The payee is the person to whom the amount is payable under the promissory note.

Subsequent parties, if any, are the holder, the endorser, and the endorsee. The holder is the person who may be the payee or endorsee of the promissory note. The holder is the person who is entitled to possession of the instrument in his own name and is also entitled to receive the amount due under the promissory note. The endorser is the person who, by endorsement, transfers the promissory note to another person. The endorsee is the person to whom the promissory note is transferred by endorsement. Parties to Promissory Notes, Bills, & Checks, Retrieved August 25, 2014, from http://www.myedupages.com/all-topics/89-banking-laws-practices/parties-to-promissory-notes-bills-and-cheques/162-parties-to-promissory-notes-bills-and-cheques

Endorsement

Endorsement is the act of the owner or payee signing his/her name on the back of a check, bill of exchange or other negotiable instrument so as to make it payable to another or cashable by another person.

9

An endorsement in blank is also known as general endorsement. It specifies no particular endorsee and thereafter is payable to bearer and may be negotiated by delivery alone. An endorsement in blank is an unqualified endorsement, and thus the endorser thereof makes all warranties to all subsequent holders in due course specified in Section 3-417, Uniform Commercial Code. Endorsement, Law and Legal Definition, Retrieved & *abridged*, August 25, 2014, from http://definitions.uslegal.com/e/endorsement/

Promissory Note, Governing Law

In the United States, the law governing negotiable instruments in general and promissory notes in particular is Article 3 of the Uniform Commercial Code. UCC Article 3 – Negotiable Instruments, Legal Information Institute, Retrieved August 25, 2014, from http://www.law.cornell.edu/ucc/3

## The Mortgage

The Mortgage was executed on November 29, 2017. The parties are the borrower, the originating lender and Mortgage Electronic Registration Systems, Inc. (MERS) which is named as nominee for the lender and mortgagee. This instrument secures the debt of the borrower to the lender including interest thereof. The mortgaged property is located at 1513 Patricia Court, Williamstown NJ 08094. It belongs in the jurisdiction of Gloucester County (Exhibit B).

This Mortgage recorded in Gloucester County on November 30, 2017 (Exhibit E).

Mortgage

A mortgage is a legal document by which the owner transfers to the lender an interest in real estate to secure the repayment of a debt, evidenced by a mortgage note. When the debt is repaid, the mortgage is discharged, and a satisfaction of mortgage is recorded with the register of deeds in the county where the mortgage was recorded. West's Encyclopaedia of American Law. Mortgage, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/mortgage

Parties in a Mortgage

The party who borrows the money and gives the mortgage (the debtor) is the mortgagor; the party who pays the money and receives the mortgage (the lender) is the mortgagee. The mortgage must be executed according to the formalities required by the laws of the state where the property is located. It must describe the real estate and must be signed by all owners, including non-owner spouses if the property is a homestead. Some states require witnesses as well as acknowledgement before a Notary Public.

The mortgage note, in which the borrower promises to repay the debt, sets out the terms of the transaction: the amount of the debt, the mortgage due date, the rate of interest, the amount of monthly payments, whether the lender requires monthly payments to build a tax and insurance reserve, whether the loan may be repaid with larger or more frequent payments without a prepayment penalty, and whether failing to make a payment or selling the property will entitle the lender to call the entire debt due. West's Encyclopaedia of American Law, Mortgage, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/mortgage

11

Security Interest

A security interest arises when, in exchange for a loan, a borrower agrees in a security agreement that the lender (the secured party) may take specified collateral owned by the borrower if he or she should default on the loan. Secured Transaction Law: An Overview, Retrieved August 25, 2014, from http://www.law.cornell.edu/wex/secured_transactions

Secured Transaction

A secured transaction is defined as any loan or credit in which property is pledged as security in the event payment is not made. Hill, G. and Hill, K. Secured Transaction, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/secured+transaction

Mortgage, Governing Law

In the United States, the law governing secured transactions in general and mortgages in particular is Article 9 of the Uniform Commercial Code. UCC Article 9 – Secured Transactions, Retrieved August 25, 2014 from http://www.law.cornell.edu/ucc/9

## Information on the Debt and the Security Instruments

| General | Amount of Principal | $238,598 |
|---|---|---|
| | Date Granted | November 29, 2017 |
| | Maturity Date | December 1, 2047 |
| | Term | 30 Years |
| The Debt Instrument | Type of Document | Fixed Rate Note |
| | Interest Rate | 4.625% p.a. |
| | First Interest Rate Change Date | Not Applicable |
| | Loan Number | 000056409 |
| The Security Instrument | Type of Document | Mortgage |
| | Date Executed | November 29, 2017 |
| | MERS ID Number | 1002872-0000056409-4 |
| | Lien Position | First |

## The Parties to the Debt and the Security Instruments

| Borrower | Name | Carlene McPhillip |
| --- | --- | --- |
| | Mailing Address | 1513 Patricia Court<br>Williamstown NJ 08094 |
| | Property Address | 1513 Patricia Court<br>Williamstown NJ 08094 |
| Co-Borrower | Name | None |
| Lender | Name | UniFirst Mortgage Corp. |
| | Mailing Address | 217 Eisenhower Boulevard<br>Johnstown PA 15906 |
| Mortgagee | Name | Mortgage Electronic Registration Systems, Inc. |
| | Mailing Address | PO Box 2026<br>Flint MI 48501 |
| Servicer | Name | Mr. Cooper |
| | Mailing Address | PO Box 81860<br>5801 Postal Road<br>Cleveland OH 44181 |
| Title Company | Name | Group 21 Title Agency |
| | Mailing Address | PO Box 81860<br>525 Route 73 North Suite 111<br>Marlton NJ 08053 |

14

## About the Servicer

A Loan Statement dated November 18, 2022 shows that the subject loan is serviced by Mr. Cooper (Exhibit D).

> Loan Servicer
>
> A loan servicer is a financial institution which reports loan payments, collects monthly payments and penalties on late payment, releases liens, makes certain that insurance and taxes are paid and initiates foreclosure proceedings for loans in default. A loan servicer is also called a mortgage servicer. A loan servicer can also be the lender who owns the loan. Loan Servicer, Law & Legal Definition, Retrieved August 25, 2014 from http://definitions.uslegal.com/l/loan-servicer/

Examiners' Comments

### The Fixed Rate Note

The subject loan exists according to the amount, interest rate, maturity date and the terms and conditions stated in the Fixed Rate Note which is signed by the borrower. This note has been endorsed twice. The second endorsement is in blank.

The Fixed Rate Note, the parties thereto and its terms and conditions fall within the cited definitions, as applicable, and is considered to be governed under the applicable laws.

### The Mortgage

The Mortgage exists as a security on the subject loan according to the amount, maturity date, property address, and the terms and conditions stated in the mentioned deed which is signed by the borrower and notarized. It represents a first lien on the title of the mortgaged property which has been recorded in the county that has jurisdiction over the property.

The subject Mortgage, the parties thereto, and its terms and conditions fall within the cited definitions, as applicable, and is considered to be governed under the applicable laws.

# Robo-Signing

## History

In the mortgage industry, robo-signing is the practice of an employee signing thousands of documents and affidavits without verifying the information contained therein. Some reports have revealed that one bank official signed off on almost 10,000 documents in one month. The practice calls into question the validity of thousands of mortgage assignments and foreclosures across the country.

Banks have been under investigation since 2010 for their part in the robo-signing scandal which resulted in many homeowners losing their homes without merit. After the scandal came to light, the banks said they would no longer engage in this practice. However, as recently as July 2011, it was discovered that mortgage robo-signing was still being practiced.

When the practice recently came to light, four major banks, JP Morgan Chase, Ally Financial/GMAC, Bank of America, and Wells Fargo all called a halt to foreclosure actions in 23 states. In the days following their announcements, Bank of America ceased foreclosures in all 50 states. A coalition of 40 attorneys general plan on launching a probe into mortgage-servicing practices and may hold them accountable where there were violations of state foreclosure laws. Phillips Garcia Law, What is Robo-Signing, Retrieved August 25, 2014 from http://www.southcoastaccidentattorney.com/faqs/what-is-robosigningnbsp.cfm

### Robo-Signer

A robo-signer is a person in a legal document processing assembly line whose only task is to sign previously-prepared documents affecting title to real property in a robotic-like fashion without reading the documents or verifying the facts contained therein by reviewing primary source evidence. The robo-signer's mission is to expedite the documents' recordation in the public land records or in court proceedings. Additionally, robo signers regularly fail to establish or simply do not have the authority to execute these documents on behalf of the legal title holder or principal on whose behalf they purport to act.

17

Surrogate Signer

A surrogate signer is a person who signs a legal document on behalf of and in the name of another without reading it or understanding the document's contents. Surrogate signers are not authorized to execute these documents on behalf of the legal title holder or principal on whose behalf they purport to act.

Robo-Signing is Forgery

Forgery is the creation of a false written document or alteration of a genuine one, with the intent to defraud. Forgery consists of filling in blanks on a document containing a genuine signature, or materially altering or erasing an existing instrument. An underlying intent to defraud, based on knowledge of the false nature of the instrument, must accompany the act. Hill, G. and Hill, K. Forgery, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/forgery

Forgery is a Felony

"This is the first time any grand jury in the country has indicted a corporation or a high-level executive at a corporation for 'robo-signing,'" Missouri Attorney General Chris Koster told The Huffington Post. "The grand jury is alleging that the documents have false signatures on them, that the notarizations are fraudulent and that it was all done with intent to deceive. If that's true, it makes the [foreclosure] documents forgeries." Levine, D.M., In DocX Case, Robo-Signing Forgery Charge Hits Top Executive, Retrieved August 25, 2014 from http://www.huffingtonpost.com/2012/02/07/robo-signing-docx-missouri_n_1261369.html

Perjury

A crime that occurs when an individual willfully makes a false statement during a judicial proceeding, after he or she has taken an oath to speak the truth.

The common-law crime of perjury is now governed by both state and federal laws. In addition, the Model Penal Code, which has been adopted in some form by many states and promulgated by the Commission on Uniform State Laws, also sets forth the following basic elements for the crime of perjury: (1) a false statement is made under oath or equivalent affirmation during a judicial proceeding; (2) the statement must be material or relevant to the proceeding; and (3) the witness must have the Specific Intent to deceive. Perjury; Legal Dictionary, Retrieved December 9, 2015. http://legal-dictionary.thefreedictionary.com/perjury

18

Fraud

A false representation of a matter of fact – whether by words or by conduct, by false or misleading allegations, or by concealment of what should have been disclosed – that deceives and is intended to deceive another so that the individual will act upon it to her or his legal injury.

Fraud is commonly understood as dishonesty calculated for advantage. A person who is dishonest may be called a fraud. In the U.S. legal system, fraud is a specific offense with certain features.

Fraud is most common in the buying or selling of property, including real estate, Personal Property, and intangible property, such as stocks, bonds, and copyrights. State and federal statutes criminalize fraud, but not all cases rise to the level of criminality. Prosecutors have discretion in determining which cases to pursue. Victims may also seek redress in civil court.

Fraud must be proved by showing that the defendant's actions involved five separate elements: (1) a false statement of a material fact,(2) knowledge on the part of the defendant that the statement is untrue, (3) intent on the part of the defendant to deceive the alleged victim, (4) justifiable reliance by the alleged victim on the statement, and (5) injury to the alleged victim as a result. Fraud, Legal Dictionary, Retrieved December 9, 2015. http://legal-dictionary.thefreedictionary.com/fraud

Penalties for Notary Misconduct, Crimes and Deeds

A notary who issues false certificates, and this could include backdated certificates would be guilty of a misdemeanour.  A false Acknowledgment certificate constitutes forgery.  Additionally, the notary could have their commission revoked if found guilty of this crime, with an additional fine of $1500 per incident. 123Notary, Retrieved January 4, 2016. http://blog.123notary.com/?p=2067

## Findings

No evidence or allegation of robo-signing was found on the documents that were presented in this examination.

# MERS as Nominee & Mortgagee

## About MERS

Mortgage Electronic Registration Systems, Inc. (MERS) is an American privately-held company that operates an electronic registry designed to track servicing rights and ownership of mortgage loans in the United States.

## MERS and the Debt Instrument

MERS is not a party in the Fixed Rate Note. A Loan Statement dated November 18, 2022 shows that the subject loan is serviced by Mr. Cooper (Exhibit D).

The servicer is doing this function on behalf of the noteholder and not for MERS.

## MERS & the Mortgage

The Mortgage names MERS as nominee for the lender. MERS was established in order to facilitate the recording of security instruments with the idea that it would be the mortgagee or beneficiary or grantee.

MERS is described as a Delaware corporation which is separate from the originating lender. MERS is the mortgagee in this Mortgage.

The subject Mortgage is registered under the MERS® System. Its MERS Identification Number is 1002872-0000056409-4 (Exhibit C).

> Mortgagee
>
> The term 'mortgagee' means the holder of a residential mortgage at the time at which that mortgage transaction is consummated. 12 USC § 4901 – Definitions, Retrieved August 25, 2014, from http://www.law.cornell.edu/uscode/text/12/4901

Nominee

A nominee is a person or entity who is requested or named to act for another, such as an agent or trustee. Hill, G. and Hill, K. Nominee. Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/nominee

A nominee is a party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others. USLegal.com. Nominee Law and Legal Definition, Retrieved August 25, 2014 from http://definitions.uslegal.com/n/nominee/

## The MERS System®

Under the MERS System®, MERS will hold legal title to mortgages, deeds of trust, or security deeds on behalf of its members both as *nominee* and *mortgagee* or *beneficiary*. Thus, any member that holds a note secured by real property that assigns that note to another member by way of an entry into the MERS database need not assign the security instrument because legal title to it remains in the name of MERS as agent for the member which holds the corresponding note.

MERS's position is that if a member of MERS directs it to provide a written assignment of the mortgage or deed of trust or security deed, MERS has the legal authority as agent of each of its members to assign the security instrument to the member which is currently holding the note as reflected in the MERS database. Mandelman, M., New Bankruptcy Court Decision Sounds the Alarm – The USS MERS is Going Down, *Retrieved & abridged* August 25, 2014 from http://mandelman.ml-implode.com/2011/02/new-bankruptcy-court-decision-sounds-the-alarm-%E2%80%93-the-uss-mers-is-going-down/

## Interpretation of the Role of MERS

1. MERS is not a party in the Fixed Rate Note.

2. The role of MERS in the Mortgage is discussed as follows:

   The Mortgage states that MERS is:

   2.1.    acting solely as nominee for the lender, and

   2.2.    the mortgagee.

The first statement means that MERS, as nominee, is only an *agent* for the lender while the second means that MERS, as mortgagee, is a *principal* in this security instrument. These contradict laws that presuppose that an agent and its principal must be two different persons or entities.

   Principal

   A principal is a person who authorizes an agent to act to create one or more legal relationships with a third party. This branch of law is called agency and relies on the common law proposition that he who acts through another, acts personally. Principal (Commercial Law), Retrieved August 25, 2014, from http://encyclopedia.thefreedictionary.com/Principal+(commercial+law)

   Agent

   An agent is a person who is authorized to act for another through employment, by contract, or apparent authority. The importance is that the agent can bind the principal by contract or create liability of he/she causes injury while in the scope of the agency. Hill, G. and Hill, K. Agent, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/agent

## Act by MERS Affecting the Mortgage

No document was presented in this examination which shows an act that was executed by MERS which affected this Mortgage.

23

# Securitization

## Securitization in General

### Definition

Securitization is the financial process of pooling receivables, such as residential mortgage loans, and using them as guarantee for the issuance of certificates which are sold to the investing public. The collections from the principal and interest on the loans are used to redeem the certificates and pay for their interest.

### Purpose

The purpose of securitization is to raise money in a relatively shorter period than it takes to collect on the loans. For example, while it may normally take 20 years to redeem 80% of the money being lent to various borrowers from their regular monthly amortizations, the same amount can be generated in as short as three to six months through securitization.

The new money raised from securitization is then used for new lending to other borrowers for the same type of loans and the new loans can also be pooled for yet another round of securitization.

The soar in demand for housing that started around the late 1990s resulted in the corresponding rise in the demand for funding on residential home mortgages. The purpose of securitization had to be achieved over and over again and the securitization process had to be repeated as many times – but with certain urgency. This required the establishment of channels through which loans can be quickly pooled unto a central operating unit, making them ready for securitization.

At first, the network in which these channels connected consisted of the central lender and its subsidiaries, affiliates, and correspondents. But soon small independent lenders joined in the fray. The reach of the central lenders have to be extended. This gave rise to warehouse lending.

Warehouse Lending

Warehouse lending is a short-term line of credit facility that is provided by a central lender to a small or remote lender in order to fund the closing of mortgages. The line is availed from the time the loan is granted by the small lender or purchased by it from another, and is paid off when the loan is sold by the small lender to the central lender. Warehouse lending made it possible for the central lender to accumulate loans faster than it could by lending those loans by itself.

## Parties

In the United States, the business entity which handles securitizations may be entitled to tax exemptions under the Internal Revenue Code if it qualifies as a Real Estate Investment Conduit (REMIC). A REMIC usually takes the form of a trust that was created by different entities. In most trusts these entities are affiliates of each other except for the trustees.

A typical securitization trust usually has the following parties:

❖ Originator – the party tasked with generating loans for the trust, either by lending the loans themselves or by acquiring them from other originators. A trust can have more than one originator.

❖ Seller and/or Sponsor – the party who pools the loans from the originators and sells them to the depositor. In some trusts the seller and the sponsor are the same entity, in others they are different, while in still others there is only a sponsor or a seller. When the sponsor is different from the seller, an originator is sometimes referred to as a seller. Still, in some trusts the functions of the seller are assumed by a party that is referred to as the responsible party or the company.

❖ Depositor – the party who sells the loans to the trustee. Some early trusts did not have sellers or sponsors. The depositor acquired the loans directly from the originating lenders or originators.

❖ Servicer or Master Servicer – the party who services the loans on behalf of the trust. A servicer could have been servicing the loans before they were securitized and

25

could have been the originator or seller or sponsor at the same time. Most trusts that have several servicers also have a master servicer.

❖ Trustee – the party who administers the trust for the benefit of its investors. Some trusts have only one trustee while others have and indenture trustee and an owner trustee. Still others that have a trustee also have another entity which acts as a co-trustee or a Delaware trustee.

❖ Custodian – the entity which, on behalf of the trustee, keeps possession of the assets and records of the trust. In some trusts the trustee or indenture trustee also acts as custodian.

## The Search for the Securitization Trust

### Loan Granting

The subject loan was granted on Novembr 29, 2017. The originating lender is UniFirst Mortgage Corp. (Exhibit A).

### Locating the Securitization Trust

1. On an unknown date, the Fixed Rate Note was endorsed by UniFirst Mortgage Corp. to First Guaranty Mortgage Corp. (Exhibit A).

2. On an unknown date, the Fixed Rate Note was endorsed in blank by First Guaranty Mortgage Corp. (Exhibit A).

2. The Mortgage has not been assigned. Voluntary Liens Report pertaining to the mortgaged property records no assignments for this Mortgage (Exhibit E).

It is now owned by the unknown second endorsee.

## The Chain of Title

### Chain of Title in General

#### Chain of Title, Definition

Chain of title refers to the history of passing of title ownership to real property from the present owner back to the original owner. A record of title documents may be maintained by a registry office or civil law notary. Chains of title include notations of deeds, judgments of distribution from estates, certificates of death of a joint tenant, foreclosures, judgments of quiet title, and other recorded transfers of title to real property. http://definitions.uslegal.com/c/chain-of-title/

Endorsement

Endorsement is the act of the owner or payee signing his/her name on the back of a check, bill of exchange or other negotiable instrument so as to make it payable to another or cashable by another person.

An endorsement in blank is also known as general endorsement. It specifies no particular endorsee and thereafter is payable to bearer and may be negotiated by delivery alone. An endorsement in blank is an unqualified endorsement, and thus the endorser thereof makes all warranties to all subsequent holders in due course specified in Section 3-417, Uniform Commercial Code. Endorsement, Law and Legal Definition, Retrieved & *abridged*, August 25, 2014, from http://definitions.uslegal.com/e/endorsement/

Assignment

Assignment is the act of transferring an interest in property or right to another. http://dictionary.law.com/Default.aspx?selected=2451

An Assignment of Mortgage is therefore defined as a document that transfers the rights of the mortgagee in the Mortgage to another person.

In order to effectuate an assignment, the general rule is that the assignment must be in proper written format and recorded to provide notice of the assignment. http://www.uslegalforms.com/assignments/assignment-of-mortgage.htm

## The Sequence of Transactions

The sequence of the required and the actual transactions pertaining to the subject loan and security instruments can be traced as follows:

| Seq. No. | Date | Fixed Rate Note | Mortgage |
|---|---|---|---|
| 1 | November 29, 2017 | Loan Granting<br>Carlene McPhillip, Borrower<br>UniFirst Mortgage Corp.<br>Originating Lender | Execution of Deed<br>Carlene McPhillip, Borrower<br>UniFirst Mortgage Corp.<br>Originating Lender<br>MERS, Nominee & Mortgagee |
| 2 | Unknown | Endorsement<br>UniFirst Mortgage Corp.<br>Endorser<br>First Guaranty Mortgage Corp.<br>Endorsee | |
| 3 | Unknown | Blank Endorsement<br>First Guaranty Mortgage Corp.<br>Endorser | |

Explanation of the Sequence

1. Loan Granting and Execution of Deed

   The subject loan was granted on November 29, 2017. The parties in the Fixed Rate Note are Carlene McPhillip, the borrower and UniFirst Mortgage Corp., the originating lender (Exhibit A).

   The Mortgage was executed on the same date. The parties are the borrower, the originating lender and MERS which is named as nominee for the lender and mortgagee (Exhibit B).

2. Endorsement

   On an unknown date, the Fixed Rate Note was endorsed by UniFirst Mortgage Corp. to First Guaranty Mortgage Corp. (Exhibit A).

3. Blank Endorsement

   On an unknown date, the Fixed Rate Note was endorsed in blank by First Guaranty Mortgage Corp. (Exhibit A).

Examiners' Comments

The Fixed Rate Note has been endorsed twice. The second endorsement is in blank.

The Mortgage has not been assigned.

An assignment of the Mortgage should have been executed simultaneously with an endorsement of the note in order to avoid separating the security instrument from the debt instrument. While an endorsement may be in blank, an assignment is a recorded instrument.

The burden of proof lies with the unknown second endorsee to prove that it has in its actual physical possession both the Fixed Note and the Mortgage together with the documents evidencing the chains of valid endorsements and assignments ending in its favor.

# Foreclosure

## Foreclosure in General

Foreclosure is the procedure by which a party who has loaned money secured by a mortgage or deed of trust on real property (or has an unpaid judgment), forces the sale of the real property to recover the money due, unpaid interest, plus the costs of foreclosure, after the debtor fails to make payment. Foreclosure Law and Legal Definition, Retrieved August 25, 2014, from http://definitions.uslegal.com/f/foreclosure/

## Foreclosure Transactions

On September 9, 2022, there was a recorded Lis Pendens in which the borrower is named as defendant but the plaintiff is not named (Exhibit E, Record No. 1).

The chain of title is a possible fraudulent chain. Thus the note itself backing the debt, both could possibly be considered fraud. The debt itself being transferred could be fraudulently transferred.

This creates question as to the validity of the note, and could mean the note itself could be void. Thus any transfers of this debt(loan) to any financial instution is fraudulent, since the chain of ownership is not perfected. In the landmark case Glaski vs Bank of America, it was ruled in favour of the homeowner. It was ruled that the foreclosing entity must have both original note and deed of trust at the time of foreclosure.

Although the chain of tite/chain of ownerhip possibly not perfected. Which creates argument against anyone trying to foreclose.

- Original Note must be in possession of the foreclosing entity in order to foreclose, according to the case Glaski vs Bank of America
- On this property, it does not appear that the financial entities have poessession of the original note since an original copy has not yet been furnished. Thus they cannot foreclose. Nor do they have any right to the property, directly or indirectly.
- Thus at this time, no financial entity or company can foreclose due to the original note argument.

# Affirmative Defenses

## Breach of Contract

Definition: An accord and satisfaction is a legal contract whereby two parties agree to discharge a tort claim, contract, or other liability for an amount based on terms that differ from the original amount of the contract or claim.

Accord & satisfaction

## Accord & Satisfaction

Requires a mortgage which is paid in full. Proof which is the assignment of mortgage. Once the mortgage is paid in full, the mortgage has to be transferred back into the original owners name free and clear.

Technically speaking according to this provision, the mortgage loan/lien has been paid in full.

When a mortgage is sold to another company, the mortgage lien has been technically satisfied. The originating lender must put the property title back into the homeowners name.

Provision 23 in the mortgage contract document states the following

The highlighted wording here is "Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument."

The "payment of all sums" was received when the loan was sold according to the assignment filed below on the property with MERS involved.

This this loan was "sold". Paid in full. Thus this loan has been satisfied in full.

An accord and satisfaction has occurred on this mortgage loan with the assignment on record using the actual documents themselves are proof.

Thus this loan should be adjusted from the property, or proper negotiations must be given to redo the terms, balance of this loan.

- The loan should be placed back into the homeowners name and the lender should back away of any baseless claims they are making for enforcement of this loan. Since it has been paid off technically.
- Lender must release this security instrument using the verbiage of the lenders own contract on the mortgage loan contract
- Any foreclosure proceedings against the property in question are completely fraudulent and must be halted and voided immediately.

33

CASE

**Weiss v Phillips 2017 NY Slip Op 08209 -  November 21, 2017**

**Summary**

**Facts**: In this case before the New York Appellate Division (First Department), defendant Edward Phillips purchased two distressed properties, one of which he transferred to a relative. The two agreed the relative would obtain a mortgage on the property, which Phillips would pay, and would transfer the property back to Phillips at a later date. Four years later, Phillips's attorney sent a paralegal to obtain the relative's signature on a blank deed in order to transfer the property back to Phillips. Instead, the paralegal inserted his mother's name as the grantee on the deed, and the mother later deeded the property to herself and the paralegal. On or about that same date, plaintiff Peter Weiss lent $500,000 to the paralegal and his mother in exchange for a note and mortgage on the property. At this point, the loan obtained by Phillips's relative remained unpaid, with about $450,000 due. When Phillips learned about the fraudulent transactions, he filed a lawsuit, which was settled when the paralegal and his mother agreed to transfer title on the property back to Phillips.

After settling the lawsuit, Phillips learned that the loan with Weiss was in default and that Weiss intended to foreclose on the property. Phillips thus executed a Consolidated Extension Mortgage Agreement Note (CEMA) with Weiss through which Phillips acknowledged the validity of Weiss's loan and mortgage on the property and agreed to waive all defenses and counterclaims in exchange for a one-year extension of the loan. After the year passed, Weiss commenced this action and filed a motion for summary judgment seeking to foreclose. The trial court granted Weiss's motion over Phillips's objections, including that the mortgage was unenforceable because it was based on a void deed.

**Holding**: On appeal, the New York Appellate Division (First Department) affirmed the trial court's decision in an opinion authored by Justice Renwick. Among other things, the court held that the deed here was the result of a fraudulent inducement and not a forgery, which made it only voidable rather than void. Further, contrary to Phillips's arguments, the court held that Weiss was a bona fide encumbrancer due to the CEMA's provision that Phillips acknowledged and ratified Weiss's rights under the loan documents and waived any claims or defenses regarding the same. Additionally, the court rejected Phillips's claim that the CEMA was unconscionable and that he did not understand its terms. Phillips executed it with the advice of counsel, in part because of counsel's advice that Weiss might have an equitable subrogation claim because purportedly $450,000 of the $500,000 in loan proceeds from his loan were used to discharge Phillips's relative's mortgage on the property. The court further found that this was not a typical foreclosure mandating the production of the promissory note tied to the mortgage before the foreclosure could proceed. This was so because Phillips acknowledged Weiss's right to foreclose in the CEMA and

there was no question that Weiss was the holder of the note and mortgage as evidenced by the CEMA and the parties' deposition testimony. As such, the court held that summary judgment was appropriate.

Justice Gesmer authored a lengthy concurrence in part and dissent in part. The focus on the dissent was the argument that UCC 3-804 required Weiss to produce the original Note to foreclose or explain how it was lost or destroyed. The dissent also found that the CEMA was ambiguous on whether Phillips was assuming responsibility to pay the mortgage and questioned whether Weiss was a bona fide encumbrancer as he did no investigation into the fraudsters' creditworthiness or the bona fides of the property.

**Relevance to the title industry**: This decision is a reminder of the importance of having a party acknowledge the validity of title or a lien in documents resolving title disputes whether those documents take the form of a settlement agreement, a modification or an extension of a mortgage.  Weiss unknowingly made a $500,000 loan secured by a mortgage on a property that the borrowers obtained via fraud. Through the CEMA, however, Weiss ensured that the mortgage was enforceable against the property by his having the property's "true" owner be a party to the CEMA and acknowledge the mortgage lien. Additionally, the decision reemphasizes the importance of the doctrine of equitable subrogation to lenders or title insurance companies which, according to Phillips's attorney, was part of the reason Phillips agreed to execute the CEMA and ratify the mortgage.

https://law.justia.com/cases/new-york/appellate-division-first-department/2017/810090-10-3935.html

1.   FRAUD CASES

**US Bank N.A. v Nelson - January 24, 2019**

**Summary**

35

The question in this case is whether a foreclosure defendant preserves the defense of lack of standing if the answer denies the plaintiff's allegation of standing but does not separately plead lack of standing as an affirmative defense.

The facts are straightforward. Defendants defaulted on a loan secured by a mortgage, and US Bank commenced this action to foreclose on the loan. The complaint alleged that US Bank was "the owner and holder" of the mortgage being foreclosed. Defendants' answers denied information sufficient to confirm the truth of that allegation, but did not separately allege that plaintiff lacked standing to commence the action. Supreme Court granted US Bank's motion for a judgment of foreclosure and denied defendants' motion to dismiss for, among other reasons, lack of standing.

A divided panel of the Second Department affirmed. The majority noted that, as a general matter, a defendant is not required to affirmatively plead in its answer that the plaintiff failed to allege some essential element of a claim; it is enough to simply deny the plaintiff's allegations. But a defendant is required to affirmatively plead any matter that is not the plaintiff's burden to prove as part of the claim. And standing is not an essential element of a foreclosure claim; the issue arises only if defendant raises it. So, the majority held, a defendant could forfeit the defense of lack of standing by failing to affirmatively plead it in the answer or raise the defense in a pre-answer motion to dismiss. And while the majority stressed that no "magic words" or "ritualistic formulation" was required, a "mere denial of factual allegations will not suffice."

A single judge dissented. The dissenter concluded that a denial of the plaintiff's factual allegations of standing would put a plaintiff on notice that standing would be in issue. And given the notice function of pleading, such a denial should be sufficient to plead the defense of lack of standing, regardless whether it is expressly labeled a "defense" or an "affirmative defense."

**U.S. BANK NATIONAL ASSOCIATION v. SILVANA SOTILLO - June 5, 2017**

xxxxx.................. "We review a grant of a motion to dismiss a complaint for failure to state a cause of action de novo, applying the same standard under Rule 4:6-2(e) that governed the motion court." Wreden v. Township of Lafayette, 436 N.J. Super. 117, 124 (App. Div. 2014). Thus, we are "limited to examining the legal sufficiency of the facts alleged on the face of the complaint." Nostrame v. Santiago, 213 N.J. 109, 127 (2013) (quoting Printing Mart-

Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). We are required to "'search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.' ..........................xxxxxxxxxxxxxx

xxxxx..................... that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgement or order as a matter of law." R. 4:46-2(c). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). ..................xxxxxxxxxxxxxxx

We have held "an assignee of a [contract] can be held liable under the CFA, for its own unconscionable commercial activities in the subsequent performance of the assigned contract." Jefferson Loan Co., Inc. v. Session, 397 N.J. Super. 520, 533 (App. Div. 2008). We made clear "[o]ur holding is limited to an assignee's own unconscionable commercial practices . . . , not an assignee's derivative liability for the actions of the assignor of the [contract]." Id. at 538.4

Xxxxx.............. . a transfer of the negotiable instrument to a holder in due course to whom the mortgage is also assigned will enable the assignee to enforce the mortgage (as well as the negotiable instrument) according to its terms, free and clear of any personal defenses the mortgagor may have against the assignor. This results from the view that the mortgage is mere "incident" or "accessory" to the debt and when the debt is embodied in a negotiable instrument the quality of negotiability is necessarily imparted to the accompanying mortgage.

N.J.S.A. 12A:3-305(a) in turn provides such an obligor may assert real defenses, namely

(1) a defense of the obligor based on infancy of the obligor to the extent it is a defense to a simple contract, duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or discharge of the obligor in insolvency proceedings[,]

37

(2) a defense of the obligor stated in another section of this chapter or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract; [or]

(3) a claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument[.]

2.  VIOLATIONS OF TILA

**JERRY HOANG VS BANK OF AMERICA -** December 6, 2018

**SUMMARY**

**Truth in Lending Act**

The panel reversed the district court's dismissal of an

action brought by a borrower against Bank of America, N.A.,

alleging claims under the Truth in Lending Act ("TILA")

after the bank declared the borrower in default on a loan and

initiated non-judicial foreclosure proceedings.

If a creditor fails to make required disclosures under

TILA, borrowers are allowed three years from the loan's

consummation date to rescind certain loans. 15 U.S.C.

§ 1635(f). The borrower sent the bank notice of intent to

rescind the loan within three years of the consummation date.

The panel held that under *Jesinoski v. Countrywide Home Loans*, 135 S. Ct. 790, 792 (2015), borrowers may affect rescission of such a loan simply by notifying the creditor of their intent to rescind within the three-year period from the loan's consummation date. The panel further held that because TILA did not include a statute of limitations outlining when an action to enforce such a rescission must be brought, courts must borrow the most analogous state law statute of limitations and apply that limitation period to TILA rescission enforcement claims. The panel held that in Washington, the state's six-year contract statute of limitations was the most analogous statute. The panel rejected the district court's application of TILA's one-year statute of limitations for legal damages claims. The panel also rejected

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

HOANG V. BANK OF AMERICA 3

the bank's argument that Washington's two-year catch-all statute of limitations should apply. Because the borrower brought this action within six years, the district court erred in dismissing the TILA claim as time barred.

The panel held that the district court improperly denied the borrower leave to amend the complaint. The district court made its determination based on its determination that amendment would be futile because the claims were timebarred. The panel held that because the borrower's TILA rescission enforcement claim was not time-barred, an

amendment by the borrower would not be futile.

**OPINION**

N.R. SMITH, Circuit Judge:

If a creditor fails to make required disclosures under the
Truth in Lending Act (TILA), borrowers are allowed three
years from the loan's consummation date to rescind certain
loans.**1** 15 U.S.C. § 1635(f). Borrowers may effect that
rescission simply by notifying the creditor of their intent to
rescind within the three-year period. *Jesinoski v. Countrywide
Home Loans*, 135 S. Ct. 790, 792 (2015). TILA does not
include a statute of limitations outlining when an action to
enforce such a rescission must be brought. Without a statute
of limitations in TILA, courts must first borrow the most
analogous state law statute of limitations and apply that
limitation period to TILA rescission enforcement claims. *Cty.
of Oneida v. Oneida Indian Nation of N.Y. State*, 470 U.S.
226, 240 (1985). In Washington, the state's six-year contract
statute of limitations is the most analogous statute. We have
jurisdiction under 28 U.S.C. § 1291, and we reverse and
remand for further proceedings.

**3.  LACK OF JURISDICTION**

**U.S. BANK NATIONAL ASSOCIATION v. MERVIN HODGE  -  October 18, 2018**

"Service by mail is not effective . . . unless plaintiff first made 'a

reasonable and good faith attempt' to serve defendant personally." City of

Passaic v. Shennett,  390 N.J. Super 475, 483 (App. Div. 2007)

3(a)). "A party's good faith effort to personally serve a defendant must be

'described with specificity in the proof of service.'" Ibid. (quoting R. 4:4-3).

The Chapter 7 discharge of debt did not impact plaintiff's mortgage lien.

The Order of Discharge specifically notes "a creditor may have the right to

enforce a valid lien, such as a mortgage or security interest, against the debtor's

property after the bankruptcy, if that lien was not avoided or eliminated in the

bankruptcy case."

**SHAROVA V WELLS FARGO BANK, N.A. - January 3, 2019**

xxx........"with respect to an action pursuant to RPAPL 1501(4), a person having an estate or an interest in real
property subject to a mortgage can seek to cancel and discharge that encumbrance where the period allowed by
the applicable statute of limitations for the commencement of an action to foreclose the mortgage has expired,
provided that the mortgagee or its successor was not in possession of the subject real property at the time the
action to cancel and discharge the mortgage was commenced ........xxxxxxxxxxxx

**King v. Wells Fargo Bank, N.A.**

**xxx...............** entire controversy doctrine, codified in Rule 4:30A of the New Jersey Court Rules, "embodies the principle that the adjudication of a legal controversy should occur in one  litigation in only one court.". The doctrine requires litigants to assert all affirmative claims relating to the controversy between them in one action, and to join all parties with a material interest in the controversy, or be forever barred from bringing a subsequent action involving the same underlying facts. ........xxxxx....... . In other words, any claim challenging the foreclosure-plaintiff's "right to foreclose" is "germane" to a foreclosure action and must be raised there.

Arguments against Foreclosure

Considering all of the fraud involved with securitization & mortgages, these important points/consideration must be considered.

- Original Note has been lost or destroyed
- Note and Deed of Trust have been separated
- Possible MERS fraud involved with this loan
- The right party to foreclosure must have original note, as well as deed of trust to foreclosure, in this case no one entity does. Thus foreclosing on this property is completely fraudulent.

According to the landmark case, Glaski Vs. Bank of America.  The case was determined that in order for a company/financial entity to foreclose on a property, the company/financial entity must have both the mortgage note and the deed of trust together at the time of foreclosure. On this specific loan this is not the case, and the foreclosing entity does not have both the original mortgage note, nor the deed of trust. Hence the conclusion is that they cannot foreclose.

## Law Analysis/Citation

The trial court has confirmed it.  Now the appellee's brief confirms it. There is no legal precedent for this case to be on the Judicial Branch website. None has been cited, appellant has found no such precedent in Connecticut or for that matter in the United States. And this Court agrees…15 months ago.  JP Morgan Chase Bank, N.A. vs. Virgulak, 192 Conn.App. 688 (2019). And if appellant is mistaken, he is in great company, because neither the trial court nor the plaintiff, nor the Appellate Court has been able to cite a case --- a holding.  This Court agrees with appellant and with a holding:

The plaintiff has cited no authority, and we have found none, that stands for the proposition that…a court can foreclose a mortgage that purports to secure a nonexistent debt. Id., supra at 705.

Case Citation

JP Morgan Chase Bank vs Dirgulak. Case Citation: 218A.3d

**Chain of Title:**

The chain of title is a possible fraudulent chain. Thus the note itself backing the debt, both could be considered fraud. The debt itself being transferred could be fraudulently transferred.

This creates question as to the validity of the note, and could mean the note itself could be void. Thus any transfers of this debt(loan) to any financial instution is fraudulent, since the chain of ownership is not perfected. In the landmark case Glaski vs Bank of America, it was ruled in favour of the homeowner. It was ruled that the foreclosing entity must have both original note and deed of trust at the time of foreclosure.

Although the chain of tite/chain of ownerhip  is possibly not perfected. Which creates argument against anyone trying to foreclose.

- Original Note must be in possession of the foreclosing entity in order to foreclose, according to the case Glaski vs Bank of America
- On this property, it does not appear that the financial entities have possession of the original note, thus they cannot foreclose. Nor do they have any right to the property, directly or indirectly.
- Thus at this time, no financial entity or company can foreclose due to the original note argument.

**MERS & The Debt**

MERS does record the assignment in the actual real property records system. The  actual note itself, is the creation of the legal obligation to have the loan/note repaid for the debt. Thus the note is the actual legal document which backs the debt. The debt itself has not been transferred or negotiated by MERS

- MERS does record the assignment in the actual real property records system. The actual note itself, is the creation of the legal obligation to have the loan/note repaid for the debt. Thus the note is the actual legal document which backs the debt. The debt itself has not been transferred or negotiated by MERS

- MERS is not legally entitled to receive monthly payments from the borrower. MERS cannot legally be entitled to benefit from a foreclosure in any sale of the home in a foreclosure sale.

- MERS does not own the mortgage note, thus it cannot attempt to foreclose.

- MERS cannot have any legal claim or interest in the loan interest, the debt, security instrument which MERS serves as a nominee.

- Regarding MERS policy and legalities, only a MERS member can transfer to another MERS member. A non MERS member cannot conduct transfers for a MERS member and vice versa.

**Note: MERS section included here to give  a background information to mers as it relates to "other" mortgages which mers has been involved in.**

The chain of title is a possible fraudulent chain. Thus the note itself backing the debt, both could possibly be considered fraud. The debt itself being transferred could be fraudulently transferred.

This creates question as to the validity of the note, and could mean the note itself could be void. Thus any transfers of this debt(loan) to any financial instution is fraudulent, since the chain of ownership is not perfected. In the landmark case Glaski vs Bank of America, it was ruled in favour of the homeowner. It was ruled that the foreclosing entity must have both original note and deed of trust at the time of foreclosure.

Although the chain of tite/chain of ownership possibly not perfected. Which creates argument against anyone trying to foreclose.

- Original Note must be in possession of the foreclosing entity in order to foreclose, according to the case Glaski vs Bank of America
- On this property, it does not appear that the financial entities have poessession of the original note since an original copy has not yet been furnished. Thus they cannot foreclose. Nor do they have any right to the property, directly or indirectly.
- Thus at this time, no financial entity or company can foreclose due to the original note argument.

45

# CASES

**CAPITAL ONE, N.A v. LAURENCE FRANKLIN** - November 4, 2019

**Summary:**

**If Held Separately, Note and Mortgage Assignment Both Needed to Foreclose, Court Says**

**A New Jersey appeals court has held in a published ruling that a party seeking to foreclose on a mortgage must have both the promissory note and a valid assignment of mortgage.**

A New Jersey appeals court has held in a published ruling that a party seeking to foreclose on a mortgage must have both the promissory note and a valid assignment of mortgage. But in a case where Capital One Bank brought a foreclosure action on a property when it possessed the mortgage but not the note, the appeals court said irregularities did not warrant reversal. James Peck IV appealed the Aug. 26, 2016, judgment of foreclosure by Capital One, which was the loan servicer for Freddie Mac. Peck, an attorney who litigated the case pro se, maintained that only Freddie Mac had standing to foreclose. Peck represented himself until his death in July 2016, when counsel was retained. According to the Appellate Division's opinion Monday, Peck took out a $258,750 mortgage with Chevy Chase Bank in March 2005, and a few months later the bank sold the note to Freddie Mac but retained the mortgage. In 2009, Chevy Chase merged with Capital One, and in 2010 Peck defaulted on the mortgage. A first attempt by Capital One to foreclose on Peck's property was dismissed without prejudice in June 2012 because the bank failed to comply with a court-ordered deposition of an employee who could shed light on possible mortgage irregularities, the court said. In those proceedings, Capital One brought the original note to court, but it was returned to Freddie Mac later that year. In February 2013, Capital One started the present foreclosure proceedings. Peck contested the action, but a judge dismissed his answer and referred the case to the Office of Foreclosure for entry of final judgment as uncontested. Peck's motion for reconsideration was denied in May 2016, and his motion for summary judgment—which he apparently filed shortly before his death—was denied in November 2016, according to the Appellate Division. On appeal before Judges Jose Fuentes, Ellen Koblitz and Thomas Manahan, Peck's estate, represented by Nicholas Stratton of Stratton Stepp in Glen Rock, asserted that Freddie Mac, as owner of the loan, is "the only entity with the right to enforce the mortgage." The Appellate Division panel said that, when the note is separated from the mortgage, "the plaintiff in a foreclosure action must demonstrate both possession of the note and a valid mortgage assignment prior to filing the complaint." Such a policy precludes "the possibility of one entity foreclosing on the home while the other enforces the note," Koblitz said, writing for the panel. Peck's estate conceded that Freddie Mac, as owner of the note, had the right to

46

foreclose on the home. The estate argued, however, that the mortgage was not legally retained by Chevy Chase Bank, but followed the note by force of law. "We reject that analysis. The issue is whether Capital One, both the successor owner and assignee of the mortgage, and the loan servicer, had the right to foreclose," Koblitz wrote. She cited a 2013 Freddie Mac internal bulletin, which said, "Foreclosures must normally be processed or litigated in the [s]ervicer's name." Since the defendant was provided more than sufficient notice that Capital One was the servicer for Freddie Mac, and since Freddie Mac publicly declared its policy to foreclose through its servicers, and since Capital One did possess the note at an earlier foreclosure proceeding as well as an assignment, the court said the irregularities were not sufficient to reverse the foreclosure judgment. "We do not intend by this decision to approve the way this foreclosure was prosecuted. The note should have been in Capital One's possession at the time it filed this foreclosure complaint," Koblitz wrote for the court. Stratton said he was considering an appeal to the Supreme Court. Calling the ruling "frustrating," "hard to square with other cases" and "super confusing," he said the ruling holds that, "by operation of law, the mortgage does not follow the note. Previously, if you own the note, the mortgage follows the note." Stratton, who represents homeowners in foreclosure cases, expressed concern about the precedential nature of the ruling. "It's a published case—you're going to see this case pop up in foreclosure matters," he said. "I'm not sure anyone knows how this is going to play out." The lawyer for Capital One, Danielle Weslock of McCarter & English in Newark, did not return a call about the case.

**Investors Bank, Plaintiff-Respondent, v. Javier Torres, Defendant-Appellant, and Mrs. Javier Torres, his wife, and Dora M. Dillman, Defendants. - 07-01-2020**

**xxx...** the courts ensure that the defendant will be adequately protected against a claim to the instrument by a holder that may appear at some later time. ......xxx

xxxxx..... N.J.S.A. 12A:3-309 plainly bars a party that possessed a lost promissory note before it was lost from transferring its interests under that note after the loss. ...........xxxx

a. A person not in possession of an instrument is entitled to enforce the instrument if the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, the loss of possession was not the result of a transfer by the person or a lawful seizure, and the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

**Kolbasyuk v. Capital Management Services, LP, No. 18-1260 (2d Cir. 2019) - March12,2019**

**SUMMARY**

A debt collection letter that informs the consumer of the total, present quantity of his or her debt satisfies 15 U.S.C. 1692g notwithstanding its failure to inform the consumer of the debt's constituent components or the precise rates by which it might later increase. Such a letter does not violate section 1692e for failure to inform the consumer that his or her balance might increase due to interest or fees when the letter contains the "safe harbor" language previously ratified in Avila v. Riexinger & Associates, LLC, 817 F.3d 72 (2d Cir. 2016).

In this case, after plaintiff received a debt collection letter from CMS, he filed suit against the company under the Fair Debt Collection Practices Act. The Second Circuit affirmed the district court's dismissal of plaintiff's claims, holding that CMS's letter complied with sections 1692g and 1692e.

## Debt Validity Argument + Additional Arguments

Debt Collection Validity

-      If a debt cannot be validated, there can be no collection of it. This is established by 15 USC 1692g(b).

-      Disputed Debts a debt collector
must cease collection of the debt until it is validated.

18 U.S. Code § 241 - Conspiracy against rights

## Additional Argument:

"Where there are no depositions, admissions, or affidavits the court

has no facts to rely on for a summary determination."

Trinsey v. Pagliaro, D.C. Pa. 1964, 229 F. Supp. 647.

The National Bank Act of 1864, Section 28, "Such associations shall not purchase or hold real estate in any other case or for any other purpose than as specified in this section. Nor shall it hold possession of any real estate under mortgage, or hold the title and possession of any real estate purchased to secure any debts due to it for a longer period than five years."

**Law Analysis/Citation:**

The trial court has confirmed it.  Now the appellee's brief confirms it. There is no legal precedent for this case to be on the Judicial Branch website. None has been cited, appellant has found no such precedent in Connecticut or for that matter in the United

States. And this Court agrees…15 months ago.  JP Morgan Chase Bank, N.A. vs. Virgulak, 192 Conn.App. 688 (2019). And if appellant is mistaken, he is in great company, because neither the trial court nor the plaintiff, nor the Appellate Court has been able to cite a case --- a holding.  This Court agrees with appellant and with a holding:

The plaintiff has cited no authority, and we have found none, that stands for the proposition that…a court can foreclose a mortgage that purports to secure a nonexistent debt. Id., supra at 705.

Case Citation

JP Morgan Chase Bank vs Dirgulak. Case Citation: 218A.3d


CASE

Boucher v. Fin. Sys. of Green Bay, 880 F.3d 362


In Boucher v. Fin. Sys. of Green Bay, a debt collector sent a Wisconsin borrower a notice that closely tracked safe harbor language that 7th Circuit had previously ruled to comply with the FDCPA—except for one thing. The debt collector's notice indicated that the Wisconsin borrower may be liable for "late charges and other charges." The borrower sued the debt collector under the FDCPA asserting that the "late charges and other charges" language in the notice violated the statute. The debt collector countered that its notice tracked the safer harbor language and the notice could not violate the FDCPA as a matter of law.


Basing its decision in part on Wisconsin law, the 7th Circuit found the debt collector's notice was misleading to an unsophisticated consumer particularly given that Wisconsin law does not allow a debt collector to recover late charges and other charges. Accordingly, the 7th Circuit agreed with the borrower that the notice was confusing to the unsophisticated consumer.

In addition to limiting the value of "safe harbor" language, the 7th Circuit cautioned lower courts against dismissing FDCPA claims based upon deceptive notices. That is because the 7th Circuit suggests that "district court judges are not good proxies for the 'unsophisticated consumer' whose interest the [FDCPA] protects."

https://caselaw.findlaw.com/us-7th-circuit/1886136.html

Saccameno v. U.S. Bank National

Around 2009, Saccameno defaulted on her mortgage. U.S. Bank began foreclosure proceedings. She began a Chapter 13 bankruptcy plan under which she was to cure her default over 42 months while maintaining her monthly mortgage payments, 11 U.S.C. 1322(b)(5). In 2011, Ocwen acquired her previous servicer. Ocwen, inexplicably, informed her that she owed $16,000 immediately. Saccameno continued making payments based on her plan. Her statements continued to fluctuate. In 2013, the bankruptcy court issued a notice that Saccameno had completed her payments. Ocwen never responded; the court entered a discharge order. Within days an Ocwen employee mistakenly treated the discharge as a dismissal and reactivated the foreclosure. For about twp years, Saccameno and her attorney faxed her documents many times and spoke to many Ocwen employees. The foreclosure protocol remained open. Ocewen eventually began rejecting her payments. Saccameno sued, citing breach of contract; the Fair Debt Collection Practices Act; the Real Estate Settlement Procedures Act; and the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFDBPA), citing consent decrees that Ocwen previously had entered with regulatory bodies, concerning inadequate recordkeeping, misapplication of payments, and poor customer service. The jury awarded $500,000 for the breach of contract, FDCPA, and RESPA claims, plus, under ICFDBPA, $12,000 in economic, $70,000 in non-economic, and $3,000,000 in punitive damages. The Seventh Circuit remanded. While the jury was within its rights to punish Ocwen, the amount of the award is excessive.

https://law.justia.com/cases/federal/appellate-courts/ca7/19-1569/19-1569-2019-11-27.html

***1: McCollough***, ***supra***, <u>**637 F.3d 939,**</u> which held that a debt collector had violated the FDCPA by serving "requests for admission" upon a pro se defendant that: (1) "asked the [debtor] to admit facts that [the debt collector knew] were not true"; and (2) did not include an explanation that, under Montana law , the requests would be deemed admitted if not responded to within 30 days. The Ninth Circuit concluded that "the service of requests for admission containing false information upon a pro se defendant without an explanation that the requests would be deemed admitted after thirty days constitutes 'unfair or unconscionable' or 'false, deceptive, or misleading' means to collect a debt." (*Id*. at p. 952.) In reaching its holding, the court rejected the debt collector's assertion that improper discovery techniques should be remedied through "[state] court rules for civil procedure" rather than through "liability under the FDCPA." (*Id*. at p. 951.) The court explained that Congress had "enacted the FDCPA expressly because prior laws for redressing 'abusive, deceptive, and unfair debt collection practices' were 'inadequate to protect consumers.' [Citation.] The statute preempts state laws 'to the extent that those laws are inconsistent with any provision of [the FDCPA].' [Citation.]" (*Ibid*.)

To demonstrate a violation of the FDCPA, the moving party must show (among other things) that: (1) the defendant is a "debt collector" within the meaning of the statute; and (2) the defendant committed some act or omission in violation of the FDCPA. (See *Robinson v. Managed Accounts Receivables Corp*. (C.D. Cal. 2009) <u>654 F.Supp.2d 1051, 1057</u>.)  *Bretches v. OneWest Bank*, B257013, at *13-14 (Cal. Ct. App. Sep. 14, 2015)

15 U.S. Code § 1692g - Validation of debts

U.S. Code

prev | next

(a) Notice of debt; contentsWithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

(b) Disputed debts

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

(c) Admission of liability

The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

(d) Legal pleadings

A communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a).

(e) Notice provisions

53

The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by title 26, title V of Gramm-Leach-Bliley Act [15 U.S.C. 6801 et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.

(Pub. L. 90–321, title VIII, § 809, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 879; amended Pub. L. 109–351, title VIII, § 802, Oct. 13, 2006, 120 Stat. 2006.)

# Fair debt collections act usc 1692

## § 805.  Communication in connection with debt collection

### (a) Communication with the consumer generally

Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt --

(1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer's location;

(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer; or

(3) at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.

### (b) Communication with third parties

Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

### (c) Ceasing communication

If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except --

(1) to advise the consumer that the debt collector's further efforts are being terminated;

(2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

If such notice from the consumer is made by mail, notification shall be complete upon receipt.

**(d) "Consumer" defined**

For the purpose of this section, the term "consumer" includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator. 15 USC 1692d

## § 807.  False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.

(2) The false representation of --

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

(6) The false representation or implication that a sale, referral, or other transfer of any interest in a debt shall cause the consumer to --

(A) lose any claim or defense to payment of the debt; or

(B) become subject to any practice prohibited by this subchapter.

(7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.

(8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

(9) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval.

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

(11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.

(12) The false representation or implication that accounts have been turned over to innocent purchasers for value.

(13) The false representation or implication that documents are legal process.

(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

(15) The false representation or implication that documents are not legal process forms or do not require action by the consumer.

(16) The false representation or implication that a debt collector operates or is employed by a consumer reporting agency as defined by section 1681a(f) of this title.

15 USC 1692f

## § 809.  Validation of debts

**(a) Notice of debt; contents**
Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing --

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

**(b) Disputed debts**

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

**(c) Admission of liability**

The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

**(d) Legal pleadings**

A communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a).

**(e) Notice provisions**

The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by title 26, title V of Gramm-Leach-Bliley Act [15 U.S.C. 6801 et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.

15 USC 1692h

Source: https://www.ftc.gov/legal-library/browse/rules/fair-debt-collection-practices-act-text

# Right of Rescission Laws & Case Laws
## Mortgage Rescission
## Right of Rescission /Right to Cancel Mortgage Argument

The notice of right to cancel disclosure was not provided to this client/homeowner. Thus the recent supreme court ruling on this sensitive matter gives the client/homeowner grounds to ask for cancellation of the mortgage/loan. It would be wise for the foreclosing bank or lender the client/homeowner is interacting with to give the client/homeowner favorable terms or to negotiated with the client/homeowner in order to avoid the legal proceedings that might follow considering the severity of these violations by the bank/lender/foreclosing entity.

_**Notice Of Right To Cancel**_ TILA _(Truth In Lending Act, 15 USC Section 1601 et seq; 12 CFR Part 266)_ allows three (3) days to review Disclosure Documents. The referenced "Three Day Right To Cancel" must have a trigger to begin. That trigger is, when the Lender has provided the Borrower with __ALL__ of the required Disclosures under _TILA_, and that the same are true, complete, accurate, and timely provided.

Being as the entire loan/mortgage process and Mortgage Note referenced herein and throughout, was obtained by wrongful acts of fraud, fraudulent inducement, concealment and fraudulent misrepresentation, the Borrower has other recourse, right, and cause of action under numerous State and Federal statutes.

Pursuant to the United State Supreme Court's decision in Jesinoski v. Countrywide Home Loans, Inc. (2015), 135 S.Ct. 790, TILA gives me, as a borrower, the right to rescind  the subject loan until midnight of the third business day following the consummation of the transaction or the delivery of the disclosures required under TILA.  I am hereby notifying you, as the creditor, of my intention to do so as you and/or your predecessors have failed to satisfy the TILA disclosure requirements, including but not limited to delivery of a written document to me explaining my rights at the time of the transaction.

To this date, Lender has __never__ provided Borrower with true, complete, accurate or timely documents as required. __ONLY AFTER__ such provision has been complied with can the "**3 DAY RIGHT TO CANCEL**" period begin. If the required full Disclosures have not been provided, then the period in which to CANCEL is extended for up to three (3) years, or until Lender moves to foreclose. The records thus far evidence that Borrower has requested to cancel within the three (3) year stipulated time period, while still waiting to receive all truth-in-lending disclosures as required by Federal Law, the same of which has never been received.

A close perusal, and audit of Borrower's note/loan documents have revealed certain Disclosure Violations, and that the Borrower has the remedial right and remedy pursuant to _UCC 1-201 (32) (34)_, inter alia, to invoke their Right Of Rescission (ROR), as further evidenced by the original **NOTICE OF RIGHT TO CANCEL**. This letter shall constitute **NOTICE** to all Lender(s), Successor(s), and Beneficiaries assigned, and/or appointed.

59

After sufficient **NOTICE** has been given to Lender, the Lender is required by Federal Law to CANCEL any lien(s), and to CANCEL any security interest on the Borrower's property within twenty (20) days. The Lender must also return any money, interest, fee, and/or property to the Borrower, as well as any money/funds given to any person or fiction in law/entity in connection with said transaction.

In accordance with both State and Federal law or until Lender complies, Borrower may retain the proceeds of the transaction. If it should be "impractical", or "Unfair" for the Borrower to return the property when gross discrepancies, fraud, or other wrongful acts are discovered, then he/she/they may offer its "Reasonable Value".

In the event that the Lender should fail, or refuse to return the Borrower's money offer within twenty (20) days, the Borrower may then regain/acquire all rights to clear title and reconveyance under *Federal law*, *State Statutes*, *Uniform Commercial Code*, and provisions of *TILA*, with the same being supported by the evidence of both public and bank records, and further as attached hereto.

Additionally, Borrower has the right to offer Lender a Reasonable Value. However, the penalties a bank can face for violations of *TILA*, and other State and Federal law can be as much as triple the damages, i.e., triple the amount of the interest the bank stood to fraudulently make off the mortgage/loan transaction. Therefore, the Borrower(s) hereby in good faith makes the following offer: Borrower will forgive bank/trust any liability incurred by its wrongful actions, provided  bank/trust  rightfully forgive Borrower(s) the full amount of mortgage/credit  bank/trust  fraudulently alleged to have given. In addition, Borrower(s) make the one time demand $1, 250,000.00 for any loss, damage, and injury he/she/they have sustained; and that  bank/trust  also immediately remove any/all negative comments on Borrower's credit report attributed to this transaction.

Any default, failures, or non-compliance on the Lender's part to perform as herein directed within twenty (20) days of receipt, shall constitute this **NOTICE OF RIGHT TO CANCEL** as valid and fully agreed/accepted pursuant to the terms and conditions as set forth herein.

60

# FORECLOSURE OFFENSE AND DEFENSE SEPARATION

# OF MORTGAGE NOTE

It might seem like a strange idea but it has been in the Uniform Commercial Code for Years and its predecessor. The usual rule is that the mortgage follows the note and the note follows the mortgage. But the UCC provides an exception for the operation of the parties intent, and by operation of law by inference.

Start with this Statute from Florida which has its counterpart in most of the country:

701.02 Assignment not effectual against creditors unless recorded and indicated in title of document.—

(1) No assignment of a mortgage upon real property or of any interest therein, shall be good or effectual in law or equity, against creditors or subsequent purchasers, for a valuable consideration, and without notice, unless the assignment is contained in a document which, in its title, indicates an assignment of mortgage and is recorded according to law.

So what you say? Well in most cases the note was assigned and the mortgage wasn't. At least it wasn't recorded. And in most cases as the loan moves up the securitization chain several things happens. Instead of there being a specific assignment of a specific loan, note or mortgage, there is a general description of the pool and possibly some identification of the loan date or parties but not assignment, endorsement, allonge or actual transfer.

So the first thing that happens in securitization of the loan is that the named payee on the note gets (a) paid in full and (b) paid a fee for the "rental" of its charter or license in order to facilitate an unchartered, unregistered entity or person to enter into a transaction that LOOKS like a residential loan transaction but is actually a scheme to issue unregulated securities to unsuspecting (or suspecting) investors under false pretenses. So if the loan is

for $100,000, the payee on the note gets the full $100,000. Plus he usually gets $2500 "under the table" (TILA violation).

The point here is that the note is paid and without a RECORDED assignment, the mortgage does NOT travel with the note even if an assignment was intended. And the reason is the same as the reason for recording a deed. Without that requirement a person could issue warranty deeds to 100 people on the same property. In fact, as was done in many cases with the movement of these loans, it would be the equivalent of selling the deed to the same property 100 times by a grantor who has no title.

The reason this is so important, is that if the mortgage has been severed from the note, then the obligation, if it exists at all has been converted from a secured obligation to an unsecured obligation, thus making foreclosure impossible. No mortgage can be foreclosed without the mortgagee producing the note and stating that it is in default and showing (proving) that this is so. In securitization, this is NEVER possible.

**Foreclosure Defense and Chain of Title**

Here is where foreclosure defense can begin to chip away at a bank's claim on your property. In order for a mortgage, deed of trust or promissory note to be valid, it must have what is known as "perfection" of the chain of title. In other words, there must be a clear, unambiguous record of ownership from the time you signed your papers at closing, to the present moment. Any lapse in the chain of title causes a "defect" in the instrument, making it invalid.

In reality, lapses occur frequently. As mortgages and deeds began to routinely be bought and sold, the sheer magnitude of those transfers made it difficult, costly and time-consuming for institutions to record every transaction in a county records office. But in order to have some method of record-keeping, the banks created the

**Mortgage Electronic Registration System** (MERS), a privately held company that tracks the servicing rights and ownership of the nation's mortgages. The MERS holds more than 66 million American mortgages in its database.

When a foreclosure is imminent, MERS appoints a party to foreclose, based on its records of who owns the mortgage or deed of trust. But some courts have rejected the notion that MERS has the legal authority to assign title to a particular party in the first place. A court can decide MERS has no "standing," meaning that the court does not recognize its right to initiate foreclosure since MERS does not have any financial interest in either the property or the promissory note.

And since MERS has essentially bypassed the county record-keeping system, the perfection of chain of title cannot be independently verified. This is where a foreclosure defense can gain traction, by questioning the perfection of the chain of title and challenging MERS' legal authority to assign title.

Some courts may also challenge MERS' ability to transfer the promissory note, since it likely has been sold to a different entity, or in most cases, securitized (pooled with other loans) and sold to an unknown number of entities. In the U.S. Supreme Court case *Carpenter v. Longan*, it was ruled that where a promissory note goes, a deed of trust must follow. In other words, the deed and the note cannot be separated.

If your note has been securitized, it now belongs to someone other than the holder of your mortgage. This is known as bifurcation — the deed of trust points to one party, while the promissory note points to another. Thus, a foreclosure defense claims that since the relationship between the deed and the note has become defective, it renders the deed of trust unenforceable.

Your promissory note must also have a clear chain of title, according to the nation's **Uniform Commercial Code** (UCC), the body of regulations that governs these types of

**financial instruments. But over and over again, borrowers have been able to demonstrate that subsequent assignments of promissory notes have gone unendorsed. In fact, it has been standard practice for banks to leave the assignment blank when loans are sold and/or securitized and, customarily, the courts have allowed blank assignment to be an acceptable form of proof of ownership. However, when the Massachusetts Supreme Court in *U.S. Bank v. Ibenez* ruled that blank assignment is not sufficient to claim perfection, it provided another way in which a foreclosure can be challenged.**

This is my first diary entry and I'm not going to hide the fact that this information comes from personal experience and need.  When I made mortgage payments to Chase Home Finance, LLC, it claimed ownership of my mortgage note, also known as a deed of trust note, or 'loan' note (hereafter "Note").  During the same time period that Chase claimed ownership of my Note, so did Fannie Mae.  However, I soon discovered that *neither* Chase nor Fannie Mae owned my Note.  It was, and still is, owned by a mortgage backed security trust (MBST) which purchased my Note from neither Chase nor Fannie Mae but from yet another purported owner of my Note.   In my extended diary I give the UCC statute common to *all* states and also recent case citations (one is less than two weeks old) that you, your attorney or your friend's attorney will need for a successful "show me the note" defense. Yes! It works!

You need to know this; that the term, "show me the note" is a misnomer.  Under the Uniform Commercial Code (UCC), Section 309 of Article 3 (UCC 3:309) http://www.law.cornell.edu/...  the Note owner does not need to show a Note, whether original or a copy, in order to enforce it "if" it once had possession of the Note and now claims to have lost it or that it was accidently destroyed.  That, however, is not the problem that banks face.  The problem banks are having with the "show me the note" defense is proving that they have a right to enforce the Note, even if they can produce a copy.   The UCC, at 3:309(2), says that the bank must 'prove'  its right to enforce the Note.

You ask the bank, "Where did you get that Note?  Show me the endorsements".  The bank must show the '*chain of title*' from the original Lender bank to itself, and that it *cannot* do.  Almost always, the Lender sold your Note to Fannie Mae the day it was signed which then, within days, sold it to another entity and so on until it ended up in a "mortgage backed security trust", or MBST.  Fannie Mae no longer owns your Note, nor does MERS.  The United States Bankruptcy Court for the Eastern District of California issued a ruling dated May 20, 2010, in the matter of *In re: Walker*, Case No. 10-21656-E-11, http://www.ultimatebk.com/... stating that "Any attempt to transfer the beneficial interest of a trust deed without ownership of the underlying note is void under California law."  Though this  conclusion was based upon California law it is the same UCC and real estate law as most other states have adopted.  The *In re: Walker* court states that the Note and the mortgage are inseparable, and that an assignment of the Note carries the mortgage with it, "while an assignment of the latter [the mortgage] alone is a nullity" (most foreclosing companies claim ownership of the mortgage only, not the note making the mortgage a *nullity*).   Meaning; if a  bank claims to own the mortgage but doesn't also own your Note, it *cannot* foreclose.  This concept is from ancient English Common Law codified by most states as the UCC, for Notes (a Note is personal property), and also from real estate law and practice for the mortgage ( a mortgage is not personal property, it is real property).

A more recent California case, *Gomes v Countrywide Home Loans, et al.*, D057005, Ct. Appeals CA, 4th Dist., Div One, February 18, 2011, http://www.leagle.com/... did not address the "show me the note" defense though it was widely expected to do so.  However, in *Gomes* the CA court cited two cases approvingly where the "show me the note" defense was accepted by federal courts; *Castro v Executive Trustee Services, LLC*, (D Ariz, 2009 February 23, 2009, CV-08-2156-PHX-LOA) 2009 US Dist Lexus 14134, http://www.leagle.com/... and *Weingartner v Chase Home Finance, LLC*, (D Nev 2010) 702 F Supp2nd 1276, 1282-1283, http://mattweidnerlaw.com/... .

The CA court noted that the issue in those two cases cited in the preceding paragraph (the "show me the note" issue) was not the same issue that it had to decide in *Gomes*.  In the *Gomes* case the plaintiff, Jose Gomes, did not raise the "show me the note" defense.  Instead, his case was a lawsuit for *discovery* in order to find out '*if*' he could raise the "show me the note" defense.  The *Gomes* court held that such a lawsuit, making '*no*' specific allegations, did not state a cause of action as a matter of law.  Gomes alleged only that 'upon information and belief' MERS did not own his Note or did not have authority from the Note owner to foreclose and Jose Gomes wanted to know if his "information and belief" was true, because he didn't really *know*if it was true.  The *Gomes* court, finding that Gomes made no allegation upon which it could rule, agreed with the lower court that his case should be dismissed.  The *Gomes* court never addressed the "show me the note" defense in its published opinion.

 The most recent case that expounds upon the "show me the note" defense, as does *Weingartner*, continues with the reasoning made in previous court rulings made in Kansas, Ohio and Michigan and other states making ownership of your Note a requirement in order to commence a foreclosure, whether in a judicial or non-judicial state.  See, Eastern District Bankruptcy Court for New York, *In Re: Ferrell L. Agard*, Case No. 810-77338, February 10, 2011 issued less than two weeks ago, http://www.ritholtz.com/... .  In this case Ferrell Agard, the home owner, lost for reasons having nothing to do with ownership of the mortgage Note, but the Hon. Robert E. Grossman, Bankruptcy Judge, stated, **"However, in all future cases which involve MERS, the moving party must show that it validly holds both the mortgage and the underlying note in order to prove standing before this Court"**.  In other words, Mr. Banker, if you want to foreclose, or file a Proof of Claim and  set aside the 'stay' order that stops you from foreclosing, you must

"Prove" that you own "both" the **Mortgage Note and the Promissory Note (meaning: prove a valid "chain of title").**

# UCC Section 3-301

**UCC Section 3-301** provides only three ways in which an individual may qualify as the person eligible to enforce a note, two of which require the person to be in possession of the note (which may include possession by a third party that possesses it for the person)

19 : • The first way a person may qualify as the person eligible to enforce a note will be its "holder." This familiar concept, put down in more detail in UCC Section 1-201(b)(21)(A), requires that the person be in possession of the note and either (i) the note is payable to that person or (ii) the note is payable to bearer. Determining to whom a note is payable requires examination not only of the face area of the note but additionally of any indorsements. This is because the party to whom a note is payable may be changed by indorsement20 to ensure that, for instance, a note payable to the order of a named payee that's indorsed in blank by that payee becomes payable to bearer.21

• The 2nd way a person may be the person eligible to enforce a note will be a "Non-holder in possession of the [note] who has the rights of a holder." o Just how can an individual who is not the holder of a note have the rights of a holder?. This may occur by operation of law beyond your UCC, such as the law of subrogation or estate administration, by what type person may be the successor to or acquires another person's rights.22. Additionally it may occur if the delivery of the note to that person is really a "transfer" (as that term is defined in UCC Section 3-203, see below) because transfer of a note "vests in the transferee any right of the transferor to enforce the instrument."23 Thus, in case a holder (who, as seen above, is really a person eligible to enforce a note)  transfers the note to another person, that other person (the transferee) obtains from the holder the right to enforce the note even though the transferee does not end up being the holder (as in the

example below). Similarly, a 19 See UCC § 1-103(b) (unless displaced by particular provisions of the UCC, the law of, *inter alia*, principal and agent supplements the provisions of the UCC). See also UCC § 3-420, Comment 1 ("Delivery to an agent [of a payee] is delivery to the payee."). Note that "delivery" of a negotiable instrument is defined in UCC § 1-201(b)(15) as voluntary transfer of possession. This Report does not address the determination of whether a particular person is an agent of another person under the law of agency and the agency law implications of such a determination.

20 "Indorsement," as defined in UCC § 3-204(a), requires the signature of the indorser. The law of agency determines whether a signature made by a person purporting to act as a representative binds the represented person. UCC § 3-402(a); see note 12, supra. An indorsement may appear either on the instrument or on a separate piece of paper (usually referred to as an *allonge*) affixed to the instrument. See UCC § 3-204(a) and Comment 1, par. 4.

21UCC Section 3-205 contains the rules concerning the effect of various types of indorsement on the party to whom a note is payable. Either a "special indorsement" (see UCC § 3-205(a)) or a "blank indorsement" (see UCC § 3205(b)) can change the identity of the person to whom the note is payable. A special indorsement is an indorsement that identifies the person to whom it makes the note payable, while a blank indorsement is an indorsement that does not identify such a person and results in the instrument becoming payable to bearer. When an instrument is indorsed in blank (and, thus, is payable to bearer), it may be negotiated by transfer of possession alone until specially indorsed. UCC § 3-205(b).

22 See Official Comment to UCC § 3-301. 23 UCC § 3-203(b).

Subsequent transfer will result in the following transferee being truly a person eligible for enforce the note.

23  o Under what circumstances does delivery of a note qualify as an exchange? As mentioned in UCC Section 3-203(a), a note is transferred "if it is delivered by a person apart from its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." For instance, assume that the payee of a note sells it to an assignee, going to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee won't qualify as a holder (because the note continues to be payable to the payee) but, because the transaction between the payee and the assignee qualifies as an exchange, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the person eligible for enforce it. Thus, the failure to acquire the endorsement of the payee doesn't prevent a person in possession of the note from being the person eligible for enforce it, but demonstrating that status is more difficult. The reason being the person in possession of the note must also demonstrate the purpose of the delivery of the note to it to be able to qualify as the person eligible for enforce.

24  Under what circumstances does delivery of a note qualify as a transfer? As stated in UCC Section 3-203(a), a note is transferred "if it is delivered with a person apart from its issuer for the goal of giving to the person receiving delivery the right to enforce the instrument." Like, think that the payee of a note sells it to an assignee, intending to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee will not qualify as a holder (because the note is still payable to the payee) but, as the transaction between the payee and the assignee qualifies as a transfer, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the individual eligible for enforce it. Thus, the failure to obtain the endorsement of the payee doesn't prevent a person in possession of the note from being the individual eligible for enforce it, but demonstrating that status is more difficult. The

reason being the individual in possession of the note must demonstrate the goal of the delivery of the note to it in order to qualify as the individual eligible for enforce.24

24 If the note was transferred for value and the transferee does not qualify as a holder because of the lack of endorsement by the transferor, "the transferee has a specifically enforceable right to the unqualified endorsement of the transferor." See UCC § 3-203(c).

25 UCC § 3-309(a)(iii) (1990 text), 3-309(a)(3) (2002 text). The 2002 text goes on to provide that a transferee from the person who lost possession of a note may also qualify as a person entitled to enforce it. See UCC § 3309(a)(1)(B) (2002). This point was thought to be implicit in the 1990 text, but was rejected in some cases in which the issue was raised. The reasoning of those cases was rejected in Official Comment 5 to UCC § 9-109 and the point was made explicit in the 2002 text of Article 3.

26 To prevail the person must establish not only that the person is a person entitled to enforce the note but also the other elements of the maker's obligation to pay such a person. See generally UCC §§ 3-309(b), 3-412. Moreover, as is the case with respect to the enforcement of all rights under the UCC, the person enforcing the note must act in good faith in enforcing the note. UCC § 1-304. Subsequent transfer can lead to the next transferee being a person eligible for enforce the note.

**Illustrations:**

1.Maker issued a negotiable mortgage note payable to the order of Payee. Payee is in possession of the note, which has not been indorsed. Payee may be the holder of the note and, therefore, is the person eligible to enforce it. UCC §§ 1-201(b)(21)(A), 3-301(i).

2. Maker issued a negotiable mortgage note payable to the order of Payee. Payee indorsed the note in blank and gave possession of it to Transferee. Transferee may be the holder of the note and, therefore, is the person eligible to enforce it. UCC §§ 1-201(b)(21)(A), 3-301(i).

70

3. Maker issued a negotiable mortgage note payable to the order of Payee. Payee sold the note to Transferee and gave possession of it to Transferee for the objective of giving Transferee the proper to enforce the note. Payee did not, however, indorse the note. Transferee isn't the holder of the note because, while Transferee is in possession of the note, it's payable neither to bearer nor to Transferee. UCC § 1-201(b)(21)(A). Nonetheless, Transferee is really a person eligible to enforce the note. This is because the note was transferred to Transferee and the transfer vested in Transferee Payee's to enforce the note. UCC § 3-203(a)-(b). As a result, Transferee is really a nonholder in possession of the note with the rights of a holder and, accordingly, a person eligible to enforce the note. UCC § 3-301(ii).

4  Same facts as Illustrations 2 and 3, except that (i) underneath the law of agency, Agent is the agent of Transferee for purposes of possessing the note and (ii) it is Agent, rather than Transferee, to whom actual physical possession of the note is written by Payee. In the important points of Illustration 2, Transferee is just a holder of the note and a person eligible to enforce it. In the context of Illustration 3, Transferee is just a person eligible to enforce the note. Whether Agent may enforce the note or mortgage on behalf of Transferee depends partly on what the law states of agency and, in the event of the mortgage, real property law.

5. Same facts as Illustration 2, except that after obtaining possession of the note, lost the note and its whereabouts cannot be determined. Transferee is just a person eligible to enforce the note even though Transferee does not need possession of it. UCC § 3-309(a). If Transferee brings an action on the note against Maker, Transferee must establish the terms of the note and the weather of Maker's obligation on it. The court might not enter judgment and only Transferee, however, unless the court finds that Maker is adequately protected against loss that may occur by reason of a state of another person

(such while the finder of the note) to enforce the note. UCC § 3-309(b). 27 See

*id*. UCC § 3-309(b) goes on to state that "Adequate protection may be provided

by any reasonable means."

# Standing and Capacity

Standing and capacity to sue are related, but distinguishable, legal concepts (*see Silver v Pataki,* 96 NY2d 532, 537 [2001]; *Community Bd. 7 of Borough of Manhattan v Schaffer,* 84 NY2d 148, 154-155 [1994]; *Caprer v Nussbaum,* 36 AD3d 176, 181-182 [2006]; *Security Pac. Natl. Bank v Evans,* 31 AD3d 278, 279 [2006]). Although they are both components of a party's authority to sue (*see Matter of Graziano v County of Albany,* 3 NY3d 475, 479 [2004]), capacity requires an inquiry into the litigant's status, i.e., its "power to appear and bring its grievance before the court" (*Community Bd. 7 of Borough of Manhattan v Schaffer, supra* at 155), while standing requires an inquiry into whether the litigant has "an interest in the claim at issue in the lawsuit that the law will recognize as a sufficient predicate for determining the issue at the litigant's request" (*Caprer v Nussbaum, supra* at 182). Where standing is put into issue by a defendant's answer, a plaintiff must prove its standing if it is to be entitled to relief (*see TPZ Corp. v Dabbs,* 25 AD3d 787, 789 [2006]; *see also Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761, 769 [1991] [standing "is an aspect of justiciability which, *when challenged,* must be considered at the outset of any litigation" (emphasis added)]).

This section is provided to provide background general information as it relates to securitization.

## Certificates relating to a securitization trust.

As detailed herein, the certificates reflected beneficial ownership interests in the trust and the supplemental interest trust. The original certificate principal balance, pass-through rates, and other features were listed in the table on pages s-1 and s-2 for the offered certificates. The certificates were issued under a pooling and servicing arrangement between a mortgage loan trust for example, as a depositor, lender, and a Bank, an Association, as servicers, and a Bank, N.A., as trustee and custodian, dated as of the closing date. All mortgage loan collections were used to pay servicer and trustee costs, premiums for lender-paid mortgage insurance, certain swap counterparty payments, and interest and principal payments on the certificates.

Based on their outstanding certificate principal balances and associated entitlements, all principal collections were paid to one or more classes of certificates offered by this prospectus supplement or to other classes of certificates not offered by this prospectus supplement. Any excess collections over the amounts paid to the holders of the offered certificates (either as interest or principal), the servicers, the trustee, mortgage insurance providers, and the swap counterparty were paid to the owners of the other classes of certificates (including the class X certificates) that were not offered by this prospectus supplement and were entitled to such excess amounts. This prospectus supplement includes a "description of the Certificates-Distributions."

According to the Pooling and Servicing Agreement, the following documents were normally required to be given to the Trust for each Mortgage Loan:

(1) the associated original Mortgage Note endorsed in full or in part without recourse to the Trust,
(2) the original mortgage, as well as documentation of recording (or, if the original recorded Mortgage has not yet been returned by the recording office, a copy thereof certified to be a true and complete copy if such Mortgage was sent to for recording),
(3) an original assignment of the Mortgage to the Trust in recordable form or in blank (save as indicated below) or
(4) the originals of any agreements involving assumption, modification, extension, or guarantee.

Many of the Mortgage Loans are likely to have had mortgages or assignments of mortgages recorded in the name of an agent on behalf of the holder of the linked Mortgage Note. No Mortgage assignment in favor of the Trust had to be drafted, delivered, or recorded in those situations. Instead, each Servicer was expected to take all necessary steps to ensure that the Trust was visible to the owner of the linked Mortgage Loan on the agent's records for the purposes of the agent's system for recording transfers of beneficial ownership of mortgages. The Depositor did not plan to cause the assignments to be recorded, with the exception of assignments relating to mortgaged properties in certain states.

According to the terms of the Mortgage Loan Purchase Agreements, each Seller made or assigned to the Depositor certain representations and warranties concerning the related Mortgage Loan as of the date of (or provided in) the applicable Mortgage Loan Purchase Agreement, which generally included representations and warranties similar to those summarized in the prospectus under the heading "Description of the Agreements-Representations and warranties; Repurchase." The Depositor's rights under the Mortgage Loan Purchase Agreements were assigned to the Trust on the Closing Date for the benefit of the offered certificates' holders. Following the discovery of a breach

of any representations or warranties that materially or adversely affected the interests of holders of Offered Certificates in a Mortgage Loan, or receipts of notice of such breach, the applicable seller was obligated to cure such breach or Purchase that affected Mortgage Loan from the Trust for a price equal to the unpaid principal balance thereof plus any co-payments (or, in certain circumstances, to substitute another Mortgage Loan).

Holders of the Offered Certificates suffered a loss to the extent that any Mortgage Loan for which a representation or warranty was violated was not purchased or, if authorized, substituted by the appropriate seller and a Realized Loss occurred with respect to such Mortgage Loan.

## Amendment

The Depositor, Servicers, and Trustee amended the Pooling and Servicing Agreement without the consent of certificate holders for the purposes described in the prospectus under "Description of the Agreement - Material Terms of the Pooling and Servicing Agreements and Servicing Agreements – Amendments." The Depositor, the Servicers, and the Trustee, as well as the holders of a 66 percent percentage interest in each class of certificates affected, amended the Pooling and Servicing Agreement to add to, change, or eliminate any of the provisions of the Pooling and Servicing Agreement, or modifying the certificate holders' rights in any way; provided, however, that no such amendment allowed:

1. Without the swap counterparty's approval changed the provisions of the Pooling and Servicing Agreement governing payments to the supplemental interest Trust, or otherwise had a major detrimental effect on the swap counterparty's interests (such consent was not to be unreasonably withheld)
2. Any payment needed to be distributed on any certificate has been reduced in any way, or the schedule of such payments has been delayed, without the approval of the holder of such certificate;
3. If aggregate outstanding principal amounts of certificates of each class, the holders of which were needed to consent to any such alteration, without the approval of the holders of all certificates of such class, the aforesaid percentage would be reduced.

## Section 2

## Conveyance of Mortgage Loan

The Depositor does barely sell, transfer, assign, set over, and convey to the Trust without recourse all of the Depositor's right, title, and interest in and to all of the assets that comprise the Trust Fund on or before the Cut-off Date, including all interest and principal received on or without respect to the Mortgage Loan on or before the Cut-off Date ( other than Scheduled Payments due on the Mortgage Loans on or before the Cut-odd Date), ), all accounts, chattel paper, deposit accounts, documents, general intangibles, products, instruments, investment property, letter-of-credit rights, and all earnings of the foregoing. In connection with the Depositor's conveyance of the Trust's assets, the Depositor further agrees to indicate in its books and records that the Mortgage Loans were sold to the Trustee pursuant to this Agreement on or before the Closing Date, at its own expense, and to deliver to the Trust the Mortgage Loan Schedule. The Mortgage Loan Schedule is attached to this Agreement as Exhibit B and is hereby incorporated into and formed a part of it.

The Depositor, the Servicers, the Trust, and the Trustee all agreed and understood that no Mortgage Loan should be included in the Trust, including but not limited to:

- a "High-Cost Home Loan," as defined by the New Jersey Home Ownership Act, which went into effect on November 27, 2003.
- a "High-Cost Home Loan," as defined by the New Mexico Home Loan Protection Act, which went into effect on January 1, 2004.
- a "High-Cost Home Loan," as defined by the Massachusetts Predatory Home Loan Practices Act, which went into effect on November 7, 2004, or (iv) a "High-Cost Home Loan," as defined by the Indiana High-Cost Home Loan Law, which went into effect on January 1, 2005.


1. With regard to any Mortgage Loan thus assigned that was not a Co-op Loan, the Depositor did hereby provide to, and deposit with, the custodian the following documents or instruments:
   A. The original Mortgage Note, along with all riders, was endorsed in blank or "Pay to the order of Securitization trust, without recourse." All intervening endorsements were included in the Mortgage Note, demonstrating a complete chain of title from the originator to (_____);
   B. Except as provided below and for each Mortgage Loan that was a MERS Loan, the original recorded Mortgage with all riders, with evidence of recording thereon, or, if the original Mortgage had not been returned from the recording office, a copy of the original Mortgage certified by the Transferor to the true copy of the original of the Mortgage that has been delivered for recording in the appropriate recording office of the jurisdiction in which the Mortgaged was located, noting the presence of the Loan's MIN and either language indicating that the Mortgage Loan was a MOM Loan origination, or if the Mortgage Loan was not a MOM Loan origination, the original Mortgage and its assignment to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage was recorded;
   C. The original Assignment of each Mortgage Loan that was not a MERS Loan endorsed either in blank or to "Securitization trust" in the case of each Mortgage Loan that was not a MERS Loan.
   D. The original title insurance policy (or, if the original title insurance policy has not been received from the title insurance firm, a preliminary title report, commitment, or binder);
   E. Originals of any intervening mortgage assignments, along with evidence of recording, or, if the original intervening assignment has not yet been returned from the recording office, a copy of such assignment certified to be a true copy of the original of the assignment sent for recording in the appropriate jurisdiction where the Mortgaged property was; and
   F. If any, the originals of all assumptions and modifications agree.


2. With regard to any Mortgage Loan thus assigned that was a Co-op Loan, the Depositor did hereby provide to, and deposit with, the Custodian the following documents or instruments:
   A.
   (i) (I)Either the original Mortgage Note (or a lost note affidavit with a copy of the original Mortgage Note) or
   (ii) the original consolidation, extension, and modification agreement (or a lost note affidavit including a copy of the original consolidation, extension, and modification agreement), in either case, endorsed "pay to the order of Securitization trust without recourse" or "pay to the order of Securitization trust without recourse."
   B. The Mortgagor's original Mortgage with respect to such Co-op Loan;

C.  The original Assignment of Mortgage, either blank or endorsed to "Securitization trust."

D.  Original mortgage assignments revealed a complete chain of assignment from the originator of the associated Co-op Loan to the final endorsee on the Mortgage Note;

E.  Original Form UCC-1 and any continuation statements with evidence of filling thereon (or a documented copy thereof) entered into by the Mortgagor with respect to such Co-op Loan;

F.  A completed chain of assignments from the originator of the associated Co-op Loan to the applicable Seller, with evidence of recording on Form UUC-3 (or copies thereof) by the applicable Seller or its agent assigning the security interest covered by such Form UUC-3 (or copies thereof);

G.  Original stock certificates representing the stock allocated to the related dwelling unit in the related residential cooperative housing corporation, pledged by the related Mortgagor to the originator of such Co-op Loan with a stock power in blank attached, and pledged by the related Mortgagor to the originator of such Co-op Loan;

H.  The first exclusive lease;

I.  The original or a copy of the proprietary lease assignment to the Trust, as well as all subsequent assignments;

J.  An original or a copy of the recognition agreement for the mortgage interests in the Co-op Loan by the residential cooperative housing corporation, whose stock was pledged by the connected Mortgagor or the originator of such Co-op Loan; and

K.  Originals of any assumption, consolidation, or modification agreements relating to any of the items listed in (A) through (F) above for such Co-op Loan.

If the Depositor did not deliver the Mortgage, Assignments of Mortgage, or assumption, consolidation, or modification, as the case may be, concurrently with the execution and delivery of this Agreement solely due to a delay caused by the public recording office where such Mortgage, Assignments of Mortgage, or assumption, consolidation, or modification, as the case may be, with evidence of recording thereon, if applicable, solely due to a delay caused by the public recording office where such Mortgage, Assignments of Mortgage, or assumption, consolidation, the Depositor shall deliver or cause to be delivered to the Custodian written notification that such Mortgage, assumptions, consolidation, or modification, as the case may be, has been delivered to the proper public recording office for recording.

Following that, the Depositor delivered or caused to be delivered to the Custodian such Mortgage, Assignments of Mortgage, or assumption, consolidation, or modification, as the case may be, together with evidence if a recording was indicated on the document, if applicable, upon receipt thereof from the public recording office. Any required endorsement that was not included on a Mortgage Note or an Assignment of Mortgage was created or caused to be made by the Depositor.

No Depositor, Servicer, or Trustee was compelled to permit the Assignment of Mortgage referred to in this section 2.01 to be recorded with respect to any Mortgage Loan that was not a Co-op Loan. None of the Depositors, Servicers, or Trustees were compelled to cause the Form UCC-3 referred to in this Section 2.01 to be filed concerning any Co-op Loan. If any Assignment of Mortgage referred to in this section 2.01 is not recorded or is recorded incorrectly, neither the Servicers, the Trust, nor the Custodian are liable for any failure to receive or act on such notice.

On behalf of the Certificate holders, the Trust was given ownership of each Mortgage Note, the Mortgage, and the contents of the accompanying Mortgage File. Neither the Depositor nor the Servicers took any actions that were inconsistent with such ownership, and they should not have claimed a stake in it. In response to any third-party

77

inquiries about ownership of the Mortgage Loans, the Depositor and Servicers stated that such ownership was held by the Trust on behalf of the Certificate holders. Mortgage documents relating to the Mortgage Loan were not delivered to the Custodian and were instead held in trust by the applicable Servicer for the benefit of the Trust as the owner thereof, and the Servicer's possession of the contents of each Mortgage File so retained was solely for the purpose of servicing the related Mortgage Loan, and such retention and possession by the Servicer was solely in a custodial capacity. The Depositor committed to taking no action that would contradict the Trust's ownership of the Mortgage Loans, to notify any interested parties that the Mortgage Loans had been sold, and to claim no ownership interest in the Mortgage Loans.

The conveyance of the Depositor's right, title, and interest in and to the Trust Find pursuant to this Agreement was intended to be a purchase and sale, not a loan, as stated in this Agreement. If the transfer of the Mortgage Loans from the Depositor to the Trust was not characterized as a sale under applicable law, this Agreement constituted a security agreement, and the Depositor was deemed to have granted to the Trust and did grant to the Trust, a security interest in the Mortgage Loans, a first priority security interest in all of the Depositor's right, title, and interest in, to, and under the Mortgage Loans, all payments of principal on or interest on such Mortgage Loans, all other rights relating to payments made in respect of the Trust Fund, and all proceeds thereof, whether now owned or hereafter acquired.

If the Trust created by this Agreement terminates before the settlement of any person's rights in any Certificates, the security interest created hereby continued in full force and effect, and the Trustee (or the Custodian on its behalf) was deemed to be a collateral agent for such person's benefit.

The Depositor did cede, assign, and set over to the Trust for the benefit of the Certificate holders its rights and interests under each sale Agreement, in addition to the conveyance made in the first paragraph of this Section 2.01, including the Depositor's right, title, and interest in the representations and warranties contained in such Sale Agreement, as well as the benefit of the repurchase obligations and the obligation of the sellers contained in the Sale Agreement to take all actions reasonably necessary to ensure the enforceability of the Mortgage Loan at the request of the Depositor or the Trust.

The Trustee hereby accepted such assignment and was entitled to exercise the Depositor's rights under each Sale Agreement as if it were the Depositor for such purposes. Except as expressly set forth herein, the foregoing Sale Agreement, transfer, assignment, set-over, deposit, and conveyance did not and was not intended to result in the Trust creating or assuming any obligation of the Depositor, the Sellers, or any other person in connection with the Mortgage Loans or any other agreement or instrument rating thereto.

## SECTION 10.03.

## Governing Law.

THIS AGREEMENT WAS CONSTRUCTED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF PENNSYLVANIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF PENNSYLVANIA AND THE OBLIGATION, RIGHTS, AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATE

HOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS WITHOUT REGARD TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

The original Mortgage recording was frequently the only recorded document in the Chain of Title for traditional lending before Securitization. Because banks maintained the loans and did not sell them, only the original recording remains in the banks' possession.

The introduction of securitization, particularly through "Private Investors" rather than Fannie Mae or Freddie Mac, ushered in a whole new mortgage lending procedure. The Notes and Mortgages were securitized and sold once, twice, three times, or more. Using the conventional paradigm, each transfer of the Note or Mortgage of Trust would necessitate the recording of new Assignments of the Mortgage and Note. Each recording, of course, necessitated time and money.

(NOT to be confused with the sale of Servicing Rights, which is just the right to collect payments on Notes and keep a tiny fraction of the payment for Servicing Fees. When a homeowner says their loan was sold, they're usually talking about Servicing Rights.)

## Securitizing a Loan

The practice of selling a loan to Wall Street and private investors is known as securitization. It's a method that requires a lot of thought. The steps for securitizing a debt were generally as follows:

- A Wall Street business would approach other entities and reach an arrangement to issue a "Series of bonds" for sale to investors. In other words, the bond was "pre-sold" by the Wall Street business.
- A Wall Street firm might approach a lender and offer a warehouse line of credit. The loan would be funded through the Warehouse Credit Line. Restrictions imposed by the initial Pooling and Servicing Agreement Guidelines and Mortgage Loan Purchase Agreement would apply to the Warehouse Line. These documents explained the procedures for creating and administering loans before and after they were sold to Wall Street.
- Using the parameters, the lender went out and recruited "buyers" for the loans, people who fit the Purchase Agreement's general characteristics. (The guidelines were fairly broad, and almost anyone could meet them.) The lender would execute and fund the loan, collecting payments until there were enough loans to sell to the Wall Street firm, which could then issue the bonds.
- Once the necessary loans have been funded, the lender sells the loans to the "Sponsor," which is frequently a Wall Street firm's subsidiary or a lender-created corporation. At this point, the loans are divided into "tranches" that will later be converted into bonds.
- The loans were then "sold" to a "Depositor." This was a "Special Function Vehicle" created for a single purpose. The goal was to construct a "bankruptcy remote vehicle" that protects lenders or other entities from what might happen to the loans, and/or protects the loans from the lenders. Once again, the "Depositor" would be created by a Wall Street corporation or a lender.

- The "Depositor" would then deposit the loans with the issuing Corporation, which is a separate entity founded expressly to sell the bonds.
- Finally, the bonds were sold, and a Trustee was appointed to ensure that the bondholders were paid monthly.

WACHOVIA BANK, NATIONAL ASSOCIATION originated mortgage loans as a "correspondent lender." These loans were then sold and transferred to the SECURITIZATION TRUST, a "federally-approved securitization" trust.

The Note and Mortgage had taken two distinctly different paths since Dec. 27, 2006. The Note was securitized into the SECURITIZATION TRUST.  The Mortgage of the subject property still remained the same with the original lender.

The formal agreement that established the SECURITIZATION TRUST was known as a "Pooling and Servicing Agreement (PSA)" and was available on the Securities Exchange Commission's website. A "Prospectus Supplement," also available on the SEC website, explained the Trust. By its provisions, the Trust established a "CLOSING DATE" of December 27, 2006. In this situation, the promissory note was converted to trust property in accordance with the PSA's requirements. The Securities and Exchange Commission receives the Trust agreement under oath. The acquisition of the subject Trust's assets and the PSA is governed by the law.

Given the circumstances, if the Assignment of Mortgage completed after the Trust's Closing Date , would make it void since it breached the Trust instrument's specific requirements.

As required by the Pooling and Servicing Agreement, there was no record of Assignments to either the Sponsor or the Depositor.

## Securitization Summary

- There can be no legal enforcement of the Note if the Mortgage and the Note are not issued by the same organization. The Mortgage protects the lender by enforcing the Note and allowing them to foreclose on the property. As a result, if the Mortgage and the Note are separated, foreclosure is not possible. If each has a distinct mortgage/beneficiary, the Note cannot be enforced by the Mortgage, and there can be no lawful foreclosure on the homeowners' property if the Mortgage is not itself a legally enforceable instrument.

- If the loan was sold, pooled, and transformed into a security, the purported holder would no longer be able to argue that it is a true party of interest because the original lender has been paid in full.

- In addition, once the Note is changed into stock, or a stock equivalent, the Note is no longer a Note. Double dipping occurs when both the Note and the stock or stock equivalent exist at the same time. Security fraud is known as double-dipping.

- Once a loan is securitized, which the aforementioned loan may have been several times, the loan loses its security component (i.e., the Mortgage) and the right to foreclose through the Mortgage is eternally lost.

- According to the findings of this report, the Promissory Note has been permanently converted into stock. As a stock, it is subject to the SEC's laws and regulations, necessitating the completion of registration statements, Pooling and Servicing Agreements, Form 424B-5, and other documents. There is no evidence on record that the Mortgage was ever transferred simultaneously with the supposed legal transfer of the Note, such that the Mortgage and Note were permanently separated, rendering the putative security in a property null and void, as asserted.

- A thorough study and analysis found that this was a securitized debt. The Assignment of Mortgage pretended to be an A to D transaction, but the foreclosing party was concealing the true sales facts of A to B, B to C, and C to D, where A is the original lender, B is the sponsor/seller, C is the bankruptcy-remote depositor, and D is the issuing mortgage-backed securities trust. According to our findings, they also withheld the legal SEC filings that governed the transaction. True original loan Notes and Mortgages required to be given by the Document Custodian confirmed to have been in their possession on the proper dates, to be governed by those SEC filings. As a result, the Trust's claim of ownership cannot be proven, and the loan servicing rights are not established at law by agreement. The examiner provides this as written testimony, and we are available for oral testimony.

# Foreclosure Procedure General Analysis:

**The following section is provided to give a general background on procedutural foreclosure related points in certain states. The banks should follow foreclosure procedure, if they do not follow proper foreclosure procedure, then they foreclosure should be halted for improper procedural or procedural errors.**

**N.Y. C.P.L.R. § 3211**

**PROCEDURAL FORECLOSURE LAWS**

In response to the ongoing foreclosure crisis, the New York State Legislature has enacted a number of procedural and substantive protections for homeowners defending a foreclosure action involving their primary residence ( *see Independence Bank v. Valentine,* 113 A.D.3d 62, 976 N.Y.S.2d 504 [2d Dept.2013] ). Among these new protections was the enactment of CPLR 3408, which, in its original form, provided for a mandatory foreclosure settlement conference in a residential foreclosure action involving a high-cost home loan or a subprime or nontraditional home loan, as those terms were statutorily defined ( *see* L. 2008, ch. 472, § 3). The statute was later amended to apply to *all* residential foreclosure actions involving a primary residence ( *see* L. 2009, ch. 507, § 9).

The legislation also addressed the retroactivity of CPLR 3408 to ongoing foreclosure actions. Curiously, the retroactivity provisions are not located in the CPLR itself, but rather, retroactivity is addressed in an Unconsolidated Law ( *see* Hon. Mark C. Dillon, *The Newly–Enacted CPLR 3408 for Easing the Mortgage Foreclosure Crisis: Very Good Steps, but not Legislatively Perfect,* 30 Pace L. Rev. 855, 870 [2010] ). Specifically, section 3–a of the enacting legislation provided that in "any foreclosure action on a residential mortgage loan, in which the action was initiated prior to September 1, 2008 *but where the final order of judgment has not yet been issued,*" the defendant would be entitled to request a foreclosure settlement conference ( *see* L. 2008, ch. 472, § 3–a). The subsequent legislation, which expanded the applicability of CPLR 3408 to *all* residential foreclosure actions involving a primary residence, amended section 3–a by making it applicable to "any foreclosure action on a home loan, in which in which the action was initiated prior to September 1, 2008 but where the final order of judgment has not been issued" ( *see* L. 2009, ch. 507, § 10

*JP Morgan Chase Bank v. Casanova*, 980 N.Y.S.2d 746, 747-48 (N.Y. Sup. Ct. 2014)

# Forensic Loan Analysis Report

## Carlene McPhillip

### 1513 Patricia Court, Williamstown NJ 08094

# Table of Contents

| Section Title | Page |
|---|---|
| Forensic Audit | 3 |
| Anti-Predatory Lending Violations | 4 |
| Forensic Examination | 6 |
| Forensic Examination Findings | 7 |
| Missing Documents | 8 |
| Mortgage Void/Cancellation | 9 |
| Law Summary | 11 |

**Forensic Audit focuses on Violations of**

**(TILA) Truth In Lending,(RESPA) Real Estate Procedures Acts, and (FDCPA) Fair Debt Collection Practices Act.**

1. A Forensic Loan Audit is an audit on loan documentation to uncover violations and errors. It is an extensive comprehensive review and investigation into the Homeowners/borrowers existing loan.

**The main types of violations are as follows;**

❖ Good Faith Guideline Violations.

❖ Borrower approved for loan they are not able to repay.

❖ Real Estate Procedures Acts Violations

❖ No Net Benefit to Borrower.

❖ Truth-In-Lending Act (TILA) Violations Inaccurate reporting of APR and finance charge calculations on borrower disclosures. Calculation errors which occur as a direct result of failing to include one or more prepaid finance charges in the calculations, incorrect disclosed funding dates, or last-minute changes made to loan by the settlement agent at the closing table. If it is understated, the lender is in violation of the federal Truth-In-Lending Act as well as many state laws prohibiting such actions. Lender is required to reimburse borrower for the difference, and may be subject to statutory damages, administrative sanctions, loan buy-backs, and lawsuits. In addition, the rescission period may reopen, creating additional risk for the lender.

# Anti-Predatory Lending Violations

**These are relating to Consumer Protection laws;**

❖ Violations usually occur because of the misunderstanding of how they work. Examples of violations include failing to include fees such as yield spread premiums in the calculations or using an incorrect loan amount value to perform the calculation. Penalties vary by each law. The usual costs include borrower reimbursements, statutory and punitive damages, attorneys' fees, administrative fines and penalties, loan buy-backs and reformation, and class-action lawsuits.

### State Law Violations;

❖ Examples include illegal prepayment penalty clauses, rates that are usurious, or fees that are not allowed to be charged. Some penalties include actual damages and costs, attorney's fees, administrative fines and penalties, loan buy-backs, and class-action lawsuits.

❖ Reverse Mortgage Violations -These violations include violations relating to reverse mortgage obtained. Some violations include failing to disclose the APR, and providing incomplete or improper disclosures.

❖ Real Estate Settlement Procedures Act (RESPA) Violations-RESPA prohibitions put limits on a lender's and broker's ability to charge or pay fees that are hidden from the borrower. Violations include accepting kickbacks or referral fees, up charging for services provided by 3rd parties, and charging for services not performed.

❖ Penalties include actual damages, administrative fines and class-action lawsuits.

❖ In addition, other violations include lending without providing borrowers a reasonable, tangible net benefit, state-specific disclosure errors, servicing violations, and Fair Lending violations.

If there is one of these types of violations in the loan audit discovered, it could result in some cases repayment of interest back to the borrower/homeowner.

## Constructive Fraud

❖ Material facts relating to the loan, which include terms of the loan. Prepayment penalty or any information which a borrower must know before loan is accepted. Were these facts not properly disclosed to the borrower? Were they mentioned at all?

### Fraud and Negligent Misrepresentation

❖ This is basically any statements comments and representation written or oral by the broker, loan officer, notary which in any way contradicted the terms of the loan documents.

### Negligent Misrepresentation

❖ If the broker/loan officers who worked on the loan make errors which result in misrepresentation, this is classified as negligent misrepresentation.

### Breach of Contract

❖ Any terms in the contract of the note the lender failed to follow, such as the way the interest is calculated and the penalties.

# Forensic Examination

2. This loan application has been audited for the purpose of determining violations of Truth in Lending Act [16 U.S.C. § 1601] ("TILA"), Home Ownership Equity Protection Act [12 C.F.R. 226.32 et seq.] ("HOEPA"), Real Estate Settlement Procedures Act [12 U.S.C. § 2601], and to the extent applicable, violations of other state and federal laws, certain predatory lending practices, and compliance issues.

3. As is standard practice for the process of forensic auditing, this report is based solely on the documentation provided by the borrower requesting my services. The borrower understands that I am required to make reasonable and industry knowledgeable assumptions as to provide disclosures, loan terms, and compliance dates that, if erroneous, may result in differences between my findings and the documents' actual compliance with regulatory requirements.

4. Specific analytical tests were used to determine compliance with various federal regulations including the Real Estate Settlement Procedures Act (RESPA), Truth in Lending Act (TILA), Home Ownership and Equity Protection Act (HOEPA) and Regulation Z. These tests included: a) the reverse engineering and calculation of all required TILA disclosure variables; b) a detailed analysis and review of all loan variables and features; c) an assessment of HOEPA and other disclosure requirements; d) analysis and correct computation of the rescission period; and e) a detailed examination of HUD-1 closing costs. A TILA payment schedule was also prepared with a detailed list of loan terms for informational purposes. For all sections, "NA" indicates that the value, variable or result is not applicable or not available.

# Single Family Home

**Type of Report:** Forensic Mortgage Analysis

**Prepared for:** Carlene McPhillip
**Loan Amount:** $ 238,598
**Loan Date:** November 29, 2017

## Forensic Examination Findings

### Good Faith Estimate and Truth in Lending Statement

5. The Truth In Lending Act states that an initial disclosure is to be issued within three (3) working or business days from the receipt of the loan application. In addition, inclusions, exclusions, and applicable changes to the terms of loan or program must be provided within three (3) working or business days.

6. The Real Estate Settlement Practices Act (RESPA) of 1974 is a response by Congress to perceived abuses in the real estate settlement process. It is an attempt to protect consumer(s) from unnecessarily high settlement charges resulting from certain abuses.

7. RESPA's stated purpose is to bring about specific changes in the agreed or proposed settlement process for residential real estate. Results of this act are as follows:

❖ More accurate and effective advance disclosure of settlement costs to home buyers and to home sellers removal of or elimination of kickbacks and/or referral fees that had a tendency to unnecessarily increase certain settlement service costs.

❖ Reduced Amounts to home buyers to be placed in escrow accounts established to ensure the payment of real estate taxes and insurance fees.

❖ Significant reformation and modernization of local land title record keeping (12 U.S.C.A § 2601)

8. The Real Estate Settlement Practices Act of 1974 is in governance and applies to any "federally related mortgage loan" (excluding loans for temporary financing such as a construction loan that is secured by a first or subordinate lien on residential property, including individual units of condominiums and cooperatives) 12 U.S.C.A. § 2602(1) (A). It also applies to any whole or partial loans by any lender with deposits or accounts that are insured by a federal agency and/or a lender that is regulated by the federal government 12 U.S.C.A. § 2602(1) (B) (i).

## Missing Documents

**File is missing initial and final disclosure documents, including but not limited to:**

**Per RESPA (Real Estate Settlement Procedures Act- 12 USC 2601 et seq.)**

- ❖ Affiliated Business Arrangement Disclosure
- ❖ Servicing Disclosure Statement
- ❖ Escrow Account Disclosure

**Per ECOA (Equal Credit Opportunity Act- Reg B - 12 CFR 202):**

- ❖ Initial signed & dated Uniform Residential Loan Application (1003)

**Per FCRA (Fair Credit Reporting Act- 15 USC 1681):**

- ❖ Disclosure of Credit Scores
- ❖ Notice to Home Loan Applicant

9. As per both state and federal laws that are mandated for initial disclosures, we noted below that initial disclosure documentation was not found nor provided nor included in this file.

10. If the broker failed to deliver that initial disclosure to the borrower, and then it becomes incumbent for the lender to ensure and confirm that these disclosures were delivered to the borrower on time. If the lender failed to provide these disclosure documents to the borrower within three (3) working or business days for the original date of loan application, then the borrower must complete a sworn statement testifying to that effect.

# Right of Recession/Right to Rescind Mortgage

***Notice Of Right To Cancel*** TILA (***Truth In Lending Act, 15 USC Section 1601 et seq; 12 CFR Part 266***) allows three (3) days to review Disclosure Documents. The referenced "Three Day Right To Cancel" must have a trigger to begin. That trigger is, when the Lender has provided the Borrower with **ALL** of the required Disclosures under ***TILA***, and that the same are true, complete, accurate, and timely provided.

Being as the entire loan/mortgage process and Mortgage Note referenced herein and throughout, was obtained by wrongful acts of fraud, fraudulent inducement, concealment and fraudulent misrepresentation, the Borrower has other recourse, right, and cause of action under numerous State and Federal statutes.

**Pursuant to the United State Supreme Court's decision in <u>Jesinoski v. Countrywide Home Loans, Inc.</u> (2015), 135 S.Ct. 790, TILA gives me, as a borrower, the right to rescind the subject loan until midnight of the third business day following the consummation of the transaction or the delivery of the disclosures required under TILA. I am hereby notifying you, as the creditor, of my intention to do so as you and/or your predecessors have failed to satisfy the TILA disclosure requirements, including but not limited to delivery of a written document to me explaining my rights at the time of the transaction.**

To this date, Lender has **<u>never</u>** provided Borrower with true, complete, accurate or timely documents as required. **<u>ONLY AFTER</u>** such provision has been complied with can the "**3 DAY RIGHT TO CANCEL**" period begin. If the required full Disclosures have not been provided, then the period in which to CANCEL is extended for up to three (3) years, or until Lender moves to foreclose. The records thus far evidence that Borrower has requested to cancel within the three (3) year stipulated time period, while still waiting to receive all truth-in-lending disclosures as required by Federal Law, the same of which has never been received.

A close perusal, and audit of Borrower's note/loan documents have revealed certain Disclosure Violations, and that the Borrower has the remedial right and remedy pursuant to ***UCC 1-201 (32) (34)***, inter alia, to invoke their Right Of Rescission (ROR), as further evidenced by the original **NOTICE OF RIGHT TO CANCEL**. This letter shall constitute **NOTICE** to all Lender(s), Successor(s), and Beneficiaries assigned, and/or appointed.

After sufficient **NOTICE** has been given to Lender, the Lender is required by Federal Law to CANCEL any lien(s), and to CANCEL any security interest on the Borrower's property within twenty (20) days. The Lender must also return any money, interest, fee, and/or property to the Borrower, as well as any money/funds given to any person or fiction in law/entity in connection with said transaction.

In accordance with both State and Federal law or until Lender complies, Borrower may retain the proceeds of the transaction. If it should be "impractical", or "Unfair" for the Borrower to return the property when gross discrepancies, fraud, or other wrongful acts are discovered, then he/she/they may offer its "Reasonable Value".

In the event that the Lender should fail, or refuse to return the Borrower's money offer within twenty (20) days, the Borrower may then regain/acquire all rights to clear title and reconveyance under **Federal law**, **State Statutes**, **Uniform Commercial Code**, and provisions of **TILA**, with the same being supported by the evidence of both public and bank records, and further as attached hereto.

Additionally, Borrower has the right to offer Lender a Reasonable Value. However, the penalties a bank can face for violations of **TILA**, and other State and Federal law can be as much as triple the damages, i.e., triple the amount of the interest the bank stood to fraudulently make off the mortgage/loan transaction. Therefore, the Borrower(s) hereby in good faith makes the following offer: Borrower will forgive Bank/Lender any liability incurred by its wrongful actions, provided Bank/Lender rightfully forgive Borrower(s) the full amount of mortgage/credit the Bank/Lender fraudulently alleged to have given. In addition, Borrower(s) make the one time demand $1, 250,000.00 for any loss, damage, and injury he/she/they have sustained; and that Bank/Lender also immediately remove any/all negative comments on Borrower's credit report attributed to this transaction.

Any default, failures, or non-compliance on the Lender's part to perform as herein directed within twenty (20) days of receipt, shall constitute this **NOTICE OF RIGHT TO CANCEL** as valid and fully agreed/accepted pursuant to the terms and conditions as set forth herein.

**Law Summary and Additional Information Section**
**Real Estate Settlement Procedure Act Law(Respa).**

**§ 3500.6   Special information booklet at time of loan application.**

(a) *Lender to provide special information booklet.* Subject to the exceptions set forth in this paragraph, the lender shall provide a copy of the special information booklet to a person from whom the lender receives, or for whom the lender prepares, a written application for a federally related mortgage loan. When two or more persons apply together for a loan, the lender is in compliance if the lender provides a copy of the booklet to one of the persons applying.

(1) The lender shall provide the special information booklet by delivering it or placing it in the mail to the applicant not later than three business days (as that term is defined in §3500.2) after the application is received or prepared. However, if the lender denies the borrower's application for credit before the end of the three-business-day period, then the lender need not provide the booklet to the borrower. If a borrower uses a mortgage broker, the mortgage broker shall distribute the special information booklet and the lender need not do so. The intent of this provision is that the applicant receive the special information booklet at the earliest possible date.

(2) In the case of a federally related mortgage loan involving an open-ended credit plan, as defined in §226.2(a)(20) of Regulation Z (12 CFR), a lender or mortgage broker that provides the borrower with a copy of the brochure entitled "When Your Home is On the Line: What You Should Know About Home Equity Lines of Credit", or any successor brochure issued by the Board of Governors of the Federal Reserve System, is deemed to be in compliance with this section.

(3) In the categories of transactions set forth at the end of this paragraph, the lender or mortgage broker does not have to provide the booklet to the borrower. Under the authority of section 19(a) of RESPA (12 U.S.C. 2617(a)), the Secretary may issue a revised or separate special information booklet that deals with these transactions, or the Secretary may chose to endorse the forms or booklets of other Federal agencies. In such an event, the requirements for delivery by lenders and the availability of the booklet or alternate materials for these transactions will be set forth in a Notice in the Federal Register. This paragraph shall apply to the following transactions:

(i) Refinancing transactions;

(ii) Closed-end loans, as defined in 12 CFR 226.2(a)(10) of Regulation Z, when the lender takes a subordinate lien;

(iii) Reverse mortgages; and

(iv) Any other federally related mortgage loan whose purpose is not the purchase of a 1- to 4-family residential property.

(b) *Revision.* The Secretary may from time to time revise the special information booklet by publishing a notice in the Federal Register.

(c) *Reproduction.* The special information booklet may be reproduced in any form, provided that no change is made other than as provided under paragraph (d) of this section. The special information booklet may not be made a part of a larger document for purposes of distribution under RESPA and this section. Any color, size and quality of paper, type of print, and method of reproduction may be used so

long as the booklet is clearly legible.

(d) *Permissible changes.* (1) No changes to, deletions from, or additions to the special information booklet currently prescribed by the Secretary shall be made other than those specified in this paragraph (d) or any others approved in writing by the Secretary. A request to the Secretary for approval of any changes shall be submitted in writing to the address indicated in §3500.3, stating the reasons why the applicant believes such changes, deletions or additions are necessary.

(2) The cover of the booklet may be in any form and may contain any drawings, pictures or artwork, provided that the words "settlement costs" are used in the title. Names, addresses and telephone numbers of the lender or others and similar information may appear on the cover, but no discussion of the matters covered in the booklet shall appear on the cover.

(3) The special information booklet may be translated into languages other than English.

Truth In Lending (TILA)
Regulation Z

Regulation Z (12 CFR 226) implements the Truth in Lending Act (TILA) (15 USC 1601 et seq.), which was enacted in 1968 as title I of the Consumer Credit Protection Act (Pub. L. 90-321). Since its implementation, the regulation has been amended many times to incorporate changes to the TILA or to address changes in the consumer credit marketplace.

During the 1980s, Regulation Z was changed significantly, first in connection with the Truth in Lending Simplification and Reform Act of 1980. In 1981, all consumer leasing provisions in the regulation were transferred to the Board's Regulation M. During the late 1980s, Regulation Z was amended to implement the rate limitations for home-secured loans set forth in section 1204 of the Competitive Equality Banking Act of 1987 and to require disclosures for adjustable-rate mortgage loans. Other Regulation Z amendments implemented the Fair Credit and Charge Card Disclosure Act of 1988 and the Home Equity Loan Consumer Protection Act of 1988, which required disclosure of key terms at the time of application.

Purpose of the TILA and Regulation Z

The Truth in Lending Act is intended to ensure that credit terms are disclosed in a meaningful way so that consumers can compare credit terms more readily and more knowledgeably. Before its enactment, consumers were faced with a vast array of credit terms and rates. It was difficult to compare loans because the terms and rates were seldom presented in the same format. Now, all creditors must use the same credit terminology and expressions of rates. In addition to providing a uniform system for disclosures, the act is designed to

- Protect consumers from inaccurate and unfair credit billing and credit card practices
- Provide consumers with rescission rights
- Provide for rate caps on certain dwelling-secured loans
- Impose limitations on home equity lines of credit and certain closed-end home mortgages

Determination of the
Finance Charge and the APR

Finance Charge (Open-End and Closed-End Credit) (§ 226.4)

The *finance charge* is a measure of the cost of consumer credit represented in dollars and cents. Along with APR disclosures, the disclosure of the finance charge is central to the uniform credit cost disclosure

envisioned by the TILA.

Generally, the finance charge includes any charges or fees payable directly or indirectly by the consumer and imposed directly or indirectly by the financial institution either incident to or as a condition of an extension of consumer credit. For example, the finance charge on a loan always includes any interest charges and, often, other charges, such as points, transaction fees, or service fees.

Regulation Z provides examples, applicable to both open-end and closed-end credit transactions, of what must, must not, or need not be included in the disclosed finance charge (section 226.4(b)).

*Calculation of the Finance Charge (Closed-End Credit)*

One of the more complex tasks under Regulation Z is determining whether a charge associated with an extension of credit must be included in, or excluded from, the disclosed finance charge. The finance charge initially includes any charge that is, or will be, connected with a specific loan. Charges imposed by third parties are finance charges if the institution requires use of the third party. Charges imposed by settlement or closing agents are finance charges if the institution requires the specific service that gave rise to the charge and the charge is not otherwise excluded.

The "Finance Charges" diagram summarizes included and excluded charges and may be helpful in determining whether a loan-related charge is a finance charge.

**§ 226.4 Finance charge.**

(a) *Definition.* The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

(1) *Charges by third parties.* The finance charge includes fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor:

(i)  Requires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can choose the third party; or

(ii)  Retains a portion of the third-party charge, to the extent of the portion retained.

(2) *Special rule; closing agent charges.* Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor--

(i)  Requires the particular services for which the consumer is charged;

(ii)  Requires the imposition of the charge; or

(iii)  Retains a portion of the third-party charge, to the extent of the portion retained.

(3) *Special rule; mortgage broker fees.* Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the consumer to use a mortgage broker and even if the creditor does not retain any portion of the charge.

(b) *Examples of finance charges.* The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:

(1)  Interest, time price differential, and any amount payable under an add-on or discount system of additional charges.

(2)  Service, transaction, activity, and carrying charges, including any charge imposed on a checking or other transaction account to the extent that the charge exceeds the charge for a similar account without a credit feature.

(3)  Points, loan fees, assumption fees, finder's fees, and similar charges.

(4)  Appraisal, investigation, and credit report fees.

(5)  Premiums or other charges for any guarantee or insurance protecting the creditor against the consumer's default or other credit loss.

(6)  Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.

(7)  Premiums or other charges for credit life, accident, health, or loss-of-income insurance, written in connection with a credit transaction.

(8)  Premiums or other charges for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction.

(9)  Discounts for the purpose of inducing payment by a means other than the use of credit.

(10)  Charges or premiums paid for debt cancellation or debt suspension coverage written in connection with a credit transaction, whether or not the coverage is insurance under applicable law.

(c)  *Charges excluded from the finance charge.* The following charges are not finance charges:

(1)  Application fees charged to all applicants for credit, whether or not credit is actually extended.

(2)  Charges for actual unanticipated late payment, for exceeding a credit limit, or for delinquency, default, or a similar occurrence.

(3)  Charges imposed by a financial institution for paying items that overdraw an account, unless the payment of such items and the imposition of the charge were previously agreed upon in writing.

(4)  Fees charged for participation in a credit plan, whether assessed on an annual or other periodic basis.

(5)  Seller's points.

(6)  Interest forfeited as a result of an interest reduction required by law on a time deposit used as security for an extension of credit.

(7)  *Real-estate related fees.* The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount:

(i)  Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii)  Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents.

(iii)  Notary and credit-report fees.

(iv)  Property appraisal fees or fees for inspections to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest-infestation or flood-hazard determinations.

(v)  Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.

(8)  Discounts offered to induce payment for a purchase by cash, check, or other means, as provided in section 167(b) of the Act.

(d)  *Insurance and debt cancellation and debt suspension coverage.* (1) *Voluntary credit insurance premiums.* Premiums for credit life, accident, health, or loss-of-income insurance may be excluded from the finance charge if the following conditions are met:

(i)  The insurance coverage is not required by the creditor, and this fact is disclosed in writing.

(ii)  The premium for the initial term of insurance coverage is disclosed in writing. If the term of insurance is less than the term of the transaction, the term of insurance also shall be disclosed. The premium may be disclosed on a unit-cost basis only in open-end credit transactions, closed-end credit transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving an insurance plan that limits the total amount of indebtedness subject to coverage.

(iii)  The consumer signs or initials an affirmative written request for the insurance after receiving the disclosures specified in this paragraph, except as provided in paragraph (d)(4) of this section. Any consumer in the transaction may sign or initial the request.

(2)  *Property insurance premiums.* Premiums for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, including single interest insurance if the insurer waives all right of subrogation against the consumer,[5] may be excluded from the finance charge if the following conditions are met:

(i)  The insurance coverage may be obtained from a person of the consumer's choice,[6] and this fact is disclosed. (A creditor may reserve the right to refuse to accept, for reasonable cause, an insurer offered by the consumer.)

(ii)  If the coverage is obtained from or through the creditor, the premium for the initial term of insurance coverage shall be disclosed. If the term of insurance is less than the term of the transaction, the term of insurance shall also be disclosed. The premium may be disclosed on a unit-cost basis only in open-end credit transactions, closed-end credit transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving an insurance plan that limits the total amount of indebtedness subject to coverage.

(3)  *Voluntary debt cancellation or debt suspension fees.* Charges or premiums paid for debt cancellation coverage for amounts exceeding the value of the collateral securing the obligation or for debt cancellation or debt suspension coverage in the event of the loss of life, health, or income or in case of accident may be excluded from the finance charge, whether or not the coverage is insurance, if the following conditions are met:

(i)  The debt cancellation or debt suspension agreement or coverage is not required by the creditor, and this fact is disclosed in writing;

(ii)  The fee or premium for the initial term of coverage is disclosed in writing. If the term of coverage is less than the term of the credit transaction, the term of coverage also shall be disclosed. The fee or premium may be disclosed on a unit-cost basis only in open-end credit transactions, closed-end credit

transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving a debt cancellation agreement that limits the total amount of indebtedness subject to coverage;

(iii) The following are disclosed, as applicable, for debt suspension coverage: That the obligation to pay loan principal and interest is only suspended, and that interest will continue to accrue during the period of suspension.

(iv) The consumer signs or initials an affirmative written request for coverage after receiving the disclosures specified in this paragraph, except as provided in paragraph (d)(4) of this section. Any consumer in the transaction may sign or initial the request.

(4) *Telephone purchases.* If a consumer purchases credit insurance or debt cancellation or debt suspension coverage for an open-end (not home-secured) plan by telephone, the creditor must make the disclosures under paragraphs (d)(1)(i) and (ii) or (d)(3)(i) through (iii) of this section, as applicable, orally. In such a case, the creditor shall:

(i) Maintain evidence that the consumer, after being provided the disclosures orally, affirmatively elected to purchase the insurance or coverage; and

(ii) Mail the disclosures under paragraphs (d)(1)(i) and (ii) or (d)(3)(i) through (iii) of this section, as applicable, within three business days after the telephone purchase.

(e) *Certain security interest charges.* If itemized and disclosed, the following charges may be excluded from the finance charge:

(1) Taxes and fees prescribed by law that actually are or will be paid to public officials for determining the existence of or for perfecting, releasing, or satisfying a security interest.

(2) The premium for insurance in lieu of perfecting a security interest to the extent that the premium does not exceed the fees described in paragraph (e)(1) of this section that otherwise would be payable.

(3) *Taxes on security instruments.* Any tax levied on security instruments or on documents evidencing indebtedness if the payment of such taxes is a requirement for recording the instrument securing the evidence of indebtedness.

(f) *Prohibited offsets.* Interest, dividends, or other income received or to be received by the consumer on deposits or investments shall not be deducted in computing the finance charge.

*[Source: 75 Fed. Reg. 7794, Feb. 22, 2010]*

Continue HERE

Right of Rescission

**§ 226.15 Right of rescission.**

(a) *Consumer's right to rescind.* (1)(i) Except as provided in paragraph (a)(1)(ii) of this section, in a credit plan in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind: each credit extension made under the plan; the plan when the plan is opened; a security interest when added or increased to secure an existing plan; and the increase when a credit limit on the plan is increased.

(ii)  As provided in section 125(e) of the Act, the consumer does not have the right to rescind each credit extension made under the plan if such extension is made in accordance with a previously established credit limit for the plan.

(2)  To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram, or other means of written communication. Notice is considered given when mailed, or when filed for telegraphic transmission, or, if sent by other means, when delivered to the creditor's designated place of business.

(3)  The consumer may exercise the right to rescind until midnight of the third business day following the occurrence described in paragraph (a)(1) of this section that gave rise to the right of rescission, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[36] whichever occurs last. If the required notice and material disclosures are not delivered, the right to rescind shall expire 3 years after the occurrence giving rise to the right of rescission, or upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.

(4)  When more than one consumer has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b)  *Notice of right to rescind.* In any transaction or occurrence subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered in electronic form in accordance with the consumer consent and other applicable provisions of the E-Sign Act). The notice shall identify the transaction or occurrence and clearly and conspicuously disclose the following:

(1)  The retention or acquisition of a security interest in the consumer's principal dwelling.

(2)  The consumer's right to rescind, as described in paragraph (a)(1) of this section.

(3)  How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4)  The effects of rescission, as described in paragraph (d) of this section.

(5)  The date the rescission period expires.

(c)  *Delay of creditor's performance.* Unless a consumer waives the right to rescind under paragraph (e) of this section, no money shall be disbursed other than in escrow, no services shall be performed, and no materials delivered until after the rescission period has expired and the creditor is reasonably satisfied that the consumer has not rescinded. A creditor does not violate this section if a third party with no knowledge of the event activating the rescission right does not delay in providing materials or services, as long as the debt incurred for those materials or services is not secured by the property subject to rescission.

(d)  *Effects of rescission.* (1) When a consumer rescinds a transaction, the security interest giving rise to

the right of rescission becomes void, and the consumer shall not be liable for any amount, including any finance charge.

(2)  Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3)  If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

(4)  The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.

(e)  *Consumer's waiver of right to rescind.* (1) The consumer may modify or waive the right to rescind if the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the right to rescind, and bears the signature of all the consumers entitled to rescind. Printed forms for this purpose are prohibited, except as provided in paragraph (e)(2) of this section.

(2)  The need of the consumer to obtain funds immediately shall be regarded as a bona fide personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during June through September 1993, pursuant to 42 U.S.C. 5170, to be a major disaster area because of severe storms and flooding in the Midwest.[36a] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to paragraph (e)(1) of this section shall expire one year from the date an area was declared a major disaster.

(3)  The consumer's need to obtain funds immediately shall be regarded as a bona fide personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during June through September 1994 to be a major disaster area, pursuant to 42 U.S.C. 5170, because of severe storms and flooding in the South.[36b] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to paragraph (e)(1) of this section shall expire one year from the date an area was declared a major disaster.

(4)  The consumer's need to obtain funds immediately shall be regarded as a bona fide personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during October 1994 to be a major disaster area, pursuant to 42 U.S.C. 5170, because of severe storms and flooding in Texas.[36c] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to paragraph (e)(1) of this section shall expire one year from the date an area was declared a major disaster.

(f)  *Exempt transactions.* The right to rescind does not apply to the following:

(1)  A residential mortgage transaction.

(2)  A credit plan in which a state agency is a creditor.

*[Reg. Z, 46 FR 20892, Apr. 7, 1981, as amended at 54 FR 24688, June 9, 1989; 58 FR 40583, July 29, 1993; 59 FR 40204, Aug. 5, 1994; 59 FR 63715, Dec. 9, 1994; 66 FR 17338, Mar. 30, 2001; 72 FR 63474, Nov. 9,*

*2007]*

### § 226.22 Determination of annual percentage rate.

(a)  *Accuracy of annual percentage rate.* (1) The annual percentage rate is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made. The annual percentage rate shall be determined in accordance with either the actuarial method or the United States Rule method. Explanations, equations and instructions for determining the annual percentage rate in accordance with the actuarial method are set forth in appendix J to this regulation.[45d]

(2)  As a general rule, the annual percentage rate shall be considered accurate if it is not more than 1/8 of 1 percentage point above or below the annual percentage rate determined in accordance with paragraph (a)(1) of this section.

(3)  In an irregular transaction, the annual percentage rate shall be considered accurate if it is not more than 1/4 of 1 percentage point above or below the annual percentage rate determined in accordance with paragraph (a)(1) of this section.[46]

(4)  *Mortgage loans.* If the annual percentage rate disclosed in a transaction secured by real property or a dwelling varies from the actual rate determined in accordance with paragraph (a)(1) of this section, in addition to the tolerances applicable under paragraphs (a)(2) and (3) of this section, the disclosed annual percentage rate shall also be considered accurate if:

(i)  The rate results from the disclosed finance charge; and

(ii)(A)  The disclosed finance charge would be considered accurate under § 226.18(d)(1); or

(B)  For purposes of rescission, if the disclosed finance charge would be considered accurate under § 226.23(g) or (h), whichever applies.

(5)  *Additional tolerance for mortgage loans.* In a transaction secured by real property or a dwelling, in addition to the tolerances applicable under paragraphs (a)(2) and (3) of this section, if the disclosed finance charge is calculated incorrectly but is considered accurate under § 226.18(d)(1) or § 226.23(g) or (h), the disclosed annual percentage rate shall be considered accurate:

(i)  If the disclosed finance charge is understated, and the disclosed annual percentage rate is also understated but it is closer to the actual annual percentage rate than the rate that would be considered accurate under paragraph (a)(4) of this section;

(ii)  If the disclosed finance charge is overstated, and the disclosed annual percentage rate is also overstated but it is closer to the actual annual percentage rate than the rate that would be considered accurate under paragraph (a)(4) of this section.

(b)  *Computation tools.* (1) The Regulation Z Annual Percentage Rate Tables produced by the Board may be used to determine the annual percentage rate, and any rate determined from those tables in accordance with the accompanying instructions complies with the requirements of this section. Volume I of the tables applies to single advance transactions involving up to 480 monthly payments or 104 weekly payments. It may be used for regular transactions and for transactions with any of the following irregularities: an irregular first period, an irregular first payment, and an irregular final payment. Volume II of the tables applies to transactions involving multiple advances and any type of payment or period

irregularity.

(2)  Creditors may use any other computation tool in determining the annual percentage rate if the rate so determined equals the rate determined in accordance with appendix J, within the degree of accuracy set forth in paragraph (a) of this section.

(c)  *Single add-on rate transactions.* If a single add-on rate is applied to all transactions with maturities up to 60 months and if all payments are equal in amount and period, a single annual percentage rate may be disclosed for all those transactions, so long as it is the highest annual percentage rate for any such transaction.

(d)  *Certain transactions involving ranges of balances.* For purposes of disclosing the annual percentage rate referred to in § 226.17(g)(4) (Mail or telephone orders--delay in disclosures) and (h) (Series of sales--delay in disclosures), if the same finance charge is imposed on all balances within a specified range of balances, the annual percentage rate computed for the median balance may be disclosed for all the balances. However, if the annual percentage rate computed for the median balance understates the annual percentage rate computed for the lowest balance by more than 8 percent of the latter rate, the annual percentage rate shall be computed on whatever lower balance will produce an annual percentage rate that does not result in an understatement of more than 8 percent of the rate determined on the lowest balance.

*[46 FR 20892, Apr. 7, 1981, as amended at 47 FR 756, Jan. 7, 1982; 48 FR 14886, Apr. 6, 1983; 61 FR 49246, Sept. 19, 1996]*

**Variable Rate Loans**

Variable-Rate Loans (§ 226.18(f))

If the terms of the legal obligation allow the financial institution, after consummation of the transaction, to increase the APR, the financial institution must furnish the consumer with certain information on variable rates. Graduated-payment mortgages and step-rate transactions without a variable-rate feature are not considered variable-rate transactions. In addition, variable-rate disclosures are not applicable to rate increases resulting from delinquency, default, assumption, acceleration, or transfer of the collateral. Some of the more important transaction-
specific variable-rate disclosure requirements under section 226.18 follow:

- Disclosures for variable-rate loans must cover the full term of the transaction and must be based on the terms in effect at the time of consummation.
- If the variable-rate transaction includes either a seller buydown that is reflected in a contract or a consumer buydown, the disclosed APR should be a composite rate based on the lower rate for the buydown period and the rate that is the basis for the variable-rate feature for the remainder of the term.
- If the initial rate is not determined by the index or formula used to make later interest rate adjustments, as in a discounted variable-rate transaction, the disclosed APR must reflect a composite rate based on the initial rate for as long as it is applied and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation (that is, the fully indexed rate).
  - If a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the adjustment, from changing to the fully indexed rate, the effect of that rate or payment cap needs to be reflected in the disclosure.
  - The index at consummation need not be used if the contract provides for a delay in implementation of changes in an index value (for example, the contract indicates that future rate changes are based on the index value in effect for some specified period, such as forty-five days before the change date). Instead, the financial institution may use any rate from the date of consummation back to the beginning of the specified period (for example, during the previous forty-five-day period).
- If the initial interest rate is set according to the index or formula used for later adjustments but is set at a value as of a date before consummation, disclosures should be based on the initial interest rate, even though the index may have changed by the consummation date.

For variable-rate consumer loans that are *not* secured by the consumer's principal dwelling or that are secured by the consumer's principal dwelling but have a term of one year or less, creditors must disclose the circumstances under which the rate may increase, any limitations on the increase, the effect of an increase, and an example of the payment terms that would result from an increase (section 226.18(f)(1)).

For variable-rate consumer loans that *are* secured by the consumer's principal dwelling and have a maturity of more than one year, creditors must state that the loan has a variable-rate feature and that disclosures were previously given (section 226.18(f)(2)). Extensive disclosures about the loan program must be provided when consumers apply for such a loan (section 226.19(b)) and throughout the loan term when the rate or payment amount is changed (section 226.20(c)).

**Special Rules for Certain Home Mortgage Transactions**

**Source:**  Reg. Z, 60 FR 15471, Mar. 24, 1995, unless otherwise noted.

**§ 226.31   General rules.**

(a) *Relation to other subparts in this part.* The requirements and limitations of this subpart are in addition to and not in lieu of those contained in other subparts of this part.

(b) *Form of disclosures*—(1) *General.* The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep.

(2) *Electronic communication.* For rules governing the electronic delivery of disclosures, including a

definition of electronic communication, see §226.36.

(c) *Timing of disclosure*—(1) *Disclosures for certain closed-end home mortgages.* The creditor shall furnish the disclosures required by §226.32 at least three business days prior to consummation of a mortgage transaction covered by §226.32.

(i) *Change in terms.* After complying with paragraph (c)(1) of this section and prior to consummation, if the creditor changes any term that makes the disclosures inaccurate, new disclosures shall be provided in accordance with the requirements of this subpart.

(ii) *Telephone disclosures.* A creditor may provide new disclosures by telephone if the consumer initiates the change and if, at consummation:

(A) The creditor provides new written disclosures; and

(B) The consumer and creditor sign a statement that the new disclosures were provided by telephone at least three days prior to consummation.

(iii) *Consumer's waiver of waiting period before consummation.* The consumer may, after receiving the disclosures required by paragraph (c)(1) of this section, modify or waive the three-day waiting period between delivery of those disclosures and consummation if the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the waiting period, and bears the signature of all the consumers entitled to the waiting period. Printed forms for this purpose are prohibited, except when creditors are permitted to use printed forms pursuant to §226.23(e)(2).

(2) *Disclosures for reverse mortgages.* The creditor shall furnish the disclosures required by §226.33 at least three business days prior to:

(i) Consummation of a closed-end credit transaction; or

(ii) The first transaction under an open-end credit plan.

(d) *Basis of disclosures and use of estimates*—(1) *Legal Obligation.* Disclosures shall reflect the terms of the legal obligation between the parties.

(2) *Estimates.* If any information necessary for an accurate disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided, and shall state clearly that the disclosure is an estimate.

(3) *Per-diem interest.* For a transaction in which a portion of the interest is determined on a per-diem basis and collected at consummation, any disclosure affected by the per-diem interest shall be considered accurate if the disclosure is based on the information known to the creditor at the time that the disclosure documents are prepared.

(e) *Multiple creditors; multiple consumers.* If a transaction involves more than one creditor, only one set of disclosures shall be given and the creditors shall agree among themselves which creditor must comply with the requirements that this part imposes on any or all of them. If there is more than one consumer, the disclosures may be made to any consumer who is primarily liable on the obligation. If the transaction is rescindable under §226.15 or §226.23, however, the disclosures shall be made to each consumer who has the right to rescind.

(f) *Effect of subsequent events.* If a disclosure becomes inaccurate because of an event that occurs after

the creditor delivers the required disclosures, the inaccuracy is not a violation of Regulation Z (12 CFR part 226), although new disclosures may be required for mortgages covered by §226.32 under paragraph (c) of this section, §226.9(c), §226.19, or §226.20.

(g) *Accuracy of annual percentage rate.* For purposes of §226.32, the annual percentage rate shall be considered accurate, and may be used in determining whether a transaction is covered by §226.32, if it is accurate according to the requirements and within the tolerances under §226.22. The finance charge tolerances for rescission under §226.23(g) or (h) shall not apply for this purpose.

[Reg. Z, 60 FR 15471, Mar. 24, 1995, as amended at 60 FR 29969, June 7, 1995; 61 FR 49247, Sept. 19, 1996; 66 FR 17339, Mar. 30, 2001]

**Truth In Lending Law: Regulation B**

**§ 202.9  Notifications.**

(a)  *Notification of action taken, ECOA notice, and statement of specific reasons--* (1)  *When notification is required.*  A creditor shall notify an applicant of action taken within:

(i)  30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application;

(ii)  30 days after taking adverse action on an incomplete application, unless notice is provided in accordance with paragraph (c) of this section;

(iii)  30 days after taking adverse action on an existing account; or

(iv)  90 days after notifying the applicant of a counteroffer if the applicant does not expressly accept or use the credit offered.

(2)  *Content of notification when adverse action is taken.*  A notification given to an applicant when adverse action is taken shall be in writing and shall contain a statement of the action taken; the name and address of the creditor; a statement of the provisions of § 701(a) of the Act; the name and address of the federal agency that administers compliance with respect to the creditor; and either:

(i)  A statement of specific reasons for the action taken; or

(ii)  A disclosure of the applicant's right to a statement of specific reasons within 30 days, if the statement is requested within 60 days of the creditor's notification. The disclosure shall include the name, address, and telephone number of the person or office from which the statement of reasons can be obtained. If the creditor chooses to provide the reasons orally, the creditor shall also disclose the applicant's right to have them confirmed in writing within 30 days of receiving the applicant's written request for confirmation.

(3)  *Notification to business credit applicants*. For business credit, a creditor shall comply with the notification requirements of this section in the following manner:

(i)  With regard to a business that had gross revenues of $1 million or less in its preceding fiscal year (other than an extension of trade credit, credit incident to a factoring agreement, or other similar types

of business credit), a creditor shall comply with paragraphs (a)(1) and (2) of this section, except that:

(A)  The statement of the action taken may be given orally or in writing, when adverse action is taken;

(B)  Disclosure of an applicant's right to a statement of reasons may be given at the time of application, instead of when adverse action is taken, provided the disclosure contains the information required by paragraph (a)(2)(ii) of this section; and the ECOA notice specified in paragraph (b)(1) of this section;

(C)  For an application made entirely by telephone, a creditor satisfies the requirements of paragraph (a)(3)(i) of this section by an oral statement of the action taken and of the applicant's right to a statement of reasons for adverse action.

(ii)  With regard to a business that had gross revenues in excess of $1 million in its preceding fiscal year or an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit, a creditor shall:

(A)  Notify the applicant, within a reasonable time, orally or in writing, of the action taken; and

(B)  Provide a written statement of the reasons for adverse action and the ECOA notice specified in paragraph (b)(1) of this section if the applicant makes a written request for the reasons within 60 days of the creditor's notification.

(b)  *Form of ECOA notice and statement of specific reasons--(1)  ECOA notice.*  To satisfy the disclosure requirements of paragraph (a)(2) of this section regarding section 701(a) of the Act, the creditor shall provide a notice that is substantially similar to the following:

The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is [name and address as specified by the appropriate agency listed in appendix A of this regulation].

(2)  *Statement of specific reasons.*  The statement of reasons for adverse action required by paragraph (a)(2)(i) of this section must be specific and indicate the principal reason(s) for the adverse action. Statements that the adverse action was based on the creditor's internal standards or policies or that the applicant, joint applicant, or similar party failed to achieve the qualifying score on the creditor's credit scoring system are insufficient.

(c)  *Incomplete applications--(1)  Notice alternatives.*  Within 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either:

(i)  Of action taken, in accordance with paragraph (a) of this section; or

(ii)  Of the incompleteness, in accordance with paragraph (c)(2) of this section.

(2)  *Notice of incompleteness.*  If additional information is needed from an applicant, the creditor shall send a written notice to the applicant specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application. The creditor shall have no further obligation under this section if the applicant fails to respond within the designated time period. If the applicant supplies the requested information within the designated

time period, the creditor shall take action on the application and notify the applicant in accordance with paragraph (a) of this section.

(3) *Oral request for information.*  At its option, a creditor may inform the applicant orally of the need for additional information. If the application remains incomplete the creditor shall send a notice in accordance with paragraph (c)(1) of this section.

(d) *Oral notifications by small-volume creditors.*  In the case of a creditor that did not receive more than 150 applications during the preceding calendar year, the requirements of this section (including statements of specific reasons) are satisfied by oral notifications.

(e) *Withdrawal of approved application.*  When an applicant submits an application and the parties contemplate that the applicant will inquire about its status, if the creditor approves the application and the applicant has not inquired within 30 days after applying, the creditor may treat the application as withdrawn and need not comply with paragraph (a)(1) of this section.

(f) *Multiple applicants.*  When an application involves more than one applicant, notification need only be given to one of them, but must be given to the primary applicant where one is readily apparent.

(g) *Applications submitted through a third party.*  When an application is made on behalf of an applicant to more than one creditor and the applicant expressly accepts or uses credit offered by one of the creditors, notification of action taken by any of the other creditors is not required. If no credit is offered or if the applicant does not expressly accept or use any credit offered, each creditor taking adverse action must comply with this section, directly or through a third party. A notice given by a third party shall disclose the identity of each creditor on whose behalf the notice is given.

*[Codified to 12 C.F.R. § 202.9]*

*[Section 202.9 amended at 68 Fed. Reg. 13161, March 18, 2003; 72 Fed. Reg. 63451, November 9, 2007, effective January 1, 2008, the mandatory compliance date is November 1, 2008]*

Credit Score Information

"The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change."

"If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer-reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application."

**Fair Credit Reporting Act**

(E) Actions not required under this subsection. This subsection shall not require any person to–

(i) explain the information provided pursuant to subsection (f);

(ii) disclose any information other than a credit score or key factors, as defined in subsection (f);

(iii) disclose any credit score or related information obtained by the user after a loan has closed;

(iv) provide more than 1 disclosure per loan transaction; or

(v) provide the disclosure required by this subsection when another person has made the disclosure to the consumer for that loan transaction.

(F) No Obligation for Content

(i) In general. The obligation of any person pursuant to this subsection shall be limited solely to providing a copy of the information that was received from the consumer reporting agency.

(ii) Limit on liability. No person has liability under this subsection for the content of that information or for the omission of any information within the report provided by the consumer reporting agency.

(G) Person defined as excluding enterprise. As used in this subsection, the term "person" does not include an enterprise (as defined in paragraph (6) of section 1303 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992).

(2) Prohibition on Disclosure Clauses Null and Void

(A) In general. Any provision in a contract that prohibits the disclosure of a credit score by a person who makes or arranges loans or a consumer reporting agency is void.

(B) No liability for disclosure under this subsection- A lender shall not have liability under any contractual provision for disclosure of a credit score pursuant to this subsection.

(G) Person defined as excluding enterprise. As used in this subsection, the term "person" does not include an enterprise (as defined in paragraph (6) of section 1303 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992).

(2) Prohibition on Disclosure Clauses Null and Void

(A) In general. Any provision in a contract that prohibits the disclosure of a credit score by a person who makes or arranges loans or a consumer reporting agency is void.

(B) No liability for disclosure under this subsection- A lender shall not have liability under any contractual provision for disclosure of a credit score pursuant to this subsection.

**The Gramm-Leach-Bliley Act**

**Privacy of Consumer Financial Information**

**A. Consumers**

*Definition*: A "consumer" is an individual who obtains or has obtained a financial product or service from a financial institution that is to be used primarily for personal, family, or household purposes, or that individual's legal representative.

**Examples of Consumer Relationships:**

- Applying for a loan
- Obtaining cash from a foreign ATM, even if it occurs on a regular basis
- Cashing a check with a check-cashing company
- Arranging for a wire transfer

**General Obligations to Consumers:**

- Provide an initial (or "short-form") notice about the availability of the privacy policy if the financial institution shares information outside the permitted exceptions.
- Provide an opt-out notice, with the initial notice or separately, prior to a financial institution sharing nonpublic personal information with nonaffiliated third parties.
- Provide consumers with a "reasonable opportunity" to opt out before disclosing nonpublic personal information about them to nonaffiliated third parties, such as 30 days from the date the notice is mailed.
- If a consumer elects to opt out of all or certain disclosures, a financial institution must honor that opt-out direction as soon as is reasonably practicable after the opt-out is received.
- If you change your privacy practices such that the most recent privacy notice you provided to a consumer is no longer accurate (e.g., you disclose a new category of NPI to a new nonaffiliated third party outside of specific exceptions and those changes are not adequately described in your prior notice), you must provide new revised privacy and opt-out notices.

# Investigative Analysis Report

for

## Carlene McPhillip

1513 Patricia Court, Williamstown NJ 08094

# Investigative Analysis

## Valid License Search:

https://www.njportal.com/DOR/BusinessNameSearch/Search/BusinessName

**Valid License Check:**

A search for UniFirst Mortgage Corp in the New Jersey state corporate business database resulted in a label of "foreign for profit corporation". FR.



A search for Mortgage Electronic Registration Systems in the New Jersey state corporate business database resulted in a label of "foreign for profit corporation". FR.



2

A search for Mr. Cooper in the New Jersey state corporate business database resulted in a label of "Domestic Profit Corporation". DP.



**S-3 Form for Foreclosure**
Failure to submit an S-3 form results in an invalid foreclosure.

# Financial Instrument Form 3005

This form is a HUD security document pursuant to
title 12 USC Section(s) 3701 and 3705. This translates to that the loan servicer
has no permission to do a foreclosure. The only party which can do a
foreclosure is the IRS commisioner whereby the S-3 form is required. Since they have
not filed the S-3 form, the foreclosure action is void as a matter of law.

Thus, they have avoided doing the process listed above.
The foreclosing party or bank then seeks to state that the property is abandoned which in
many cases it is not.
This is now documented tax evasion.

The services must provide the following documents:
HUD 1
1003
1099 Annual Interest Statement
Department of Insurance Registration
Proper Loan Documents
Proper Loan Contract

Thus they must provide all of these documents to show they have authority to even
do a trustee deed upon sale, the IRS form 8300 form has to be reported.

# USC 1441

In effect October 30, 2020 from title 26 Internal Revenue Code Subtitle A Income Taxes
Chapter 3-
Withholding of Tax on Non-Resident aliens and foreign corporations subchapter A-
Nonresident Aliens and Foreign

4

Corporations. This makes the attorney liable for this violation, especially if the attorney is going into court with an invalid claim dealing with the transfer tax. The attorney caused to
change cost and risk of the entire mortgage amount. Which they also create the 1099 form.

Thus filing the 1099 is fraudulent, which results in the attorney and the bank being liable for gross
negligence.


# GAAP

Which means they changed the accounting.
The consumer never agreed for them to their accounting which they never disclosed.
Full disclosure is required under title 5 section 556D.

Thus, the attorney and the servicer is in violation. The question is how did they receive proper authorization.

Possible liability for federal tax evasion scheme Title 26 Section 7201 and 7206.

# Rule 36 summary judgement defense

Civil Code section 1572 states as follows: "Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; 3. The suppression of that which is true, by one having knowledge or belief of the fact; 4. A promise made without any intention of performing it; or, 5. Any other act fitted to deceive."

[https://law.justia.com/cases/california/court-of-appeal/2d/269/299.html](https://law.justia.com/cases/california/court-of-appeal/2d/269/299.html)

# California Consumer Privacy Act

Existing law, the California Consumer Privacy Act of 2018, grants, commencing on January 1, 2020, a consumer various rights with regard to personal information relating to that consumer that is held by a business, including the right to request a business to delete any personal information about the consumer collected by the business, and requires the business to comply with a verifiable consumer request to that effect, unless it is necessary for the business or service provider to maintain the customer's personal information in order to carry out specified acts. The act requires a business that collects personal information about a consumer to disclose the consumer's right to delete personal information described above on its Internet Web site or in its online privacy policy or policies.

**[https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1121](https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1121)**

6

# California Code, Penal Code - PEN § 532f

A person commits mortgage fraud if, with the intent to defraud, the person does any of the following:

(1)  Deliberately makes any misstatement, misrepresentation, or omission during the mortgage lending process with the intention that it be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

(2)  Deliberately uses or facilitates the use of any misstatement, misrepresentation, or omission, knowing the same to contain a misstatement, misrepresentation, or omission, during the mortgage lending process with the intention that it be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

(3)  Receives any proceeds or any other funds in connection with a mortgage loan closing that the person knew resulted from a violation of paragraph (1) or (2) of this subdivision.

(4)  Files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omission.

A person who violates this section is guilty of a public offense punishable by imprisonment in a county jail for not more than one year or by imprisonment pursuant to subdivision (h) of Section 1170 .

Fraud involving a mortgage loan may only be prosecuted under this section when the value of the alleged fraud meets the threshold for grand theft as set out in subdivision (a) of Section 487 .

https://codes.findlaw.com/ca/penal-code/pen-sect-532f.html

# Real Estate Statutes

The Real Estate Settlement Procedures Act (RESPA) prohibits certain deceptive practices in real estate transactions, including payments of kickbacks between real estate agents, construction companies, mortgage brokers, and lenders. Lenders are required to provide a good-faith estimate of a loan's costs, similar to the disclosures required by TILA. A consumer purchasing real estate is also entitled to a comprehensive statement, known as a HUD-1, showing how the purchase price is to be disbursed at closing.

# CASE

[Hoang v. Bank of America NA, No. 17-35993 (9th Cir. 2018)](#)

If a creditor fails to make required disclosures under the Truth in Lending Act (TILA), borrowers are allowed three years from the loan's consummation date to rescind certain loans. However, TILA does not include a statute of limitations outlining when an action to enforce such a rescission must be brought.

The Ninth Circuit applied the analogous state law statute of limitations -- Washington's six year contract statute of limitations -- to TILA rescission enforcement claims. The panel held that plaintiff's TILA claim was timely under Washington's statute of limitations. In this case, the cause of action arose in May 2013 when the Bank failed to take any action to wind up the loan within 20 days of receiving plaintiff's notice of rescission. The panel also held that the district court improperly denied plaintiff leave to amend the complaint.

## Court Description: Truth in Lending Act. The panel reversed the district court's dismissal of an action brought by a borrower against Bank of America, N.A., alleging claims under the Truth in Lending Act ("TILA") after the bank declared the borrower in default on a loan and initiated non-judicial foreclosure proceedings. If a creditor fails to make required disclosures under TILA, borrowers are allowed three years from the loan's consummation date to rescind certain loans. 15 U.S.C. § 1635(f). The borrower sent the bank notice of intent to rescind the loan within three years of the consummation date. The panel held that under Jesinoski v. Countrywide Home Loans, 135 S. Ct. 790, 792 (2015), borrowers may affect rescission of such a loan simply by notifying the creditor of their intent to rescind within the three-year period from the loan's consummation date. The panel further held that because TILA did not include a statute of limitations outlining when an action to enforce such a rescission must be brought, courts must borrow the most analogous state law statute of limitations and apply that limitation period to TILA rescission enforcement claims. The panel held that in Washington, the state's six-year contract statute of limitations was the most analogous statute. The panel rejected the district court's application of TILA's one-year statute of limitations for legal damages claims. The panel also rejected HOANG V. BANK OF AMERICA 3 the bank's argument that Washington's two-year catch-all statute of limitations should apply. Because the borrower brought this action within six years, the district court erred in dismissing the TILA claim as time barred. The panel held that the district court improperly denied the borrower leave to amend the complaint. The district court made its determination based on its determination that amendment would be futile because the claims were time- barred. The panel held that because the borrower's TILA rescission enforcement claim was not time-barred, an amendment by the borrower would not be futile.

[https://law.justia.com/cases/federal/appellate-courts/ca9/17-35993/17-35993-2018-12-06.html](https://law.justia.com/cases/federal/appellate-courts/ca9/17-35993/17-35993-2018-12-06.html)

## Comments

### Predatory Lending

Typically involves it imposing unfair and abusive loan terms on borrowers, often through aggressive sales tactics, taking advantage of a borrower's lack of understanding of complicated transactions, as well as outright deception.

Simply put, predatory lending becomes a crime in California when the lender manages the loan transaction to extract the maximum value for itself without regard for the borrower's ability to repay the loan.

This unfair practices can be justified in court under AB-1201 Unfair Practices Act

https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB1201&search_keywords=consumer+protection

**2 Cal.4th 919 (2016)**

**199 Cal.Rptr.3d 66**

**365 P.3d 845**

**TSVETANA YVANOVA, Plaintiff and Appellant,**
**v.**
**NEW CENTURY MORTGAGE CORPORATION et al., Defendants and Respondents.**

**SEVERINO RIVAC, et al., Plaintiffs,**
**v.**
**NDEX WEST, LLC, et al., Defendants.**

Case No. 13-cv-1417-PJH.

**United States District Court, N.D. California.**

March 22, 2017.

9

# MERS Analysis Report
### for
## Carlene McPhillip
1513 Patricia Court, Williamstown NJ 08094

## Table of Contents

| Section Title | Page |
|---|---|
| MERS Screenshot | 3 |
| MERS License Fraud Analysis | 4-11 |
| Mortgage Note Considerations<br>UCC Excerpt Analysis | 12<br>13 |

## MERS Screenshot

1

22/01/2023, 07:44                                                                                         MERS® ServicerID - Results

MERS®
ServicerID

### 1 Record Matched Your Search

MIN: 1002872-0000056409-4 Note Date: 11/29/2017        MIN Status: Inactive
Servicer:  Nationstar Mortgage LLC                  Phone: (888) 480-2432
Coppell, TX
If you are a borrower on this loan, you can click here to enter additional information and display the Investor name.

Return to Search

---

### MERS Analysis

---

Mers & The Debt

MERS does record the assignment in the actual real property records system. The actual note itself, is the creation of the legal obligation to have the loan/note repaid for the debt. Thus the note is the actual legal document which backs the debt. The debt itself has not been transferred or negotiated by MERS

- MERS does record the assignment in the actual real property records system. The actual note itself, is the creation of the legal obligation to have the loan/note repaid for the debt. Thus the note is the actual legal document which backs the debt. The debt itself has not been transferred or negotiated by MERS

- MERS is not legally entitled to receive monthly payments from the borrower. MERS cannot legally be entitled to benefit from a foreclosure in any sale of the home in a foreclosure sale.

- MERS does not own the mortgage note, thus it cannot attempt to foreclose.

- MERS cannot have any legal claim or interest in the loan interest, the debt, security instrument which MERS serves as a nominee.

**MERS & Securitization**

Mortgage Electronic Registration System (MERS) has been named the beneficiary for this loan. MERS was created to reduce in need of executing and recording of assignment of mortgages, with the idea that MERS would be the mortgagee of record. This would allow "MERS" to foreclose on the property, and at the same time, it would assist the lenders in avoiding the recording of the Assignments of Beneficiary on loans sold. This helped to save money for the lenders in manpower and helped to reduce the costs of recording these notes. It was also designed to "shield" investors from liability as a result of lender misconduct regarding the process of mortgage lending. MERS is imposed to overcome certain laws and other legal requirements dealing with mortgage loans holding an "artificial" entity. Because of designating certain member employees to be MERS corporate officers, the foreclosing agency and MERS "designated officer" has a conflict of interest. MERS and the servicer both have not a beneficial interest in the note even they don't receive the income from the payments. And actually the service employee can't sign the Assignment in the name of MERS because the Assignment execution of MERS employee is illegal. The new party has not executed the Assignment from the actual owner of the note. An assignment will result in a nullity because of a mortgage in the absences of the assignment and physical delivery of the note. It must also bear in mind that the lender or other holder of the note registers the loan on MERS. Thereafter, all sales or assignments of the mortgage loan are accomplished electronically under the

MERS system. MERS never acquires actual physical possession of the mortgage note, nor do they acquire any beneficial interest in the Note.

From the beginning MERS has indicated numerous violations of Unfair and Deceptive Acts and Practices because of  conflicting nature and identity of the servicer and the beneficiary. As these practices were intentionally designed, it misleads the borrower and benefits the lenders.

So the main point becomes, is MERS the Servicer or the foreclosing party? As the Servicer is the party who initiate the foreclosure and they take the documents to their own employee who are designated as a "Corporate Officer of MERS", and who conveniently signs the document for MERS, aren't they the "foreclosing party"?

Is MERS the Beneficial Owner of the Note?

1.      MERS is named after the beneficiary on the Deed of Trust and holding only legal title to the interest granted by Borrower in this Security Instrument...has the right: to exercise any or all of those interest, including, but not limited to, releasing and canceling this security instrument.

2.      MERS can claim to hold the Note but it has not  any actual possession of the Note

3.      MERS don't get any payments or income from the monthly payments. Ultimate Investor gets this money. The Investor has the beneficial interest in the Note because the Investor receiving the payments.

4.      MERS agreement indicates that MERS will comply with the instructions of the holder of mortgage loan promissory notes at all time. It also indicates that "When the beneficial owner  will not give contrary instructions , MER may depends on instructions from the servicer shown on the MERS system in accordance with these rules and the procedures with respect to transfers of beneficial ownership.

5.      MERS is not the beneficial owner of the note that has been testified in Florida Courts.

Assignment of Beneficiary

MERS does not keep the record of the assignment of beneficiary though it is required by law, until the foreclosure process starts and the Notice of Default has been filed, and apparently, only when it appears that the borrower will not be able to reinstate the loan and then foreclosure is inevitable. It maintains itself as the beneficiary throughout the entire process up to foreclosure.

MERS has represented in Florida Courts that its sole purpose is as a system to track mortgages. It has stated that the lenders and servicers do entry for themselves and  it does not do the entries itself, but. When an Assignment of Beneficiary is executed, it is the member servicer or lender that goes to the website, downloads the necessary forms, completes the forms and then takes it to the designated "MERS officer" to sign.

MERS agreements state that MERS and the Member agree that: (i) the MERS System is not a vehicle for creating or transferring beneficial interest in mortgage loans, (ii) transfer of servicing interests reflecting on MERS System are subject to the consent of the beneficial owner.

Since MERS and the servicer both haven't a beneficial interest in the note, they don't receive the income from the payments, and since it is actually an employee of the servicer signing the Assignment in the name of MERS, this begs the question:

Is the assignment executed by the MERS employee even legal, since the actual owner of the note has not executed the assignment to the new party?

A good indicator might be in Sobel v Mutual Development, Inc, 313 So 2d 77 (1st DCA Fla 1975). An assignment of a mortgage in the absence of the assignment and physical delivery of the note in question is a nullity.

Possession of the Note & Holder in Due Course

Coming to the forefront, possession of the Note is a key argument. The foreclosing entity has to

prove possession and ownership of the original Note in order to foreclose. A survey reported that upwards of 40% of the Notes are missing and cannot be found that's why this comes to the forefront. And MERS is once again involved in this.

MERS foreclosure lawsuits often include a Lost, Missing, or Destroyed Affidavit In Judicial Foreclosure states. The Note cannot be found, and that the Note prior to being lost was in the possession of MERS which was "testified" by this affidavit. This has become very problematic for MERS,As they have admitted in Courts that they do not own the Note or even hold the Note. If this is so, then MERS is likely filing fraudulent Affidavits.

When challenged, one defense that MERS uses to support its "legal standing" is that the servicer has possession of the Note and Deed. MERS, by the act of having its own "Officers" as employees of the servicer, entitles it to foreclose on behalf of the servicer and the beneficiary. When confronted with this defense, the response should be for the servicer to produce the note.

It should also be noted that the lender or other holder of the note registers the loan on MERS. Then, under the MERS system all sales or assignments of the mortgage loan are accomplished electronically. MERS never acquires actual physical possession of the mortgage note, and they don't acquire any beneficial interest in the Note.

Securitization Process

Securitization is the name for the process by which the final investor for the loan ended up with the loan. It entailed the following:

1.      Mortgage broker had client who needed a loan and delivered the loan package to the lender.

2.      The lender approved the loan and funded it. This was usually through "warehouse" lines of credit. The lender most of the times used warehouse line instead using their own money and that had been advanced to the lender by major Wall Street firms like J.P. Morgan.

3.      The lender "sold" the loan to the Wall Street lender, earning from 2.5 - 8 points per loan. This entity is known also as the mortgage aggregator.

4. The loan, and thousands like it, are sold together to an investment banker.

5. Securities banker buys loans from Investment banker

6.      Securities banker sells the loans to the final investors, as a Securitized Instrument, where a Trustee is named for the investors, and the Trustee will administer all bookkeeping and disbursement of funds.

7.      The issue with the securitization process is that when the Securitized Instrument was sold, it was split apart and sold in tranches, (in slices like a pie). There were few or no records kept of which notes went into which trancheand there are no records of how many investors bought into each particular tranche. Additionally, there were no

Assignments designed or signed in anticipation of establishing legal standing to foreclose.

8.      Rating Agencies rated the tranches at the request of the Investment Bankers who paid the Rating Agencies.

9.      When the tranches were created, each "slice" was given a rating, "AAA, AA, A, BBB, BB, etc. which tranche got "paid" first out of the monthly proceeds determined the ratings. If significant numbers of loans missed payments, or went into default, then the AAA tranche would receive all money due, and this went on down the line. The bottom tranches with the most risk would receive the leftover money.

These were the first tranches to fail. Even if the defaulting loans were in the AAA tranche, the AAA tranche would still be paid and the lowest tranche would not. Wall Street, after the 2000 Dot.com crash, had large amounts of money sitting on the sidelines, looking for new investment opportunities. Returns on Investments were dismal, and investors were looking for new

opportunities. Wall Street recognized that creating Special Investment Vehicles offered a new investment tool that could generate large commissions.

Other Pertinent Facts of Securitization

1.      In Wall Street pooling agreements they defined in the agreements that the loans that they would accept for each investment vehicle. The lenders were executed agreements by them, with the lenders and then immediately issued warehouse lines of credit to the lenders.

2.      Lenders then informed brokers to know the loan parameters to meet the pooling agreement guidelines and the brokers went out and found the borrowers.

3.      Wall Street took all the loans, packaged them up and sold them as bonds and other security instruments to other investors, i.e. Joe's Pension, and paid off original investors or reissued new line of credit, and earned commissions on both ends.

4.      The process was repeated time and again.

5.      What we do know now is that in most cases, the reality is that the reported lender on the Deed of Trust was NOT the actual lender. The actual lender who lent the money was the Wall Street Investment Bank. They simply rented the license of the lender, so that they would not run afoul of banking regulations and/or avoid liability and tax issues. For all purposes, Wall Street was the true lender and there are arguments that suggest that Disclosures should have been required naming Wall Street as the lender.

Now it can be easier to understand how possession of the Note and ownership of the Note play a vital role. In most cases, which tranche will contain any particular note, it is unknown. And will not it be known how many investors, and who bought the individual tranches without significant and time-consuming investigation.

Hence, any foreclosure that was securitized may be completely unlawful. Without the "True Owners" of the note stepping forward to demand foreclosure,


Assignee Liability

Assignee liability is another issue being contested. Under TILA and RESPA, If on the face of the loan documents gives evident that there are violations of the statutes, then assignees have a significant liability when they assume the loan. Moreover, the question arises as to if assignee liability can be claimed only if there are no violations on the face of the documents.

It is believed that MERS became the "beneficiary" for so many notes to address the Assignee Liability problem. Since MERS works as the beneficiary, and it doesn't keep the record of assignments, it becomes more difficult to determine assignee liability and holder in due course issues.

This could offer "cover" for all the parties who are participating in the Securitization process, since no there were recorded of Assignments and "proof of ownership" of the note could not be easily determined. Tracking the monthly payments made to the investors, determining which party received the monthly payment will be the only way to determined ownership of the Notes. This would be time consuming and likely only Discovery would prove the process necessary to get this information.

In Cazares v Pacific Shore Funding, CD. Cal. Jan 3, 2006, assignee that actively participated in original lender's act and dictated loan terms may be liable under UDAP.

The question then arises as to assignments further down the "chain of title". Under these circumstances, to attack the lenders, the UDAP codes can be utilized. The contracts can be "voided or rescinded for showing fraud and other causes of action, " common law and UDAP codes, especially CA B&P § 17200, and CA Civil Code §1689, which allows for contract rescission.

Litigation and major legal decisions

Mortgage Electronic Registration Systems, Inc. v. Lisa Marie Chong, et al. (United States District Court, District of Nevada)

On December 4, 2009, Judge Dawson found that "MERS provided no evidence that it was the agent or nominee for the current owner of the beneficial interest in the note, it has failed to meet its burden of establishing that it is a real party in interest with standing." He issued his decision in 5 of the 18 cases (In re Chong, In re Pilatich, In re Cortes, In Re Medina and In re O'Dell) on appeal but declined to hold that "MERS would not be able to establish itself as a real party in interest had it identified the holder of the note or provided sufficient evidence of the source of its authority."[17]

Cervantes v. Countrywide Home Loans Inc. (United States District Court, District of Arizona)

On September 24, 2009, the U.S. District Court for the District of Arizona, in Cervantes v. Countrywide Home Loans, Inc., et al., dismissed all federal and state law claims made by three borrowers in a complaint filed against a group of defendants that included MERS. The court discussed whether MERS was a proper beneficiary but only in the context of whether its involvement constituted the tort of fraud on the borrowers. The court found the mere use of MERS was not common law fraud on the borrowers, finding that "Plaintiffs have failed to allege what effect, if any, listing the MERS system as a 'sham' beneficiary on the deed of trust had upon their obligations as borrowers."[18]

The U.S. Court of Appeals for the Ninth Circuit affirmed the trial court's judgment in favor of MERS in a published opinion filed on September 7, 2011.[19] The Court ruled that a borrower had no basis to challenge the standing of an entity like MERS. It also, however, drew attention to a legal reference book's footnote that such a borrower still had a remedy by suing to have the trustee's sale set aside.

Mortgage Electronic Registration Systems, Inc. v. Revoredo, et al. (Florida Third District Court of Appeals)

Both the 3rd District Court of Appeals in Miami and the 2nd District Court of Appeals in Lakeland held that MERS can foreclose. Senior Judge Alan R. Schwartz noted the decision was based in part in the changes in finance and technology over time. "The problem arises from the difficulty of attempting to shoehorn a modern innovative instrument of commerce into nomenclature and legal categories which stem essentially from the medieval English land law," Schwartz wrote.[20]

A related Florida case is BONY Mellon v. Pino. After homeowner Pino had established that bank paperwork was defective, BONY moved to dismiss its own suit, presumably intending to remedy the paperwork and then start a second suit for foreclosure, Florida being a judicial foreclosure state. Pino challenged the bank's right to dismiss its own suit in such a way. As the case neared a hearing at the Florida supreme court, the parties settled. Days later the bank recorded notice at the country recorder that Pino was now the free and clear owner of his house. In other words, the bank let go of its claim, presumably worth many thousands of dollars, to Pino's house, because bank attorneys believed they were likely to lose at the state supreme court, and thus establish a precedent that could cost them a lot of money. Avoiding the precedent was worth more than the lost money lent to Pino. In spite of the bank's action, the court decided to hear the matter to rule on the propriety of the banks "dismiss-fix-sue again" approach. (Brittany Davis, Miami Herald blog, May 10, 2012)

Jewelean Jackson, et. al. v. Mortgage Electronic Registration Systems, Inc. (Minnesota Supreme Court)

On August 14, 2009, the Minnesota Supreme Court ruled that MERS could foreclose under state law as the mortgagee of record.[21]

A class-action lawsuit was filed by homeowners in Delaware to hold MERS responsible for fraudulent fees on foreclosures filed by MERS.[22]

Homeowners have argued in court that their homes could not be foreclosed because MERS deeds of trust were unlawful.[23] In other cases, state appellate courts have held that MERS is permitted to

foreclose mortgage liens when it is the holder of the note and mortgage.

Landmark Nat'l Bank v. Kesler (Kansas Supreme Court)

On August 28, 2009, the Kansas Supreme Court in Landmark National Bank v. Kesler, 2009 Kan. LEXIS 834 (Aug 28, 2009), issued a decision involving MERS that focused on finality of judgments. MERS's involvement with this case arose from the fact that the company did not receive notice of a foreclosure action even though MERS was the mortgagee of record on a junior lien. In the opinion, the court noted that "[e]ven if MERS was technically entitled to notice and service in the initial foreclosure action—an issue that we do not decide at this time—we are not compelled to conclude that the trial court abused its discretion in denying the motions to vacate default judgment and require joinder of MERS…." The case did not affect MERS's standing to foreclose and the company is entitled to receive notice of legal actions when MERS is the mortgagee.[24] The court concluded that MERS had not publicly recorded the chain of title with the relevant registers of deeds in counties across Kansas. The judges determined that a mortgage contract consists of two documents: a deed of trust (which secures the property as collateral) and the promissory note (which indents the borrower to the lender), and determined that "in the event that the mortgage loan somehow separates interests of the note and the deed of trust... with the deed of trust lying with some independent entity... the mortgage may become unenforceable."[25]

On April 30, 2010, a Kansas appellate court in MERS, Inc. v. Graham, 44 Kan. App. 2d 547, 2010 WL 1873567, at **4-**5, interpreted Kesler to mean that MERS in fact does not have standing to foreclose on a mortgage in Kansas where there is no mention of MERS in the promissory note, MERS acts solely as a "nominee" for the lender, and there is no evidence that the promissory note has been assigned to MERS or that MERS otherwise possesses an interest in the promissory note.

MERSCORP, Inc., RESPA Litigation (United States Court of Appeals for the Fifth Circuit)

In 2008, the United States Court of Appeals for the Fifth Circuit dismissed a multi-district class action lawsuit against MERS. The plaintiffs alleged that a small fee charged by mortgage lenders, which was then paid to MERS, violated provisions in the Real Estate Settlement Procedures Act (RESPA). The plaintiffs also argued that MERS unfairly received business referrals from the mortgage lenders. However, the Circuit Judges held that "In exchange for the fee, MERS performed the service of being the permanent record mortgagee in the public land records..." Plaintiffs' complaint was dismissed by the appellate court for failure to state a claim under RESPA.[26]

District of Columbia Attorney General's Enforcement Statement

On October 27, 2010, DC Attorney General Peter Nickels issued a statement which concludes that "a foreclosuring may not be commenced against a D.C. homeowner unless the security interest of the current noteholder is properly supported by public filings with the District's Recorder of Deeds."[27] So in Nickels' view, subsequent transfers of the mortgage on MERS's records will not count unless they were also recorded in D.C.

Gomes v. Countrywide Home Loans (California Court of Appeal for the Fourth Appellate District, Division One)

On February 18, 2011, the California Court of Appeal for the Fourth Appellate District affirmed the sustaining of a demurrer without leave to amend. In an opinion by Justice Joan Irion, the court ruled in favor of MERS in two ways: (1) California's nonjudicial foreclosure statutes did not expressly or impliedly allow a lawsuit simply to determine whether the party initiating a foreclosure was authorized to do so; and (2) even if they did, the plaintiff consented to the use of MERS to initiate the foreclosure when he signed the deed of trust.[28] Gomes expressly cited to and relied upon the state supreme court's 2010 decision in Lu v. Hawaiian Gardens Casino, Inc.,[29] which clarified that a certain conservative method of statutory analysis (first articulated by Associate Justice Frank K. Richardson in 1979 and adopted by a majority of the court in a 1988 opinion by Chief Justice Malcolm M. Lucas) applies to all California statutes, not just the California Insurance Code. Thus, if

the California Legislature has not expressly written a cause of action into a statute, it simply does not exist. The Supreme Court of California denied Gomes's petition for review on May 18, 2011. Gomes' attorney then filed a petition for writ of certiorari in the U.S. Supreme Court in which he attempted to challenge MERS on vaguely articulated due process federal constitutional grounds not previously raised in the lower courts. However, he failed to challenge the constitutionality of the California rule for finding an implied cause of action, which would likely have failed anyway, as the federal rule for finding an implied cause of action is nearly identical. The high court denied the petition on October 11, 2011.

In re Agard (U.S. Bankruptcy Court, Eastern District of New York)

On February 10, 2011, the U.S. Bankruptcy Court for the Eastern District of New York considered a motion for relief from the bankruptcy stay brought by U.S. Bank as the trustee of a securitization trust. U.S. Bank claimed the right to foreclose on the debtor's mortgage in part because of purported assignment of the mortgage from MERS. The court found itself constrained by the Rooker-Feldman doctrine to give effect to a prior state-court judgment of foreclosure, but went on to consider several arguments MERS advanced about its legal status and authority, noting that it had held off on deciding dozens of additional cases until those matters were clarified. The court found that MERS had no power as an agent to assign the mortgage under its rules, its membership agreement, or the terms of the mortgage itself. The court also found that MERS had no power as the mortgagee of record to assign the mortgage: "MERS's position that that it can be both the mortgagee and an agent of the mortgagee is absurd, at best."

The court observed,

MERS and its partners made the decision to create and operate under a business model that was designed large part to avoid the requirements of the traditional mortgage recording process. The Court does not accept the argument that because MERS may be involved with 50% of all residential mortgages in the country, that is reason enough for this Court to turn a blind eye to the fact that this process does not comply with the law.[30]

Residential Funding v. Saurman (Michigan Supreme Court)

In April 2011, in Residential Funding v. Saurman, the Michigan Court of Appeals decided two consolidated cases holding that MERS did not have standing to foreclose non-judicially pursuant to MCL 600.3204(1)(d) because it did not actually own any interest in the debt.[31] The Michigan Supreme Court reversed the decision in an order November 16, 2011, finding that MERS is the owner of an interest in the mortgage because "[MERS'] contractual obligations as mortgagee were dependent upon whether the mortgagor met the obligation to pay the indebtedness which the mortgage secured." However, the court clarified that MERS's status as an "owner of an interest in the indebtedness" does not equate to an ownership interest in the note."

On November 16, 2011, the Michigan Supreme Court, understanding the urgency and potential fallout of this matter, issued a peremptory order, in lieu of granting the appeal, and reversed the Court of Appeals judgment. (Residential Funding Co, LLC v Saurman, 2011 WL 5588929 (Mich, November 1, 2011). The court agreed with the dissenting Court of Appeals opinion, "pursuant to MCL 600.3204(1)(d), Mortgage Electronic Registration System (MERS) is the 'owner . . . of an interest in the indebtedness secured by the mortgage at issue in each of these consolidated cases' because '[MERS] contractual obligations as the mortgagee were dependent upon whether the mortgagor met the obligation to pay the indebtedness which the mortgage secured.'" The Court clarified that "MERS status as an 'owner of an interest in the indebtedness' does not equate to an ownership interest in the note. Rather, as a record-holder of the mortgage, MERS owned a security lien on the property, the continued existence of which was contingent upon the satisfaction of the indebtedness." This interest in the indebtedness . . . authorized MERS to foreclosure by advertisement under MCL 600.3204(1)(d)." (emphasis added).

The court's interpreted MCL 600.3204(1) as inclusive rather than exclusive. The court held those with an "interest in the indebtedness" includes mortgagees of record (such as MERS) and constitutes a category of parties entitled to foreclose by advertisement, along with those who "own the indebtedness" and those who "act as the servicing agent of the mortgage."

Calvo v. HSBC (Court of Appeals of California, Second District, Division Eight)

On September 12, 2011, the California Court of Appeal for the Second District said the complaint (an alleged violation of Section 2932.5 of the California Code which requires the assignee of a mortgagee to record an assignment before exercising a power to sell real property) was irrelevant as it applied only to mortgages, not to deeds of trust.[32]

Robinson v. Countrywide (Court of Appeals of California, Fourth District)

On September 12, the Fourth District Court citing its own May decision in Gomes v. Countrywide, stated that "the statutory scheme...does not provide for a preemptive suit challenging standing. Consequently, plaintiffs' claims for damages for wrongful initiation of foreclosure and for declaratory relief based on plaintiffs' interpretation of section 2924, subdivision (a), do not state a cause of action as a matter of law."[33]

Bain vs. Metropolitan Mortgage Group, Inc. (Washington Supreme Court)

In March 2012, Kristin Bain of Tukwila, WA filed suit against MERS (and a subsidiary) for foreclosing on her house without even disclosing the actual owner of her mortgage.[34]

In August 2012, the Washington Supreme Court ruled with Bain, saying that MERS was not a lawful beneficiary of her deed and did not have the right to appoint trustees. The decision states: "A plain reading of the statute leads us to conclude that only the actual holder of the promissory note or other instrument evidencing the obligation may be a beneficiary with the power to appoint a trustee to proceed with a nonjudicial foreclosure on real property. Simply put, if MERS does not hold the note, it is not a lawful beneficiary".[35]

Electronic signatures and notarizations

Because the MERS system is electronic, it depends on the electronic storage and transmission of legal documents. On the question of notarization of electronic signatures and the honoring of notarized signatures across state lines, the US House of Representatives had passed bills to legalize these steps, and in 2010 the US Senate passed the legislation without debate. However, President Barack Obama publicly opposed the legislation on October 7, 2010. As a result, the bill died, and state laws govern whether electronic signatures can be notarized or whether a notarized signature in one state must be accepted in another.[36]

Controversy

MERS generated much debate, controversy, and criticism among litigators and academics in "some of the most widely read law review articles of the past few years."[37] Dustin A. Zacks,[38] for example, criticized MERS for taking directly inconsistent positions in various courts around the country.[39] Zacks' article found favor with the Bain Court which cited him for the proposition that "MERS's officers often issue assignments without verifying the underlying information, which has resulted in incorrect or fraudulent transfers."[40] Professor Christopher Peterson[41] has similarly argued that MERS is disengenuous in simultaneously claiming to be the mortgagee and the nominee/agent of the lender or trustee.[42] Peterson likened this alleged duplicity to being akin to the two-faced Roman God Janus,[43] while Zacks compared MERS to a "creature more akin to a many-tentacled squid."[44] Peterson's articles on MERS,[45] which also criticize MERS for its allegedly harmful effect on the integrity and transparency of public recording, have been cited by countless anti-MERS litigants[46] and in decisions both adverse and favorable to MERS.[47]

Other academics have criticized MERS on the grounds that its nominal ownership of millions of home loans poses a disastrous risk for mortgage investors should MERS ever declare bankruptcy. Such a bankruptcy could mean that mortgages would "pass into the company's bankruptcy estate

and become available to satisfy creditors' claims."[48] One law professor even suggested scrapping the MERS system entirely, replacing it with an entirely new national recording system.[49]

---

### Mortgage Note Considerations

Since MERS is connected to this mortgage. Considering all of the fraud involved with MERS, this important points/consideration must be considered.

- Original Note has been lost or destroyed
- Note and Deed of Trust have been separated
- MERS fraud involved with this loan
- The right party to foreclosure must have original note, as well as deed of trust to foreclosure, in this case no one entity does. Thus foreclosing on this property is completely fraudulent.

According to the landmark case, Glaski Vs. Bank of America.  The case was determined that in order for a company/financial entity to foreclose on a property, the company/financial entity must have both the mortgage note and the deed of trust together at the time of foreclosure. On this specific loan this is not the case, and the foreclosing entity does not have bot the original mortgage note, nor the deed of trust. Hence the conclusion is that they cannot foreclose.

---

# UCC Excerpt Analysis

According to the UCC below, there could be issues here of proper "assignmee" of the note which is the document of the loan. Thus the assignee or the ones being assigned to possibly cannot enforce the note, and furthermore seeing the MIN MERS number mentioned on the mortgage contract , one can clearly see its "inactive". Which could mean the contract has issues.

"23  o Under what circumstances does delivery of a note qualify as an exchange? As mentioned in UCC Section 3-203(a), a note is transferred "if it is delivered by a person apart from its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." For instance, assume that the payee of a note sells it to an assignee, going to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee won't qualify as a holder (because the note continues to be payable to the payee) but, because the transaction between the payee and the assignee qualifies as an exchange, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the person eligible for enforce it. Thus, the failure to acquire the endorsement of the payee doesn't prevent a person in possession of the note from being the person eligible for enforce it, but demonstrating that status is more difficult. The reason being the person in possession of the note must also demonstrate the purpose of the delivery of the note to it to be able to qualify as the person eligible for enforce."

# Carlene McPhillip

1513 Patricia Court, Williamstown NJ 08094

## Summary of Findings

---

### The Premises

The loan that is the subject of this examination was granted on November 29, 2017. The parties in the promissory note are Carlene McPhillip, the borrower and UniFirst Mortgage Corp., the originating lender. It is a Fixed Rate Note with a term of 30 years to mature on December 1, 2047. It has been endorsed twice. The second endorsement is in blank.

The Mortgage was executed on the same date. The parties are the borrower, the originating lender and MERS which is named as nominee for the lender and mortgagee. This instrument secures the debt of the borrower to the lender including interest thereof. This Mortgage recorded in Gloucester County on November 30, 2017.

On unknown dates, the Fixed Rate Note was endorsed by UniFirst Mortgage Corp. to First Guaranty Mortgage Corp. and in blank by First Guaranty Mortgage Corp. The Mortgage has not been assigned.

It is now owned by the unknown second endorsee.

On September 9, 2022, there was a recorded Lis Pendens in which the borrower is named as defendant but the plaintiff is not named. This document was not presented in this examination.

1

The Main Issue

An assignment of the Mortgage should have been executed simultaneously with an endorsement of the note in order to avoid separating the security instrument from the debt instrument. While an endorsement may be in blank, an assignment is a recorded instrument.

The burden of proof lies with the unknown second endorsee to prove that it has in its actual physical possession both the Fixed Note and the Mortgage together with the documents evidencing the chains of valid endorsements and assignments ending in its favor.

Details of the findings are discussed in the main report.

2